UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

MARITZA IDIAKHEUA,

                              Plaintiff,

                    -against-

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

                              Defendants.

**MEMORANDUM & ORDER**

**20-CV-4169 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Plaintiff Maritza Idiakheua ("Plaintiff") filed a Complaint ("the initial complaint") against the New York State Department of Corrections and Community Supervision ("DOCCS"), the New York State Office of Mental Health ("OMH"), Robert Morton, Ryan Lahey, Andrew C. Urban, and several John and Jane Doe defendants on September 5, 2020. (Dkt. 1.) Following a pre-motion conference and on suggestion of the court, Plaintiff then filed a First Amended Complaint (the "FAC") on February 8, 2021, withdrawing her claims as to the New York State Department of Corrections and Community Supervision and the New York State Office of Mental Health. (Dkt. 22.) After discovery was under way, Plaintiff, with permission of the court, filed a Second Amended Complaint (the "SAC"), against Defendants Lahey, Morton, Urban, Peter M. Horan, Chesney J. Baker, and Rene Yee-Foon (collectively, the "Defendants"), on March 3, 2022. (Dkt. 50.) In the SAC, which is the operative complaint, Plaintiff seeks compensatory damages, punitive damages, and an award of damages for lost wages pursuant to 42 U.S.C § 1983, the Fourteenth Amendment of the United States Constitution, and New York state law relating to negligence. Before this court is the Defendants' motion to dismiss pursuant to Federal Rules of

Procedure 12(b)(1) and 12(b)(6) ("Mot.") (Dkt. 29.) For the reasons stated below, the motion to dismiss is GRANTED in part and DENIED in part.

## I.   BACKGROUND[1]

Plaintiff Maritza Idiakheua is a New York resident whose adult son, Mr. Elvin Suarez, was incarcerated at Downstate Correctional Facility ("Downstate"). Plaintiff brings claims against Robert Morton, the Superintendent of Downstate and Ryan Lahey, the Mental Health Unit Chief at Downstate, (the "Supervisory Defendants") in their individual capacities; Peter Horan, Supervising Offender Rehabilitation Coordinator at Downstate, in his individual capacity; Chesney J. Baker, Licensed Master Social Worker II at the Office of Mental Health, in his individual capacity; Rene Yee-Foon, Forensic Intensive Case Manager, in his individual capacity; and Parole Officer Andrew C. Urban in his individual capacity.

Elvin Suare was diagnosed in 2014 with bipolar and schizoaffective disorders. (SAC ¶ 45.) Mr. Suarez suffers from periodic severe psychotic episodes, during which he may experience hallucinations and delusions, behave violently or destructively, force himself to vomit, and attempt self-harm. (*Id.* ¶ 46.) When properly treated with psychiatric care and medication, Mr. Suarez's condition has been effectively stabilized. (*Id.* ¶ 47.)

In April 2017, Mr. Suarez suffered a psychotic episode and began to break car windows outside the residence he shared with Plaintiff. (*Id.* ¶ 49.) Police arrived on the scene, and he physically struggled with them. (*Id.*) He was arrested and detained at a psychiatric medical center, and he later pled guilty to second-degree

---

[1] The following facts are, unless otherwise noted, taken from the SAC and, for the purposes of this motion to dismiss, are assumed to be true. *See Ark. Pub. Emps. Ret. Sys. v. Bristol-Myers Squibb Co.*, 28 F.4th 343, 349 (2d Cir. 2022).

assault with intent to injure a police officer. (*Id.*) On June 7, 2017, Mr. Suarez was sentenced to a two-year term of incarceration, to be served at, a "level-one" state prison able to provide "the most resources to inmates with mental illness." (*Id.* ¶¶ 49, 50.) He was given the designation of SMI 1-S, "the most serious category of mental health patient." (*Id.* ¶ 25.)

At Downstate, Mr. Suarez went unmedicated and his condition "deteriorated." (*Id.* ¶ 55.) On August 8, 2017, he was engaged in a "violent incident with Downstate corrections officers." (*Id.* ¶ 5.) Defendant Horan then placed Mr. Suarez in segregated confinement and other isolating disciplinary confinement, while Mr. Suarez remained without his psychiatric medication, all allegedly in violation of New York laws and regulations that require DOCCS to provide treatment to inmates with serious mental illness and to divert inmates with serious mental illness from segregated or disciplinary confinement to residential mental health treatment units. (*Id.* ¶¶ 64-70.) Defendants Morton and Lahey personally approved Mr. Suarez's punishment, including the continued escalation of his disciplinary confinement by putting him in "keeplock," or "23-hour lockdown," despite allegedly being aware of the state statutory and state correctional policy bars against doing so for seriously mentally ill inmates. (*Id.* ¶¶ 25, 88 & n.5.) Further, on at least one occasion in August 2017, Plaintiff attempted to visit Mr. Suarez at Downstate, but was told that she could not see him while he was being held in segregated confinement. (*Id.* ¶ 77.)

Mr. Suarez was scheduled to be discharged from Downstate on September 5, 2017. (*Id.* ¶ 96.) A few days before Mr. Suarez's planned release, on or about September 2, 2017, Plaintiff visited Downstate again and this time saw Mr. Suarez. (*Id.* ¶ 111.) At that visit, Mr. Suarez clearly appeared to be suffering from a psychotic episode. (*Id.* ¶ 112.) Plaintiff informed Downstate officials that Mr. Suarez needed medical care, including his psychiatric

medication. (*Id.* ¶ 114.) A prison official responded that no doctors were available to treat Mr. Suarez because it was Labor Day Weekend and offered no further help. (*Id.*) Mr. Suarez was given no medication or other medical treatment between Plaintiff's visit and Mr. Suarez's discharge, and he continued to suffer from severe psychosis throughout that time. (*Id.* ¶¶ 115, 118.)

On September 5, 2017, the day of Mr. Suarez's discharge, Plaintiff arrived at Downstate early in the morning and requested that he be released into her care as soon as possible, so that she could take him directly to receive outpatient psychiatric care at a local hospital. (*Id.* ¶ 116.) Prison officials told Plaintiff that Mr. Suarez would not be released until later in the day, and that he would be driven to her home rather than released onsite. (*Id.* ¶ 117.) That evening—after most outpatient medical services were closed for the day—Defendant Yee-Foon dropped Mr. Suarez off at Plaintiff's home. (*Id.* ¶¶ 14, 119.) Defendant Yee-Foon informed Plaintiff that Mr. Suarez needed to appear at a meeting with his designated parole officer, Defendant Urban, at 9:00 a.m. the next morning, and that failure to appear would violate the terms of supervised release and potentially result in his reincarceration. (*Id.* ¶¶ 15, 119-21.) At the time of discharge, Mr. Suarez was exhibiting clear signs of severe psychosis and Plaintiff wanted to take him to receive immediate treatment, but she feared that he would be held overnight and miss his scheduled parole meeting. (*Id.* ¶¶ 13, 15, 121.)

Plaintiff stayed awake all night to monitor Mr. Suarez's condition and drove him to the parole meeting the next morning. (*Id.* ¶¶ 15-16, 121, 123.) At the meeting, Defendant Urban expressed surprise that Mr. Suarez had been released in such an unstable condition and without medication. (*Id.* ¶¶ 16, 123.) However, Defendant Urban stated that Mr. Suarez could not receive treatment until after his scheduled intake appointment at a community mental health clinic the following day, September 7.

(*Id.*) In the meantime, Parole Officer Urban instructed Plaintiff that Mr. Suarez must apply in-person for Medicaid and other benefits that afternoon. (*Id.*)

After the parole meeting, Plaintiff escorted Mr. Suarez to submit his benefits application and then brought him home. (*Id.* ¶¶ 17, 124-125.) As they entered Plaintiff's apartment, Mr. Suarez became agitated and repeatedly punched and stabbed Plaintiff. (*Id.* ¶ 125-26.) Mr. Suarez fled and was later arrested and charged with assault and attempted murder. (*Id.* ¶ 126.) When arrested, Mr. Suarez was still exhibiting symptoms of psychosis, and stated that he had "encountered a small child" in the apartment prior to the stabbing, though only Mr. Suarez and Plaintiff had been present. (*Id.*) Plaintiff was transported by ambulance to a local hospital and treated for stab wounds. (*Id.* ¶ 125.) She suffered a punctured lung, fractured ribs, lacerations, and a nerve wound in her left arm that continues to limit her range of motion, as well as ongoing anxiety and post-traumatic stress. (*Id.* ¶¶ 130-131.) Mr. Suarez was civilly committed at a psychiatric hospital, where he has received treatment and his condition has improved, and an order of protection was entered that forbids him from seeing Plaintiff. (*Id.* ¶¶ 48, 127-128.)

On September 6, 2019, Plaintiff filed a claim against the State of New York in the New York Court of Claims "based on the same facts and occurrences that are at issue in this matter." (*See* Decl. re Pl.'s Opp. to Defs.' Supp. Mem. (Dkt. 65.) at ¶ 2.) Throughout 2020, Plaintiff sought discovery in that action. (*See id.*) Plaintiff filed her initial complaint in this court on September 5, 2020 against Defendants Morton, Lahey, and Urban as well as against several John and Jane Doe Defendants and state entities. (Dkt. 1.) On January 15, 2021, Defendants Morton, Lahey, and Urban moved to stay discovery pending the outcome of an as-yet-to-be-filed motion to dismiss. (Dkt. 18.) At a February 4, 2021 pre-motion conference, the court granted Plaintiff's motion

to file an amended complaint and Defendant's request for permission to file a motion to dismiss that amended complaint once filed. (*See* Feb. 8, 2021 Minute Entry.) The court also instructed the parties to "move forward with discovery during the pendency of the motion" into the identity of the Doe defendants and in parallel with the ongoing discovery in Plaintiff's case in the New York Court of Claims.[2] (*Id.*) On February 8, 2021, Plaintiff filed the FAC, voluntarily withdrawing her claims against DOCCS and OMH. (Dkt. 22.) On February 26, 2021, Defendants again moved for a stay of discovery. (Dkt. 27.) On April 29, 2021, Magistrate Judge Bulsara denied Defendants' second motion to stay discovery. (Apr. 29, 2021 Text Order.) In June 2021, Plaintiff sought and was granted an extension of time to file a second amended complaint or join new parties. (Dkt. 38; June 28, 2021 Text Order.) In September 2021, December 2021, and January 2022, Defendants sought and were granted extensions of time to complete discovery. (Sept. 20, 2021 Text Order; Dec. 9, 2021 Text Order; Jan. 27, 2022 Text Order.) On all three occasions, the deadline to join new parties or amend the pleadings was also extended. (*Id.*) The deadline for joining new parties or amending the pleadings was eventually set to February 28, 2022. (*Id.*) On February 28, 2022, Plaintiff filed a Motion to amend the complaint as well as a proposed Second Amended Complaint. (Dkt. 47-49.) After receiving leave from the court to do so, Plaintiff

---

[2] Discovery dedicated to determining the identity of John Doe defendants is commonly considered the type of "due diligence" necessary to satisfy C.P.L.R. § 1024, discussed at length below. *See Hogan v. Fischer*, 738 F.3d 509, 519 (2d Cir. 2013) (collecting cases). Plaintiff provided a declaration describing the discovery efforts taken in this case and in the Court of Claims action. (*See* Dkt. 65.) Although not integral to the complaint nor subject to judicial notice, such a declaration or affidavit is regularly considered by courts within this circuit for the purposes of applying C.P.L.R. § 1024 on a motion to dismiss. *See Abreu v. City of New York*, No. 17-CV-6179 (PAE), 2018 WL 3315572, at *1 n.1 (S.D.N.Y. July 5, 2018) (collecting cases).

filed the SAC on March 3, 2022, naming, for the first time, Defendants Horan, Baker, and Yee-Foon in place of the Doe defendants. (Mar. 1, 2022 Text Order; Dkt. 50.) Defendants Baker and Horan were served their respective summons and copies of the SAC on March 7, 2022. (Dkt. 57, 58.) Defendant Yee-Foon was served on March 8, 2022. (Dkt. 59.)

## II. STANDARD OF REVIEW

Defendants seek dismissal of the instant complaint pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Where defendants move to dismiss for lack of subject-matter jurisdiction pursuant to Rule 12(b)(1), a district court must dismiss a complaint when the court "lacks the statutory or constitutional power to adjudicate it." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000). When the court reviews a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), the court accepts as true all allegations of facts made by the plaintiff and draws all reasonable inferences in the plaintiff's favor. See *ATSI Comms., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007). A court will dismiss a complaint for failure to state a claim if it does not "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

## III. DISCUSSION

Defendants move to dismiss Plaintiff's claims against all Defendants, pursuant to 42 U.S.C. § 1983, for violation of her right to Substantive Due Process (SAC ¶¶ 132-35); Plaintiff's state-law claims against the Supervisory Defendants for Negligent Supervision (*Id.* ¶¶ 142-48); and Plaintiff's state-law claims against all Defendants for Negligence and Negligent Infliction of Emotional Distress. (*Id.* ¶¶ 136-41, 149-55.)

### A.  Substantive Due Process Claim under 42 U.S.C. § 1983

#### 1.  Legal Framework

Section 1983 allows an individual to bring suit against persons who, under color of state law, have caused her to be "depriv[ed] of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. "[I]n order to state a claim under § 1983, a plaintiff must allege (1) that the challenged conduct was attributable at least in part to a person acting under color of state law, and (2) that such conduct deprived the plaintiff of a right, privilege, or immunity secured by the Constitution or laws of the United States." *Haley v. Pataki*, 106 F.3d 478, 482 (2d Cir. 1997).

In its 1989 holding in *Deshaney v. Winnebago County Department of Social Services*, the Supreme Court foreclosed due process claims brought pursuant to § 1983 in circumstances where the plaintiff merely alleges harm caused by a *failure* to act, regardless of how dire the consequences of that failure may ultimately have been. *DeShaney v. Winnebago Cnty. Dep't of Soc. Servs.*, 489 U.S. 189, 195 (1989) ("The [Due Process] Clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those interests do not come to harm through other means.") However, the Supreme Court emphasized that in that case, "[w]hile the State may have been aware of the dangers that [petitioner] faced in the free world, it played no part in their creation, nor did it do anything to render him more vulnerable to them." *Id.* at 201.

Like other circuits, the Second Circuit has interpreted this language as implicitly leaving room to impose liability on government actors in a limited number of circumstances where

private actors committed the eventual harm, but government actors helped create the danger. *See Matican v. City of New York*, 524 F.3d 151, 157 (2d Cir. 2008) ("These statements led us to conclude that, by negative implication, the state does infringe a victim's due process rights when its officers assist in creating or increasing the danger that the victim faced at the hands of a third party."). To qualify for this exception to *DeShaney*, a plausible state-created danger claim must sufficiently allege two elements. First, the government actor's conduct must have included an *affirmative* act, not merely instances of failure to act. *Id.* Second, the government actor's behavior must have been "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Id.* at 155 (quoting *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 848 n.8 (1998)).

a. *Affirmative acts*

Since the inception of the state-created danger exception, many courts have been faced with the challenge of determining what constitutes an affirmative act. The Second Circuit has consistently held that conduct that "could be viewed as ratcheting up the threat of danger" and instances where "a reasonable factfinder undoubtedly could conclude that defendants, by their affirmative conduct, enhanced the danger" fit into the bounds of the exception. *Okin v. Vill. of Cornwall-on-Hudson Police Dep't*, 577 F.3d 415, 430 (2d Cir. 2009). This affirmative conduct must also have enhanced the "particular danger" to the eventual victim, "as opposed to the overall public at large." *Sanchez v. City of New York*, 736 F. App'x 288, 291 (2d Cir. 2018) (summary order) (citing *Martinez v. California*, 444 U.S. 277, 284-85 (1980)).

b. *Shocking the conscience*

To meet the threshold for state-created violence, state actors must not only have acted affirmatively but must also have done

so in a manner that shocks the conscience. In its 1998 case *County of Sacramento v. Lewis*, the Supreme Court gave guidance to lower courts seeking to understand what conduct rises to the level of conscience-shocking behavior. "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998). The *Lewis* Court differentiated between conduct that rises to the level of conscience-shocking conduct and behavior that is merely negligent. "We have ... rejected the lowest common denominator of customary tort liability as any mark of sufficiently shocking conduct, and have held that the Constitution does not guarantee due care on the part of state officials[.]" *Id.* at 848-49. "[L]iability for negligently inflicted harm is categorically below the threshold of constitutional due process." *Id.* at 849.

The Second Circuit has also weighed in on the correct standard for shocking the conscience. "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007). Whether deliberately indifferent conduct or "recklessly inflicted harms" rise to this level is "context-dependent." *Okin*, 577 F.3d at 431; *see also Bolmer v. Oliveira*, 594 F.3d 134, 143 (2d Cir. 2010) ("The phrase due process of law formulates a concept less rigid and more fluid than those envisaged in other specific and particular provisions of the Bill of Rights . . . Asserted denial is to be tested by an appraisal of the totality of facts in a given case. That which may, in one setting, constitute a denial of fundamental fairness, shocking to the universal sense of justice, may, in other circumstances, and in the light of other considerations, fall short of such denial.").

Controlling law specifically distinguishes between rapidly-decided-upon and dangerous emergency actions, such as those made by police officers "engaging in high risk pursuit" from actions taken by government officials engaged in reasoned deliberation. *See, e.g., Okin,* 477 F.3d at 432 (finding that because "domestic violence is a known danger that the officers were prepared to address upon the expected occurrence of incidents, the officers who responded to [plaintiff's] complaints had ample time for reflection and for deciding what course of action to take in response to domestic violence . . . . [t]his [was] a case where deliberate indifference [was] the requisite state of mind for showing that defendants' conduct shocks the conscience"); *Pena v. DePrisco,* 432 F.3d 98, 113 (2d Cir. 2005) ("As the very term 'deliberate indifference' implies, the standard is sensibly employed only when actual deliberation is practical.").

No "substantial countervailing interest excuse[s] the State from making provision for the decent care and protection of those it locks up . . .". *Lewis,* 523 U.S. at 851. In *Lombardi,* the Second Circuit specifically contrasted police officers catering to conflicting state interests in the heat of the moment with prison officials acting with deliberation. *Lombardi,* 485 F.3d at 82. On the one hand, police officers "'have obligations that tend to tug against each other' . . . because 'they are supposed to act decisively and to show restraint at the same moment, and their decisions have to be made in haste, under pressure, and frequently without the luxury of a second choice.'" *Id.* (quoting *Lewis,* 523 U.S. at 853). In comparison, prison officials "have 'time to make unhurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations," and therefore their actions are more likely to shock the conscience. *Id.* Nonetheless, in that case's context (health concerns raised by 9/11 World Trade Center recovery workers), decisions made over time rather than in a

hurry can still be "subjected to the pull of competing obligations" and fail to shock the conscience. *Id.* at 82-83.

### c. *Supervisory Liability & Personal Involvement*

Supervisors can only be held liable under § 1983 for their own behavior, not through *respondat superior* or a related doctrine. "To establish the liability of a supervisory official under § 1983, a plaintiff must show the defendant's personal involvement in the alleged constitutional violations." *Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003). To properly allege a supervisor's personal involvement in the alleged violation, plaintiffs must claim that there was "actual direct participation in the constitutional violation," "failure to remedy a wrong after being informed through a report or appeal," "creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue," "grossly negligent supervision of subordinates who committed a violation," or "failure to act on information indicating that unconstitutional acts were occurring." *Id.* (quoting *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003)).

### d. *Qualified Immunity*

In their motion to dismiss, Defendants assert that they are protected by the doctrine of qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* To determine whether a right was clearly established, courts in the Second Circuit must "look to Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a

clearly established right." *Okin*, 577 F.3d at 433. While the Supreme Court has directed lower courts "not to define clearly established law at a high level of generality," *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011), it has also cautioned "that officials can still be on notice that their conduct violates established law even in novel factual circumstances" and "rejected a requirement that previous cases be fundamentally similar." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). On balance, the Circuit's "qualified immunity law does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior." *Hancock v. Cnty. of Rensselaer*, 882 F.3d 58, 69 (2d Cir. 2018).

In summary, "[t]o determine whether a right is clearly established, [the court] look[s] to (1) whether the right was defined with reasonable specificity; (2) whether Supreme Court or court of appeals case law supports the existence of the right in question, and (3) whether under preexisting law a reasonable defendant would have understood that his or her acts were unlawful." *Scott v. Fischer*, 616 F.3d 100, 105 (2d Cir. 2010). And "[e]ven if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the unconstitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the issue." *Jones v. Treubig*, 963 F.3d 214, 236 n.13 (2d Cir. 2020); *see also Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019) ("For law to be clearly established, it is not necessary to identify a case directly on point. But precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate.")

e. *Statute of Limitations & Relation Back*

In enacting 42 U.S.C. § 1983, Congress did not set forth a statute of limitations. Instead, § 1983 claims must be brought within the

appropriate statute of limitations as determined by state law. *Owens v. Okure*, 488 U.S. 235, 249-51 (1989). In New York State, the statute of limitations for actions brought pursuant to § 1983 is three years. *Shomo v. City of New York*, 579 F.3d 176, 181 (2d Cir. 2009); *see also Santiago v. Fischer*, No. 09-CV-1383 (DLI) (RML), 2009 WL 3852001, at *2 (E.D.N.Y. Nov. 18, 2009). Federal law controls the question of when the claim accrues. In the Second Circuit, the claim accrues "when the plaintiff knows or has reason to know the harm." *Connolly v. McCall*, 254 F.3d 36, 41 (2d Cir. 2001).

The Federal Rules of Civil Procedure provide that an amendment to a pleading relates back to the date of the original pleading if "the law that provides the applicable statute of limitations allows relation back." Fed. R. Civ. P. 15(c)(1)(A).[3] As New York state law "provides the applicable statute of limitations" for § 1983 claims, it also provides the rules for relation back. Accordingly, an amended complaint with new defendants can relate back to the date of filing the initial complaint when: (1) both claims arise out of the same conduct, transaction or occurrence, (2) the new party shares a unity of interest with the original defendant and

---

[3] The Federal Rules of Civil Procedure also offer an alternative method for relating back. Fed. R. Civ. P. 15(c)(1)(C) ("An amendment to a pleading relates back to the date of the original pleading when . . . the amendment changes the party or the naming of the party against whom a claim is asserted, if 15(c)(1)(B) is satisfied, and if, within the period provided by Rule 4(m) for serving the summons and complaint, the party to be brought in by amendment: (i) received such notice of the action that it will not be prejudiced in defending on the merits; and (ii) knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity.") However, in cases where the relation back rules of the applicable statute of limitations are more "lenient" than those set forth by Rule 15(c)(1)(C), Rule 15(c)(1)(A) ought to be applied instead. *See Medina v. Seiling*, No. 14-CV-6034 (VSB), 2018 WL 1603857 at *7 (S.D.N.Y. Mar. 29, 2018) (citing *Hogan v. Fischer*, 738 F.3d 509, 518 (2d Cir. 2013)). As such, this court has adopted the relation back standard set forth by Rule 15(c)(1)(A).

should therefore have been on "notice of the institution of the action" such "that he will not be prejudiced in maintaining his defense on the merits," and (3) the new party knew, or should have known, that "but for" mistaken identity regarding the proper defendants, the action would have been brought against them. *Buran v. Coupal*, 87 N.Y.2d 173, 178 (1995); *see also DaCosta v. City of New York*, 296 F. Supp. 3d 569, 606 (E.D.N.Y. 2017)

Under New York Law, "[w]here a complaint identifies John Doe defendants, N.Y. C.P.L.R. § 1024 provides the mechanism for relation back." *Santiago v. City of New York*, No. 15-CV-517 (NGG) (RER), 2016 WL 11447843, at *5 (E.D.N.Y. Sept. 6, 2016), *report and recommendation adopted by* 2016 WL 5395837 (E.D.N.Y. Sept. 27, 2016). A plaintiff's failure to name defendants specifically and corresponding choice to use a Doe pseudonym may constitute "mistaken identity" under the *Buran* test so long as the plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name" and "describe[d] the John Doe party in such form as will fairly apprise the party that he is the intended defendant." *Hogan*, 738 F.3d at 519.

### f. Service of Process

In conjunction with the C.P.L.R. § 1024 relation back requirements, State courts also apply a 120-day deadline for service of process of an amended complaint on newly added defendants. Where newly added defendants had been Doe defendants in the original complaint, New York law requires service on the newly added defendants to occur within 120 days of the *original* complaint. Some federal courts in this circuit have held that because this 120-day rule arises from C.P.L.R. § 306-b, a source of state procedural law focused on proper service of process and roughly analogous to Fed. R. Civ. P. 4(m), it is therefore not properly considered a part of the body of state law on relation

back and is not binding on federal courts. *See, e.g., Vasconcellos v. City of New York*, No. 12-CV-8445 (CM), 2014 WL 4961441, at *10 (S.D.N.Y. Oct. 2, 2014) ("The simple explanation is that § 306-b is a state-law analog of Fed. R. Civ. P. 4(m), which governs service of process and is neither a statute of limitations nor a tolling provision."). These courts have instead chosen to conduct a separate service analysis, applying the 90-day standard for service of a complaint—which, even for Doe defendants, runs from the date of the amended complaint adding the parties—found in the Federal Rules of Civil Procedure. Fed. R. Civ. P. 4(m). *See, e.g., Joseph v. Bute*, No. 16-CV-2004 (PKC) (LB), 2019 WL 181302 at *6 (E.D.N.Y. Jan. 9, 2019). The relevant provision mandates that the court either (1) dismiss a complaint that is not timely served on a defendant within 90 days, (2) "order that service be made within a specified time," or, (3) "if the plaintiff shows good cause for the failure . . . extend the time for service for an appropriate period." *Id.*

Other federal courts in the circuit have followed state courts and relied upon the C.P.L.R. § 306-b standard for service, on the premise that it is part of the "body of state law" the court is applying more generally under Rule 15(c)(1)(A). *See, e.g., Xiaohong Xie v. Furniture Contractor of J.P. Morgan Chase Bank, N.A.*, No. 16-CV-06485 (PGG) (DF), 2019 WL 1213084 at *9 (S.D.N.Y. Feb. 20, 2019). If applying C.P.L.R. § 306-b, "plaintiff[s] must identify and serve the previously unknown defendant within 120 days of [their] filing suit. The 120-day period may be lengthened "upon good cause shown or in the interest of justice" so long as the plaintiffs request such an extension in their motion briefing. *See, e.g., Fisher v. Cnty. of Nassau*, No. 10-CV-0677 (JS) (ETB), 2011 WL 4899926, at *4 (E.D.N.Y. Oct. 13, 2011); *Strada v. City of New York*, No. 11-CV-5735 (MKB), 2014 WL 3490306, at *5 (E.D.N.Y. July 11, 2014) ("[T]he statute of limitations is tolled for up to 120 days during

which the plaintiff must identify the unknown defendants and serve process upon them.").

## 2.   Application

Defendants argue in their motion to dismiss that Plaintiff's § 1983 claims against the defendants not named until the SAC (Defendants Horan, Baker, and Yee-Foon) are barred by the applicable statute of limitations. This court is not persuaded by that argument. Instead, this court applies New York State's three-year statute of limitations for personal injury suits and, pursuant to F.R.C.P. 15(c)(1)(a), uses New York State's C.P.L.R. § 1024 relation back rules for cases where John Doe pseudonyms are eventually replaced by defendants' names. Although the SAC was filed after the three-year statute of limitations had expired, the John Does named in the original complaint do, in this circumstance, constitute "mistaken identity." *Hogan*, 738 F.3d at 519. Plaintiff "exercise[d] due diligence, prior to the running of the statute of limitations, to identify the defendant by name," *id.*, by attempting to conduct discovery regarding the names of these defendants in her Court of Claims action. (Pl.'s Opp. To Defs.' Supp. Mem. (Dkt. 64) at 9-11.)[4] She also successfully "described

---

[4] Plaintiffs have also filed five affidavits relating to their efforts to identify the individual defendants: two attached to their brief in opposition to the motion to dismiss, *see* Dkts. 37-4, 37-5, and three filed in response to a post-briefing order issued by this Court, *see* Dkts. 42 ("Dowd Aff."), 43 ("Polanco Aff."), 44 ("Guzman Aff."). These affidavits are neither integral to the complaint nor subject to judicial notice. *See Glob. Network Comms., Inc. v. City of New York*, 458 F.3d 150, 156 (2d Cir. 2006). Nevertheless, under New York law (which, as the Court has explained, governs the relevant aspect of the parties' dispute), "plaintiffs commencing actions against unidentified defendants are typically required to 'present an affidavit stating that a diligent inquiry has been made to determine the names of such parties." *Williams v. United States*, No. 07 Civ. 3018 (RJS)(THK), 2010 WL 963474, at *12 n.10 (S.D.N.Y. Feb. 25, 2010) (quoting *Luckern v. Lyonsdale Energy Ltd. P'ship*, 654 N.Y.S.2d 543, 546 (4th Dep't 1997)), adopted by 2010 WL 963465 (S.D.N.Y. Mar. 16, 2010). Accordingly,

the John Doe part[ies] in such form as [to] fairly apprise the part[ies] that [they are] the intended defendant[s]." *Id.*

Although the Federal Rules of Civil Procedure mandate service of an amended complaint on defendants within 90 days of filing of the original complaint, the plain language of the rule allows the court to "extend the time for service for an appropriate period" if "plaintiff shows good cause for the failure." Fed. R. Civ. P. 4(m). Accordingly, this court holds that Plaintiff's joining of new parties in the SAC relates back to the initial filing date of the initial complaint and should, in the interest of justice, be permitted to proceed despite having been served on the Defendants more than 90 days after filing of the initial complaint. Plaintiff here has plainly shown "good cause" for the failure to serve Defendants within 90 days. Although, as discussed above, she was diligently attempting to learn the then-John Doe defendants' names, Defendants' counsel in both this case and the Court of Claims case were routinely claiming delays in providing adequate discovery due to COVID-19, seeking stays of said discovery, and making claims that they could not produce requested documents for reasons such as a "microburst tornado . . . [which] created a hole in the roof over the area where Mr. Suarez's file was stored resulting in the files being ripped off the shelves and destroyed." (Pl.'s Opp.

---

courts in this District have considered such affidavits in resolving motions to dismiss similar to this one. *See, e.g., Medina,* 2018 WL 1603857, at *7; *Vasconcellos,* 2014 WL 4961441, at *9; *Laureano v. Goord,* No. 06 Civ. 7845(SHS)(RLE), 2007 WL 2826649, at *6 (S.D.N.Y. Aug. 31, 2007), adopted by 2007 WL 2852770 (S.D.N.Y. Sept. 28, 2007). Defendants have not objected to the Court's consideration of these affidavits—on the contrary, they have treated them as fact. *See* Dkt. 39 at 5–6. Thus the Court has assumed the factual content of plaintiffs' affidavits to be true, without making any findings as to their veracity. *See, e.g., Medina,* 2018 WL 1603857, at *1 n.1. Should evidence later emerge calling into doubt the factual representations in the affidavits, defendants will be at liberty to revisit these issues at summary judgment.

To Defs.' Supp. Mem. (Dkt. 64) at 9-11.) Moreover, the court invoked the latitude afforded to it by Rule 4(m) to "order that service be made within a specified time" when Judge Bulsara granted motions to extend the deadline "for parties to amend the pleadings or join new parties" until September 23, 2021, February 14, 2022, and February 28, 2022. (*Id.* at 11; *see also* June 28, 2021 Text Order; December 9, 2021 Text Order; January 27, 2022 Text Order.)[5]

Plaintiff sufficiently alleges that all Defendants, each of whom was working at the time for either the New York State Department of Corrections or the New York State Office of Mental Health at Downstate and interacted with Mr. Suarez and Plaintiff as part of their work duties, acted "under color of state law." However, the allegations as to what each of the named Defendants did to deprive Plaintiff of a federal constitutional or statutory right vary widely. For all Defendants, the federal right in question is the Fourteenth Amendment substantive due process right to "bodily integrity and safety." (SAC ¶ 134.) Plaintiff alleges deprivation of this constitutional right under a state-created danger theory, based on Defendants' individual roles in Mr. Suarez's care and release, and the danger those actions subsequently caused to Plaintiff. As such, the court addresses the state-created danger element of Plaintiff's § 1983 substantive due process claims as to

---

[5] Even if this court chose to apply the service requirements set forth in C.P.L.R. § 306(b), the outcome would remain the same. The court may lengthen the 120-day period for service "upon good cause shown or in the interest of justice" so long as the plaintiffs request such an extension in their motion briefing. C.P.L.R. § 306(b). Here, Plaintiff repeatedly made motions requesting an extension of time to join new parties, based on the good cause of delays in discovery. (*See* Dkt. 26, 36, 38, 41.) Additionally, Plaintiff clarifies in later briefing that if the court is considering the 120-day standard for service separately from the joining of new parties, the amendment should be allowed in the interest of justice. (Sur-Reply in Opp. To Defs' Mem. at 3) (*See* Dkt. 69.)

each Defendant in turn. Where applicable, the court also addresses the issue of qualified immunity with respect to individual defendants.

### a.   *Defendant Horan*

As stated above, the SAC relates back to the initial complaint as it pertains to adding Defendant Horan as a party because he was sufficiently "on notice." Specifically, the FAC alleged that "Correction Officer Defendants," explicitly defined as including Correction Officers John Does 1-6, "placed Mr. Suarez in segregated confinement" (FAC ¶¶ 25, 40), putting Defendant Horan—the prison official who both initially put Mr. Suarez into the SHU and held the hearing ordering him to remain in keeplock—on clear notice. Whether, having allegedly been provided no relevant documents by the State, the plaintiff correctly identified which office was employing Defendant Horan while he worked as an official in the prison, does not negate this finding that Horan was fairly apprised.

Indeed, the allegations against Defendant Horan contained within the SAC are particularly concrete and sufficient to state a claim of affirmative, conscience-shocking behavior that meets the Second Circuit's threshold for the state-created danger exception. Defendant Horan put Mr. Suarez into segregated confinement in the "SHU" and left him there for two weeks, while he was actively "decompensating," and becoming less stable and more prone to violence. (SAC ¶¶ 7, 35, 80.) Defendant Horan then conducted a disciplinary hearing in August 2017, where, despite the obvious deterioration of Mr. Suarez's mental health, he sentenced him to continued "isolating disciplinary confinement," this time in "keeplock," until the time of his release. (*Id.* ¶¶ 8, 19, 88.) All this was allegedly done in contravention of a state law in place at the time, which "required that level one prisons divert an inmate with a serious mental illness to a residential mental health treatment unit if he is in segregated confinement and could

potentially remain there for longer than 30 days" unless doing so would "pose a substantial risk," in which case those circumstances must be "documented in writing." (*Id.* ¶¶ 70-71.) Other state laws allegedly required "exceptional circumstances" to keep an inmate with "mental illness" in segregated confinement after an assessment at the 14-day mark. (*Id.* ¶ 72.)

Many of the Second Circuit's recent cases on state-created danger have focused on demarcating the boundary of what constitutes "affirmative" conduct, and in particular on determining the point at which sustained failure to act becomes tacit encouragement and therefore, in effect, affirmative. *See e.g., Okin,* 577 F.3d at 430; *Pena,* 432 F.3d at 111; *Dwares v. City of New York,* 985 F.2d 94, 99 (2d Cir. 1993). In analyzing the claim against Defendant Horan, this court need not approach that border. Both initially putting Mr. Suarez in the SHU and later sentencing him to remain in "keeplock" constitute *clearly* affirmative behaviors undertaken by Defendant Horan.

Some of the court's earlier cases deal with similarly outright affirmative conduct. In *Hemphill v. Schott,* a police officer allegedly returned a gun to a private individual—Mr. Torrado—and brought him along on a manhunt despite knowing that Mr. Torrado wanted to "get" the suspect, Mr. Hemphill. 141 F.3d 412, 414-15 (2d Cir. 1998). Predictably, Mr. Torrado then shot Mr. Hemphill several times. *See id.* Similarly, in *Matican,* where the plaintiff was pressured to conduct a sting operation with his drug dealer, Mr. Delvalle, his allegation "that the officers planned the sting in a manner that would lead Delvalle to learn about Matican's involvement [was] sufficiently affirmative to qualify as a state-created danger." *Matican,* 524 F.3d at 158; *see also Davis v. NYC Housing Authority,* 379 F. Supp. 3d 237, 251 (S.D.N.Y. 2019) (holding that the agency "instruct[ing] their employees to mark heating maintenance request tickets as closed within hours of being opened, with a notation that heat was restored, when in

fact heat was not restored and no effort was made to address the complaint" was affirmative conduct); *Snider v. Dylag*, 188 F.3d 51, 55 (2d Cir. 1999) (holding that a correctional officer declaring "open season" on an inmate who was subsequently beaten by other inmates constituted an affirmative action). Putting Mr. Suarez, a man known to become violent when psychotic, in restrictive disciplinary housing as his condition worsened, in alleged violation of state laws on the use of segregated confinement for seriously mentally ill inmates,[6] was an affirmative act directly causing him to be in a state of psychosis when released at his mother's home, thereby increasing the danger to her in particular.

To pass the test put forth by the Circuit in *Matican*, Horan's conduct need not only have been affirmative, it must also "shock the contemporary conscience." *Matican*, 524 F.3d at 155. Most of the facts in the Circuit's prison and probation-related state-created danger cases do not come near the egregiousness of Defendant Horan's alleged actions. Unlike prior cases, Defendant Horan did not merely withhold Mr. Suarez's needed medical care; he placed Mr. Suarez into a context that predictably worsened Mr. Suarez's psychosis. *Cf. McGhie v. Main*, No. 11-cv-3110 (NGG) (JO), 2011 WL 4852268, at *6 (E.D.N.Y. Oct. 12, 2011) (observing that Defendants allowed McGhie's post-release "psychiatric care to lapse" but "nothing in McGhie's Complaint indicate[d] that [defendants'] conduct was outrageous or brutal"). Although the facts themselves are very different, perhaps the Circuit's closest analog in the corrections context for the *severity* of the instant facts can be found in its 1999 holding in *Snider v. Dylag*, where, as stated above, a correctional officer allegedly declared "open season" on an inmate. 188 F.3d at 55.

---

[6] Although not necessary to the decision, the court notes that those laws were meant to protect mentally ill inmates from the scientifically documented negative mental health consequences of such punishments.

This case deals specifically with the effect of solitary confinement and other forms of isolating disciplinary housing. Plaintiffs make a plausible allegation that, given his job duties and the state laws and regulations in place, Defendant Horan knew or should have known that extended solitary confinement or other isolating disciplinary housing penalties would likely accelerate the psychiatric decomposition of an unmedicated individual with Mr. Suarez's diagnoses and well-documented proclivity to become violent as his condition worsens. As such, this allegation rises far beyond the threshold of mere tort negligence and enters the territory of deliberate indifference with eminently foreseeable consequences.

But this does not conclude the inquiry. When assessing whether conduct "shocks the contemporary conscience," the court must also consider the "pulls of competing obligations." *Lewis*, 523 U.S. at 853. In *Snider*, the Second Circuit held that "there were no competing prison interests to be weighed against [an inmate's] right to be fully protected" from violence inflicted by other members of the prison population. *Snider*, 188 F.3d at 55. Here, Defendant Horan did have a competing obligation to keep Downstate's staff and inmates safe from an allegedly aggressive inmate. But the court does not find this competing obligation sufficiently compelling. Plaintiff alleges that alternative procedures existed for protecting others from Mr. Suarez's possible violence, pursuant to which Defendant Horan could have "divert[ed] [Mr. Suarez] to a residential psychiatric treatment program," and given Plaintiff's allegations regarding the nature of Defendant Horan's job duties and the regulations in place, Defendant Horan knew or should have known that such other avenues existed. (SAC ¶ 8.) Accordingly, Defendant Horan's conduct could plausibly be found to "shock the contemporary conscience."

Defendants raise the defense of qualified immunity on behalf of Defendant Horan as well as the other Defendants. In the Second

Circuit, police officers have long been on notice that they can "violate a person's due process rights by affirmatively creating or increasing the risk of private violence against that person." *Okin*, 577 F.3d at 434. Although specificity is required in determining whether the law is clearly established, all reasonable inferences must be drawn in favor of the non-moving party. *See Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013). And, to the extent that qualified immunity exists to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions," *al-Kidd*, 563 U.S. at 743, correctional officers with time to do advance planning prior to making important decisions, would—as compared to police offers making split second life or death decisions—have less rather than more of a claim to this defense. Further, the Second Circuit has held that "[w]here a prison inmate has alleged that he was not protected by prison officials, this court has recognized that 'an inmate who is injured as a result of a prison official's deliberate indifference to his safety may maintain a damage action for the deprivation of his civil rights under the Eighth and Fourteenth Amendments." *Snider*, 188 F.3d at 54. Although Plaintiff's Eighth Amendment rights are not at issue here, the above statement on Fourteenth Amendment rights applies equally to her in this context, as well as to Plaintiffs in custody of the prison.

Recently, Judge Castel in the Southern District of New York held that correctional officers, based on the existing state-created danger case law, have fair warning that they could violate a constitutional right through affirmative conduct that increases the likelihood of intentional violence against a third party even if the case at bar presents nominally "novel factual circumstances." *See Villalobos v. Smith*, No. 20-cv-9736 (PKC), 2022 WL 155760, at *8 (S.D.N.Y. May 16, 2022). This court agrees and holds that Defendant Horan is not entitled to invoke the defense of qualified immunity at the motion to dismiss stage.

24

For the reasons set forth above, Defendants' motion to dismiss Plaintiff's § 1983 substantive due process claim as against Defendant Horan is DENIED.

b. *Defendant Morton*

Plaintiff also sufficiently alleges that Defendant Morton took conscience-shocking affirmative steps that increased the danger Mr. Suarez posed to Plaintiff. Plaintiff alleges that Defendant Morton, in his role as Superintendent of Downstate, was required to (and did) review the penalty imposed on Mr. Suarez by Defendant Horan, and specifically "affirmed" and "sign[ed] off on" the penalty himself, even offering (albeit very limited) written reasons for his decision. (*See* SAC ¶¶ 34, 93 (stating that "Defendant Morton *directly signed off on* Defendants' placement of Mr. Suarez in SHU confinement pursuant to a deprivation order and prior to holding a disciplinary hearing" and "unjustifiably *affirmed* Mr. Suarez's above-guidelines. . . penalty [of 44 total days of disciplinary confinement] as imposed by Defendant Horan. In the 'reason for decision' field, Defendant Morton simply stated, 'this penalty should not be reduced,' with no further justification.") (emphasis added).) Accordingly, Defendant Morton's affirmative conduct was also allegedly a but-for cause of the egregious, conscience-shocking treatment of Mr. Suarez that led to a deprivation of Plaintiff's constitutional rights, much like Defendant Horan.

Defendants argue that the state-created danger claim against Defendant Morton must be dismissed because there is no supervisory liability under § 1983. Indeed, "[i]t is well settled in [the Second] Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010). But Plaintiff does allege specific affirmative conduct and personal involvement by Defendant Morton and other defendants who are supervisors, not that they should be held liable

for the actions of their subordinates, and further asserts that their conduct increased the risk of danger that Mr. Suarez presented to Plaintiff. (SAC ¶ 25. ("Plaintiff alleges that Defendant Morton "directly signed off on Defendants' placement of Mr. Suarez in SHU confinement.").) This plausibly alleges "direct participation in the constitutional violation." *Richardson*, 347 F.3d at 435.

Defendants also argue that Plaintiff has not sufficiently pleaded Defendant Morton's direct contact with Mr. Suarez. However, in *Matican*, the Second Circuit declined to "decide whether the state-created danger exception is limited to cases where state officials had a direct relationship with the third party who caused injury." *Matican*, 524 F.3d at 158 n.7. As discussed above, however, the Circuit's cases make clear that personal involvement in the constitutional violation must be sufficiently alleged. We hold that it has been. Defendants argue without support that personal involvement in the constitutional violation inherently means direct physical interaction with Mr. Suarez himself. This court holds that Plaintiff has sufficiently alleged that Defendant Morton's approval of the plan of discipline constituted direct participation in the violation. Therefore, this court assumes that Defendant Morton can be held liable for his conduct. Moreover, since Defendant Morton's affirmative conduct was so closely related to that of Defendant Horan, this court's previous analyses determining that Defendant Horan's conduct was sufficiently affirmative and conscience-shocking to rise to the level of a constitutional deprivation and that Defendant Horan could not invoke the defense of qualified immunity can be adopted for Defendant Morton. For the reasons set forth above, Defendants' motion to dismiss Plaintiff's § 1983 substantive due process claim as against Defendant Morton is DENIED.

   c.   *Defendant Lahey*

Plaintiff alleges that much like Defendant Morton, Defendant Lahey "was required to review and issue a recommendation on,

and *did review and recommend[]*, Mr. Suarez's above-guidelines disciplinary sanction." (*See* SAC ¶ 92 (emphasis added).) As in the case of Defendant Morton, Defendant Lahey's affirmative conduct had substantially the same effect as that of Defendant Horan. Given that, and the fact that, as a seasoned leader, Defendant Lahey had all the more reason to know this course of action was improper, this court's previous analysis determining that Defendant Horan's conduct was sufficiently affirmative and conscience-shocking to rise to the level of a constitutional deprivation can be adopted for Defendant Lahey. Like Defendants Horan and Morton, Defendant Lahey is also not able to invoke the defense of qualified immunity. For the reasons set forth above, Defendants' motion to dismiss Plaintiff's § 1983 substantive due process claim as against Defendant Lahey is DENIED.

### d. *Defendant Baker*

Like Defendant Horan, Defendant Baker was first named in the SAC. Defendants allege that Plaintiff's § 1983 substantive due process claim as against Defendant Baker is barred by the applicable statute of limitations and relation back rules. In the SAC, Plaintiff alleges that Defendant Baker, a Licensed Master Social Worker II / Prerelease Coordinator employed by OMH but working at Downstate, violated her substantive due process rights. Specifically, Plaintiff alleges that Defendant Baker did so by preparing an "inadequate discharge plan" and deciding to pursue "limited treatment options" after release through "an AOT order, rather than more appropriate treatment options for Mr. Suarez." (SAC ¶¶ 25, 40.) Plaintiff also alleges that Defendant Baker was "responsible for transmitting stale information to DOCCS parole supervision staff that did not adequately account for Mr. Suarez's mental health in the weeks leading up to his release." (*Id.* ¶ 40.) The initial complaint and FAC both make plentiful references to inadequate discharge planning. For this reason, Defendant Baker, who worked at Downstate and allegedly prepared Mr.

Suarez's discharge plan, was given sufficient notice of the instant action.

As such, the court now turns to the merits of Plaintiff's state-created danger claim as against Defendant Baker. The Second Circuit has held that failing to provide any discharge plan whatsoever can constitute deliberate indifference and can shock the conscience. *See Charles v. Orange Cnty.*, 925 F.3d 73, 85-91 (2d Cir. 2019). Defendant Baker took the affirmative step of creating a discharge plan and seeking an Assisted Outpatient Treatment order from a court for mandatory post-release treatment. (*Id* ¶ 34.) Plaintiff's claim is that Defendant Baker did not provide a *robust enough* plan for mental health care after release from a government hospital or prison. Choosing one course of medical treatment rather than another has typically not been held to be a conscience-shocking act meriting a holding of constitutional deprivation. Rather, this has traditionally been seen as an area of broad discretion for government officials. *See, e.g., Darby v. Greenman,* 14 F.4th 124, 129 (2d Cir. 2021) (holding that a situation in which plaintiff disagreed with the prison dentist's "assessment of the severity of his condition and recommendation for treatment" . . . "constitute[d], at most, a difference of opinion about the proper course of treatment . . . not demonstrat[ing] deliberate indifference"). Here too, Defendant Baker's act of proposing a treatment plan that was ultimately inadequate is not so sufficiently conscience-shocking an act as to constitute a violation of the Fourteenth Amendment.

Therefore, although Plaintiff's § 1983 substantive due process claim is not time barred as against Defendant Baker, it falls outside the bounds of the Second Circuit's state-created danger exception. Accordingly, Defendants' motion to dismiss Plaintiff's § 1983 substantive due process claim as against Defendant Baker is GRANTED.

     *e.   Defendant Yee-Foon*

Defendant Yee-Foon, an intensive case manager at Downstate during the events in question, drove Mr. Suarez to Plaintiff's home in the early evening, despite Plaintiff's request that Mr. Suarez be released during business hours of treatment programs and despite noticing that Mr. Suarez was exhibiting "clear signs of mental decompensation." (SAC ¶¶ 14, 119-20.) Although the Second Circuit has not addressed these exact facts, the Tenth Circuit has found that driving a "suicidal and distraught" special education student "to his home and leaving him alone" could be plausibly construed as a sufficiently affirmative action to meet the affirmative conduct prong of that circuit's state-created danger test. *Armijo by & Through Chavez v. Wagon Mound Pub. Schs.,* 159 F.3d 1253, 1264 (10th Cir. 1998). By contrast, in *Martinez v. California,* the Supreme Court held that state officials could not be held liable for an action taken by a parolee five months after he was released, although the decision to release the parolee from prison was itself an action taken by the state. 444 U.S. 277, 285 (1980). *See also Sanchez v. City of New York,* 736 F. App'x 288, 290-91 (2d Cir. 2018) (summary order). To be sure, government officials who release individuals from custody should not be held indefinitely liable for all actions taken by all individuals ever incarcerated once they are out in the world, purely on the basis that the government officials released the individual from custody at some point in the distant past. However, the holding in *Martinez v. California* rested in large part on two key facts that are distinguishable from the case at bar. First, the incident took place five months after his release, rather than within 48 hours. Second, the victim had not "as distinguished from the public at large, faced any special danger," unlike Plaintiff Idiakheua, to whose home Mr. Suarez was directly driven. *Sanchez,* 444 U.S. at 285. For these reasons, Defendant Yee-Foon's behavior is distinguishable from the parole officials' behavior in *Martinez,* and plausibly constitutes affirmative conduct.

His conduct could also fairly be thought of as conscience shocking, and as rising well above the standard of mere negligence. While the pulls of competing obligations might have counseled against keeping Mr. Suarez in prison longer than needed, they would not have counseled in favor of actively bringing a man in Mr. Suarez's condition and with his history of violence directly from his place of incarceration to his mother's home without offering any additional timely support.

Finally, this court's previous analysis as to the defense of qualified immunity for Defendants Horan, Morton, and Lahey, applies to Defendant Yee-Foon as well. For this reason, Defendant Yee-Foon is not permitted to invoke the defense of qualified of immunity. Defendants' motion to dismiss Plaintiffs § 1983 substantive due process claim as against Defendant Yee-Foon is DENIED.

### f.  *Defendant Urban*

Plaintiff fails to state a § 1983 substantive due process claim as against Defendant Urban. Unlike the other Defendants, Defendant Urban did not engage in affirmative conduct with regard to Mr. Suarez. Instead, he failed to act. "It is clear from the cases . . . that to the extent that the plaintiffs allege merely that the individual defendants failed to intercede on the day of the accident, their complaints do not involve sufficient affirmative acts to violate substantive due process rights." *Pena*, 432 F.3d at 110. Plaintiff alleges that Urban "offered no help or guidance," although he made note that Mr. Suarez was unwell and in need of treatment (SAC ¶¶ 16, 19, 25, 123.) He appears to have instead given Plaintiff and Mr. Suarez boilerplate information about the conditions of Mr. Suarez's release, benefits application processes, and available non-emergency psychiatric care. (*See id.* ¶¶ 17, 19, 123.) The state-created danger claim against Defendant Urban is strikingly similar to that which this court dismissed in *McGhie*.

30

2011 WL 4852268, at *5 ("McGhie was not incarcerated or insti-
tutionalized when, as he alleges, he was deprived of necessary
psychiatric care"); *see also Cerbelli v. City of New* York, 600 F.
Supp. 2d 405, 413 (E.D.N.Y. 2009) (holding that a city-run psy-
chiatric facility "did not have a constitutional duty to protect [a
former psychiatric patient] or provide him with medical services
once he was no longer in its custody").

Further, nothing in the SAC with regard to Defendant Urban can
be fairly said to be conscience-shocking or "brutal and offensive
to human dignity." *Lombardi*, 485 F.3d at 81. "Even if Defend-
ants, by allowing [plaintiff's] psychiatric care to lapse, could be
said to have 'created' a danger, they would not be liable . . . unless
their conduct shocked the conscience." *McGhie*, 2011 WL
4852268, at *6. A passive failure to stop private violence will not
suffice to establish a state-created danger, and "[i]t is not enough
to allege that a government actor failed to protect an individual
from a known danger of bodily harm or failed to warn the indi-
vidual of that danger." *Sanchez v. City of New York, 736 F. App'x
288, 291 (2d Cir. 2018)* (summary order). *Accordingly,* Defend-
ants' motion to dismiss Plaintiff's § 1983 substantive due process
claim as against Defendant Urban is GRANTED.

*          *          *

For the reasons discussed above, Defendants' motion to dismiss
Plaintiff's Fourteenth Amendment substantive due process claim
brought pursuant to 42 U.S.C § 1983 is DENIED as to Defendants
Horan, Morton, Lahey, and Yee-Foon and GRANTED as to De-
fendants Baker and Urban.

### B.  State Law Claims

Plaintiffs bring state law claims of negligence and negligent in-
fliction of emotional distress against all Defendants, as well as a
state law claim of negligent supervision against the Supervisory
Defendants. Defendants first argue that the court should not ex-
ercise pendant jurisdiction over *any* of Plaintiff's state law claims

because the federal law claims cannot survive the motion to dismiss. As several federal law claims survive the motion to dismiss, and the claims contained herein all arise from a "common nucleus of operative fact," the court does not find this argument persuasive. *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 725 (1966); 28 U.S.C. § 1367(a). Hence, the court chooses to exercise its pendant jurisdiction.

Defendants' other arguments for dismissing some or all of Plaintiff's state law claims—(1) inconsistency with plaintiffs federal claims, (2) immunity based on New York Correction Law § 24, (3) statute of limitations for medical malpractice, (4) inapplicability of *respondat superior*, and (5) failure to sufficiently allege a duty required for negligent infliction of emotional distress—require more in-depth treatment. Accordingly, the court analyzes each of these arguments in turn.

### 1. Inconsistent claims

Defendants argue that because negligence cannot, by definition, rise to the level of an affirmative action needed to prove deprivation of a constitutional right, *see supra* Part III.A.1.a, negligence claims and state-created danger claims are necessarily exclusive of one another. The question before the court today is merely whether plaintiffs succeed in stating a claim. The claim must, at this time, be "plausible on its face." *Iqbal,* 556 U.S. at 678. To meet this standard, the allegation does not have to be probable, but it must be more than conceivable. *See Twombly,* 550 U.S. at 570. Additionally, "[a] party may set out 2 or more statements of a claim or defense alternatively or hypothetically" and "may state as many separate claims or defenses as it has, regardless of constancy." Fed. R. Civ. P. 8(d)(2) & (3); *See also Henry v. Daytop Vill., Inc.,* 42 F.2d 89, 94 (2d Cir. 1994) (holding that a legal theory did not preclude an incompatible claim pled in the alternative because "[c]larifying all ambiguities in favor of the nonmoving party, [plaintiff's] complaint presents two distinct claims."). At

this early stage of litigation, the court sees no reason that Plaintiff cannot plead plausible claims of both negligence and state-created danger, even if the two ultimately cannot coexist.

> 2. New York Correction Law § 24 immunity for Defendants employed by the New York State Department of Correctional Services (DOCCS)

> a. *Legal Framework*

New York Correction Law § 24 "bars federal suit on state-law claims against [correctional] officers in their individual or personal capacities." *Elder v. McCarthy*, No. 14-CV-6216 (CJS), 2017 WL 2720007 (W.D.N.Y. June 23, 2017), *aff'd in part, rev'd in part on other grounds and remanded*, 967 F.3d 113 (2d Cir. 2020). This state law, which applies to state law claims regardless of whether they are brought in state court or federal court, makes clear that "torts claims against prison officials can only be brought in the Court of Claims for the state of New York." *Id.* Accordingly, federal courts can only invoke their supplemental jurisdiction to hear state tort claims against correctional officers when the conduct falls outside the scope of their employment. *See* N.Y. Correct. § 24.

"An employee's action is deemed to fall within the scope of his or her employment if the act was done while the servant was doing his master's work, no matter how irregularly, or with what disregard of instructions." *Davis v. McCready*, 283 F. Supp. 3d 108 (S.D.N.Y. 2017) (quoting *Ierardi v. Sisco*, 119 F.3d 183, 187 (2d Cir. 1997)). Factors to be considered include "the connection between the time, place and occasion for the act; the history of the relationship between employer and employee as spelled out in actual practice; whether the act is one commonly done by such an employee; the extent of departure from normal methods of performance; and whether the specific act was one that the employer could reasonably have anticipated." *Rivera v. New York*, 34 N.Y.3d 383, 390 (2019).

In analyzing these factors, courts have held correctional officers were acting outside the scope of their employment only when their conduct could not remotely be said to have had any work-related purpose, even a misguided one. In *Ierardi v. Sisco*, the Second Circuit held that sexual harassment of a fellow DOCCS employee was "not undertaken in the discharge of [the harassing correctional officer's] duties," was "prompted purely by personal reasons unrelated to the employer's interest," and was therefore not within the scope of employment. 119 F.3d at 188. In *Rivera*, a correctional officer who brutally beat up an inmate in the cafeteria without any provocation or misbehavior by the inmate was held to be acting outside the scope of his employment. *See* 34 N.Y.3d at 385-86, 391-92. These cases have been distinguished from instances where "officers involved were endeavoring to do their job—perhaps poorly—at the time of the charged transgressions." *Ierardi*, 119 F.3d at 188.

### b. Application

Plaintiffs argue that New York Corrections Law § 24 does not apply here. This court disagrees. Plaintiffs would only be able to bring state law claims against the Defendants employed by DOCCS—Defendants Morton and Urban—if those defendants had acted outside the scope of their employment. Defendant Morton is alleged to have egregiously broken the rules governing how prison officials should punish seriously mentally ill inmates housed at Downstate. But, as outrageous as his methods for doing so may have been, penalizing inmates who behave violently within the prison is certainly within the scope of a prison superintendent's scope of employment.

Defendant Urban is alleged to have "informed [plaintiff] that Mr. Suarez was required to apply for Medicaid benefits and attend his psychiatric intake appointment [the following morning] before he could receive treatment[.]" (SAC ¶ 17.) Given the state Mr. Suarez was in at their meeting, Defendant Urban appears to

34

have been doing his job as a parole officer poorly, but he does appear to have been doing his job.

For this reason, Defendants' motion to dismiss all state law claims brought against Defendants Morton and Urban is GRANTED.

### 3. Statute of Limitations for Medical Malpractice pursuant to C.P.L.R § 214-a

Defendants argue that the negligence claims against Defendants Lahey and Baker should be read as medical malpractice claims and are therefore barred by the applicable statute of limitations.

#### a. *Legal Framework*

C.P.L.R § 214(5) provides a three-year statute of limitations for state law negligence actions, but C.P.L.R § 214-a specifies a shorter statute of limitations of just two years and six months for "medical, dental or podiatric malpractice" claims. C.P.L.R §§ 214, 214-a. The New York Court of Appeals has held that "negligence in furnishing medical treatment to a plaintiff" is different from "failure in fulfilling a different duty," even if it is a medical actor in question. *See Bleiler v. Bodnar,* 65 N.Y.2d 65, 73 (1985). A negligence claim directly relating to a physician or nurse's provision of mental health care is likely to be "substantially related to medical treatment" and "therefore properly viewed as a medical malpractice claim." *Harrell v. N.Y. State Dep't of Corr. & Cmty. Supervision,* No. 15-CV-7065 (RA), 2019 WL 3821229 at *18-19 (S.D.N.Y. Aug. 14, 2019) (holding that claims against OMH medical professionals who gave an inmate a psychiatric diagnosis, oversaw that inmate's medication, and were responsible for the "rendition of medical treatment" should thus be viewed through the lens of medical malpractice). *Cf. Papa v. Brunswick Gen. Hosp.,* 517 N.Y.S.2d 762, 764 (1987) (holding that where "the allegations of the complaint do not involve diagnosis, treatment or the failure to follow a physician's instructions . . . the gravamen of the action concerns the alleged failure to exercise

ordinary and reasonable care to [e]nsure that no unnecessary harm befell the patient" and are thus characterized as negligence.)

The New York Court of Appeals has held that the *Bleiler* framework should not be applied in the context of non-physician mental health professionals, given that the line between their conduct which is "substantially related to medical treatment" and that which is not, is unusually murky. *Karasek v. LaJoie*, 92 N.Y.2d 171, 175-76 (1998). There is an "analytical difficulty [in] separating the medical from the nonmedical services furnished by mental health care professionals[.]" *Id.* at 176-77 (holding that "there is no meaningful way to distinguish among the mental health services provided by the various nonphysician providers for purposes of classifying some subgroup of those services as medical" and that therefore "the sounder course is to hold that the services provided by psychologists, however scientifically based they may be, are not 'medical' services within the meaning of CPLR 214-a").

### b. Application

Defendant Baker is a social worker, while Defendant Lahey is a medical clinician. Given the holding in *Karasek*, the procedural rules associated with medical malpractice likely do not apply to Defendant Baker. Defendant Lahey, on the other hand, would be liable for medical malpractice if the conduct in question was "substantially related to medical treatment." *Harrell*, 2019 WL 3821229 at *18-19. For this reason, the allegations that Defendant Lahey allowed Mr. Suarez's medication to lapse would be properly brought as medical malpractice claims rather than negligence claims and are therefore barred by the applicable statute of limitations. However, Defendant Lahey's alleged decision to sign off on Mr. Suarez's continued disciplinary confinement in contravention of clearly established rules and regulations cannot be thought of as "substantially related to medical treatment" and

instead, "sounded" in, at the very least, "simple negligence," *Fox v. White Plains Med. Ctr.*, 509 N.Y.S.2d 614, 615 (2d Dep't 1986), as the "gravamen of the action concerns the alleged failure to exercise ordinary and reasonable care to [e]nsure that no unnecessary harm befell the patient." *Papa*, 517 N.Y.S.2d at 764 (1987). For the reasons set forth above, the three-year statute of limitations for personal injury suits applies to the state law claims against Defendant Baker as a social worker and to the state law claims against Defendant Lahey relating to Mr. Suarez's disciplinary confinement. These claims are therefore not barred by the applicable statute of limitations. To the extent that Plaintiff intended to bring separate state law claims against Defendant Lahey premised on his permitting Mr. Suarez's medication to lapse, those claims would have been proper only if brought as medical malpractice claims and are barred by the applicable statute of limitations.

Therefore, Defendants' motion to dismiss as time barred Plaintiff's negligence claim against Defendant Baker is DENIED. Defendants' motion to dismiss as time barred Plaintiff's negligence claim against Defendant Lahey is DENIED as it relates to Mr. Suarez's disciplinary confinement but GRANTED as it relates to Defendant Lahey's failure to properly treat Mr. Suarez while in custody.

### 4. Duty Element of Negligent Infliction of Emotional Distress Claim

"To plead a negligent infliction of emotional distress claim under New York law, a plaintiff must allege (1) a breach of a duty owed to the plaintiff; (2) emotional harm; (3) a direct causal connection between the breach and the emotional harm; and (4) circumstances providing some guarantee of genuineness of the harm." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 81 (2d Cir. 2021). Furthermore, "New York does not recognize [negligent infliction of emotional distress] causes of action

where the conduct underlying them may be addressed through traditional tort remedies[.]" *Berrio v. City of New York*, No. 15-CV-9570 (ALC), 2017 WL 118024, at *7 (S.D.N.Y. Jan. 10, 2017). Here, the plaintiff has admitted that traditional tort remedies apply to the underlying conduct by pleading simple negligence claims.

In any event, for the purposes of a negligent infliction of emotional distress claim, "the duty in such cases must be specific to the plaintiff, and not some amorphous, free-floating duty to society." *Prado v. Perez*, 451 F. Supp. 3d 306, 318 (S.D.N.Y. 2020) (quoting *Mortise v. United States*, 102 F.3d 693, 696 (2d Cir. 1996)). Plaintiff argues that the Defendants owed her a special duty because they had released a parolee into her custody. This court empathizes with that position, as Plaintiff seems to have been her adult son's primary caregiver upon his release. However, although there might have been a special duty where an inmate was released into the care of their legal guardian, as Mr. Suarez was a legal adult. Therefore, there was no legal "custody" or "custodian" to speak of. Accordingly, this court agrees that there was no special duty owed specifically to the Plaintiff.

For the reasons stated above, Defendants' motion to dismiss Plaintiff's negligent infliction of emotional distress claim against all Defendants is GRANTED.

## C. Negligent Supervision Claim against Supervisory Defendants

"To state a claim for negligent supervision or retention under New York law, in addition to the standard elements of negligence, a plaintiff must show: (1) that the tortfeasor and the defendant were in an employee-employer relationship, (2) that the employer knew or should have known of the employee's propensity for the conduct which caused the injury prior to the injury's occurrence; and (3) that the tort was committed on the employer's premises or with the employer's chattels." *Ehrens v.*

*Lutheran Church*, 385 F.3d 232, 235 (2d Cir. 2004). Furthermore, "[i]t is well settled under New York law that '[a] claim for negligent hiring or supervision can only proceed against an employer for an employee acting outside the scope of her employment." *Newton v. City of New York*, 681 F. Supp. 2d 473, 488 (S.D.N.Y. 2010); *See also Velez v. City of New York*, 730 F.3d 128, 136–37 (2d Cir. 2013). Pursuant to New York Correction Law § 24, this claim cannot be brought against Defendant Morton. As such, the court analyzes this claim only as against Defendant Lahey. Here, Plaintiff has not plausibly alleged that any of the tortfeasors were acting outside the scope of their employment, has not made any specific allegations that the Defendant Lahey "knew or should have known of [his] employee's propensity for the conduct which caused the injury prior to the injury's occurrence," *id.*, and has not plausibly alleged that Defendant Lahey, rather than the relevant city agencies, was the alleged tortfeasors' employer. For these reasons, the Defendants' motion to dismiss Plaintiff's negligent supervision claim as to Defendant Lahey, as well as to Defendant Morton, is GRANTED.

## IV. CONCLUSION

For the reasons stated above, Defendants' Motions to Dismiss are GRANTED in part and DENIED in part.

Defendants' motion to dismiss Plaintiff's Fourteenth Amendment substantive due process claim is GRANTED as to Defendants Urban and Baker, and DENIED as to Defendants Horan, Morton, Lahey, and Yee-Foon. Defendants' motion to dismiss Plaintiff's state law negligence claim is GRANTED as to Defendants Morton and Urban, DENIED as to Defendants Horan, Baker, and Yee-Foon, and GRANTED in part and DENIED in part as to Defendant Lahey. Defendants' motion to dismiss Plaintiff's negligent infliction of emotional distress claim is GRANTED as to all Defendants. Defendants' motion to dismiss Plaintiff's negligent

supervision claim is GRANTED as to Defendants Morton and Lahey.

SO ORDERED.

Dated:    Brooklyn, New York
          October 17, 2022

s/Nicholas G. Garaufis

NICHOLAS G. GARAUFIS
United States District Judge

40