UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF NEW YORK

MARITZA IDIAKHEUA,

                              Plaintiff,

                    v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION, et al.,

                              Defendants.

No. 20-cv-04169 (NGG) (SJB)

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................2

    I.     Mr. Suarez's Severe Mental Illness and Prior Treatment ...........................2

    II.    Mr. Suarez's June 2016 Psychotic Episode and Initial Detention at
         Downstate ..................................................................................................2

    III.   Defendants Failed to Treat Mr. Suarez at Downstate .................................3

    IV.   Defendants Place Mr. Suarez in SHU, Causing Him to Further
         Decompensate ............................................................................................3

    V.    Defendants Delay Mr. Suarez's Tier III Disciplinary Hearing and
         Impose an Above-Guidelines Sanction ......................................................5

    VI.   Defendants Inadequately Prepared Mr. Suarez's Release Plan ..................7

    VII.  Mr. Suarez Exhibited Clear Signs of Decompensation .............................8

    VIII. Mr. Suarez Attacked Ms. Idiakheua Within 24 Hours of His Release ........9

ARGUMENT.............................................................................................................10

    I.     Standard of Review...................................................................................10

    II.    Defendants Are Not Entitled to Summary Judgment on Ms.
         Idiakheua's Substantive Due Process Claims Against Defendants
         Horan, Morton, Lahey, and Yee-Foon......................................................11

         A.    Defendant Horan..........................................................................12

         B.    Defendant Morton........................................................................15

         C.    Defendant Lahey..........................................................................18

         D.    Defendant Yee-Foon....................................................................20

    III.   Ms. Idiakheua's Negligence Claims Against Defendants Lahey and
         Baker Should Proceed to Trial..................................................................22

          A.    Defendants Lahey and Baker Owed Ms. Idiakheua a Duty...........22

         B.    There Is a Genuine Issue of Material Fact as to Whether
              Defendant Lahey Was Negligent...................................................23

         C.    There Is a Genuine Issue of Material Fact as to Whether
              Defendant Baker's Negligence Proximately Caused Harm
              to Ms. Idiakheua ..........................................................................23

    IV.   Defendants Are Not Entitled to Qualified Immunity .................................24

CONCLUSION..........................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Armijo By & Through Chavez* v. *Wagon Mound Pub. Sch.*,
  159 F.3d 1253 (10th Cir. 1998) ..........................................................21, 22

*Ben* v. *United States*,
  160 F. Supp. 3d 460 (N.D.N.Y. 2016)..................................................22

*Borley* v. *United States*,
  22 F.4th 75 (2d Cir. 2021) .................................................................10

*Dallas Aerospace, Inc.* v. *CIS Air Corp.*,
  352 F.3d 775 (2d Cir. 2003) ..............................................................10

*Druschke* v. *Banana Republic, Inc.*,
  359 F. Supp. 2d 308 (S.D.N.Y. 2005) .................................................22

*In re Fosamax Prod. Liab. Litig.*,
  688 F. Supp. 2d 259 (S.D.N.Y. 2010) .................................................24

*Hassanein* v. *Avianca Airlines*,
  872 F. Supp. 1183 (E.D.N.Y. 1995) ...................................................24

*Idiakheua* v. *New York State Dep't of Corr. & Cnty. Supervision*,
  2022 WL 10604355 (E.D.N.Y. Oct. 18, 2022).................................*passim*

*Kerman* v. *City of New York*,
  374 F.3d 93 (2d Cir. 2004) ................................................................25

*Levine* v. *Lawrence*,
  No. 03-CV-1694 (DRH) (ETB), 2005 WL 1412143 (E.D.N.Y. June
  15, 2005) .........................................................................................22

*Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co.*,
  875 F.3d 107 (2d Cir. 2017) ..............................................................10

*Okin* v. *Vill. of Cornwall-On-Hudson Police Dep't*,
  577 F.3d 415 (2d Cir. 2009) .............................................11, 12, 14, 19

*Outlaw* v. *City of Hartford*,
  884 F.3d 351 (2d Cir. 2018) ..........................................................24, 25

*Pena* v. *DePrisco*,
  432 F.3d 98 (2d Cir. 2005) ...............................................11, 12, 14, 19

*Saint-Guillen* v. *United States*,
657 F. Supp. 2d 376 (E.D.N.Y. 2009) .........................................................23

*Sloley* v. *VanBramer*,
945 F.3d 30 (2d Cir. 2019) ..........................................................................24

*Tolan* v. *Cotton*,
572 U.S. 650 (2014) ......................................................................................24

*Uryevick* v. *Rozzi*,
751 F. Supp. 1064 (E.D.N.Y. 1990) ...........................................................24

*Vasquez* v. *Maloney*,
990 F.3d 232 (2d Cir. 2021) ........................................................................24

**Statutes**

42 U.S.C. § 1983...............................................................................................11

N.Y. Correction Law § 137 ..........................................................................4, 15

**Other Authorities**

CPL § 730 ..........................................................................................................10

Fed. R. Civ. P. 56(a) ........................................................................................10

Restatement (Second) of Torts § 319 (1965).................................................22

## PRELIMINARY STATEMENT

Elvin Suarez's mental decompensation while imprisoned at Downstate and attack on his mother within 24 hours of his release was a predictable tragedy created by Defendants. Defendants maliciously subjected Mr. Suarez—an unmedicated, Seriously Mentally Ill schizoaffective bipolar inmate—to 44 days of isolating disciplinary confinement immediately prior to releasing him to Plaintiff, Maritza Idiakheua. Defendants' sanction was purportedly to punish Mr. Suarez for a violent altercation with correctional staff (an incident caused by his mental health crisis while imprisoned) and to deter future violence (despite his imminent release). Through their actions, Defendants foreseeably rendered Mr. Suarez more symptomatic than ever to the point where he nearly killed his own mother in an acute psychotic episode.

Defendants now posit that Mr. Suarez's disciplinary sanction—which exceeded DOCCS guidelines and violated New York's SHU Exclusion Law—was "a very minor disposition" reflecting the need "to balance the security of the staff and incarcerated population with [Mr. Suarez's] needs." But if such a sanction was necessary to negate Mr. Suarez's propensity for violence, why then was Mr. Suarez immediately released to Ms. Idiakheua's home without necessary treatment at the end of his disciplinary isolation at Downstate? And if Defendants intended to care for Mr. Suarez's needs, why then did they discard the Office of Mental Health's clinical opinion that he was not fit for disciplinary confinement, and Ms. Idiakheua's pleas for help, actively depriving Mr. Suarez of the treatment he needed and was entitled to by law?

The answers—which should be determined by a jury at trial—are simple and permeate the record: Defendants acted with deliberate indifference to Mr. Suarez's health and Ms. Idiakheua's safety. Nothing in Defendants' motion forecloses this fact. Rather, Defendants misconstrue the record, seek to blame Ms. Idiakheua and her son, and otherwise fail to address key facts supporting Ms. Idiakheua's claims. Defendants' motion should therefore be denied.

**STATEMENT OF FACTS**[1]

**I.      Mr. Suarez's Severe Mental Illness and Prior Treatment**

Mr. Suarez—Ms. Idiakheua's son—was diagnosed with schizoaffective and bipolar disorder in June 2014. PS56.1[2] ¶76. Mr. Suarez was then a student at ASA College in Brooklyn, had no criminal history, and was employed to support his education. *Id.* ¶¶77–78. But following the onset of his illness, he began experiencing a range of debilitating symptoms, including hallucinations and delusions, laughing to and having conversations with himself, and depression. *Id.* ¶¶79, 83. Mr. Suarez's illness remained treatable with proper psychiatric care and medication, and state-operated facilities were able to help stabilize his condition. *Id.* ¶¶84–87.

**II.     Mr. Suarez's June 2016 Psychotic Episode and Initial Detention at Downstate**

In or around June 2016, Mr. Suarez suffered a psychotic episode and began breaking the side-view mirrors of cars parked near Ms. Idiakheua's home. *Id.* ¶91. When police arrived, he briefly struggled with them, was arrested, and subsequently pleaded guilty to second-degree assault with intent to injure a police officer. *Id.* ¶92. Mr. Suarez was temporarily detained at Kirby Forensic Psychiatric Center ("Kirby"), a psychiatric hospital operated by the Office of Mental Health ("OMH"), where he received medication and psychiatric treatment. *Id.* ¶93. But, on June 7, 2017, he was sentenced to a two-year prison term to be served at Downstate, where he was then transferred. *Id.* ¶¶94–95. Although Downstate is a "level one" prison, meaning that it is intended to provide robust resources to inmates with mental illness,[3] Downstate did not in fact have the mental health resources of most other level one prisons. PR56.1[4] ¶¶3, 6, 10.

---

[1]     Ms. Idiakheua refers the Court to her Local Rule 56.1 Counter Statement for a complete statement of the relevant facts.

[2]     "PS56.1" refers to Plaintiff's Supplemental Local Rule 56.1 statements.

[3]     At the time, Downstate had a documented history of mistreating inmates, particularly the mentally ill, and has since been closed. PS56.1 ¶¶98–99.

[4]     "PR56.1" refers to Plaintiff's Responses to Defendants' Local Rule 56.1 statements.

### III. Defendants Failed to Treat Mr. Suarez at Downstate

On June 23, 2017, during his intake evaluation, Mr. Suarez reported to DOCCS and OMH personnel his long history of mental illness and treatment, and the fact that he was prescribed Zyprexa. PS56.1 ¶¶101–03. After a further comprehensive suicide risk assessment ("CSRA"), OMH staff concluded that Mr. Suarez might benefit from admission to a Residential Crisis Treatment Program should the treatment team observe signs of psychiatric decompensation. *Id.* ¶¶107–09. By June 29, 2017, Defendant Lahey had reviewed Mr. Suarez's intake materials and approved OMH's initial mental health designation of Level 1, indicating that Mr. Suarez was "[d]iagnosed with . . . Schizoaffective Disorder." *Id.* ¶¶105–06, 110. After further review, Defendant Lahey officially designated Mr. Suarez a Level 1-S patient—the most serious designation—indicating Mr. Suarez was "Seriously Mentally Ill" ("SMI"). *Id.* ¶111.

On June 30, 2017, Mr. Suarez began refusing his psychotropic medication. *Id.* ¶112. However, his documentation does not indicate that he received the formal evaluation and counseling required after refusing medication. *Id.* ¶¶113, 119, 123, 125. As OMH Unit Chief, Defendant Lahey could have sought an order mandating Mr. Suarez's compliance. PR56.1 ¶26.

### IV. Defendants Place Mr. Suarez in SHU, Causing Him to Further Decompensate

After almost 50 days without necessary mental health treatment, on August 8, 2017, Mr. Suarez was involved in a violent altercation with DOCCS correction officers. PS56.1 ¶128. During this altercation, he used physical force against the officers and threatened to kill them upon his release. *Id.* ¶¶129–32. This incident was a sign of mental decompensation. *Id.* ¶135. A DOCCS physician immediately evaluated Mr. Suarez, noting that Mr. Suarez was lethargic, "off by 2 days with current date," and had refused medication since June 30, 2017. *Id.* ¶136. Thus, the physician made an emergency phone referral to Defendant Lahey. *Id.* ¶137. Defendant Lahey could have immediately diverted Mr. Suarez to a suitable treatment

environment. *Id.* ¶¶138–41. However, the physician's concerns went unheeded and Mr. Suarez was not then given treatment. *Id.* ¶142. Instead, Maura DiNardo, the OMH Segregated Housing Unit ("SHU") clinician, saw Mr. Suarez for a SHU admission screening. *Id.* ¶¶143–44.

DOCSS' and OMH's placement of Mr. Suarez in SHU immediately triggered Defendants' duties under New York's SHU Exclusion Law. *See* N.Y. Correction Law § 137; PR56.1 ¶¶ 47–48; PS56.1 ¶62–72. Under the law, Defendant Morton was required to take action within "twenty-four hours" by consulting OMH staff. *Id.* ¶¶64–67. The law further obligated Defendant Morton to provide Mr. Saurez "a heightened level of care," including "a minimum of two hours each day . . . of out-of-cell therapeutic treatment and programming," unless a contrary determination was documented and reviewed by Defendant Morton, "in consultation with a mental health clinician." *Id.* ¶¶70–71. Defendant Lahey, in his capacity as chair of the JCMC[5], was obligated, "within 14 days of [Mr. Suarez's] placement in segregated confinement," to either "divert [him] or make a written determination" not to divert him. PR56.1 ¶48; PS56.1 ¶¶68, 190.

Defendant Lahey did neither, *id.* ¶¶187–91, and Mr. Suarez remained in SHU. His cell contained one reinforced, exterior window and a small window on the door, a bed, sink, and toilet, with a radio and headphones. *Id.* ¶146. From August 8 through August 15, 2017, he remained subject to a deprivation order foreclosing ***any out-of-cell time whatsoever***.[6] *Id.* ¶¶147–49. During this time, he was not given access to adequate mental health resources and was left untreated. *Id.* ¶¶145, 151, 173. The extent of Mr. Suarez's "treatment" was an occasional observational peer through the small window of his single isolated cell. *Id.* ¶¶152–54; PR56.1

---

[5]  The JCMC is the Joint Case Management Committee, a joint DOCSS/OMH committee responsible for reviewing, monitoring, and coordinating the treatment plans of any inmate placed in SHU and assigned to OMH's caseload. PS56.1 ¶¶10, 38–48.

[6]  Accordingly, when Ms. Idiakheua attempted to visit her son on at least one occasion in August 2017, she was told that Mr. Suarez was not permitted visitors for fifteen days because he was in the "hole." PS56.1 ¶¶158–60.

¶¶43, 58.  On August 15, 2017, Defendant Morton finally modified the deprivation order, but did not divert Mr. Suarez from SHU or provide the required "heightened level of care."  *Id.* ¶47.

Defendants were well aware of the risks that disciplinary housing, including segregated confinement, posed to SMI inmates such as Mr. Suarez.  PS56.1 ¶¶155–57, 161–67, 177, 199, 218.  Indeed, as they have since testified, segregated confinement—including time in SHU— would be detrimental to the mental health of an SMI inmate, increasing the risk of decompensation.  *Id.* ¶163.  Predictably, this risk came to pass.  While confined in SHU, Mr. Suarez began hearing voices telling him he would need to protect himself, and experienced anxiety attacks because he couldn't leave his cell.  PR56.1 ¶¶ 59–60; PS56.1 ¶¶168–72.

## V.     Defendants Delay Mr. Suarez's Tier III Disciplinary Hearing and Impose an Above-Guidelines Sanction

Once in SHU, Mr. Suarez was entitled to a Tier III disciplinary hearing as soon as possible—under DOCCS guidelines no later than on the seventh day of his confinement in SHU.  PS56.1 ¶174.  But Defendant Horan—acting as Defendant Morton's designated hearing officer—delayed Mr. Suarez's hearing by requesting an extension beyond the prescribed 7-day period because he was "unavailable."  *Id.* ¶¶175–81; PR56.1 ¶46.

During the hearing, Mr. Suarez expressed little ability to grasp the nature of the proceeding.  PS56.1 ¶182.  He stated that he did not know what OMH was or whether he was being treated by OMH.  *Id.* ¶183.  Given Mr. Suarez's clear signs of mental decompensation, Defendant Horan adjourned the hearing to solicit OMH testimony.  *Id.* ¶184.  OMH's testimony was scheduled for Friday, August 18, 2017, but was postponed for another four days while Mr. Suarez remained in SHU.  *Id.* ¶¶184–85.  On August 21, 2017, two weeks after Mr. Suarez's initial confinement in the SHU, Defendant Horan re-opened the hearing for Ms. DiNardo to

present OMH's clinical opinion.  *Id.* ¶186.  As a result of Defendant Horan's actions, Mr. Suarez remained in SHU, which exacerbated his mental decompensation.  *Id.* ¶¶164, 168; PR56.1 ¶60.

Ms. DiNardo unequivocally testified that, in OMH's clinical opinion, Mr. Suarez was ***not suitable*** for confinement in disciplinary housing due to his mental illness.  PS56.1 ¶194.  She also opined that Mr. Suarez's violent incident was the result of his mental illness.  *Id.* ¶195.  Defendant Horan himself retorted that Mr. Suarez appeared to "lack [] connection" and was clearly not "completely free of any signs of mental illness."  *Id.* ¶202–06.  The next day, however, Defendant Horan found Mr. Suarez guilty and sentenced him to an above-guidelines sanction of 14 days' time served in SHU plus 60 days' keeplock, with 30 days deferred for 180 days.  *Id.* ¶¶ 207–09, 214, 230.  Defendant Horan stated that Mr. Suarez's conduct "warrant[ed] isolation and confinement," the precise conditions sought to be prevented by the SHU Exclusion Law.  *Id.* ¶¶221, 63.  He described the sanction as necessary "to act as a reminder that similar behaviors will not be tolerated"—all despite Mr. Suarez's decompensation, lack of comprehension, and imminent release on September 5, 2017.  *Id.* ¶¶218–22.  In keeplock, Mr. Suarez was on 23-hour lockdown, permitted to leave his cell only once daily.[7]  *Id.* ¶¶211–15.

As Chair of the JCMC, Defendant Lahey was required to review and issue a recommendation on, and did review and recommend, Mr. Suarez's conditions of confinement. *Id.* ¶245.  Although Defendant Lahey likely agreed with Ms. DiNardo's opinion that Mr. Suarez was not fit for confinement in disciplinary housing, he apparently endorsed Defendant Horan's sanction.  *Id.* ¶¶198–201; PR56.1 ¶60.  Of course, at the time, Defendant Lahey understood the risks of further subjecting Mr. Suarez to isolation and confinement.  PS56.1 ¶¶162–63.

---

[7]    Contrary to Defendants' suggestions, keeplock served in a general population cell is not meaningfully different than long-term keeplock served in a long-term keeplock unit.  PR56.1 ¶18.

As Superintendent, Defendant Morton affirmed Defendant Horan's above-guidelines sanction, despite being notified by the Acting Assistant Commissioner that his "review still le[ft] the confinement sanction OVER the guidelines." *Id.* ¶¶237–43. Because SHU Exclusion Law counsels diversion of inmates like Mr. Suarez "to a residential mental health treatment unit" when sanctioned to segregated confinement "potentially [] for a period in excess of thirty days," Defendants' conduct also violated state law. *Id.* ¶66; PR56.1 ¶¶18–19.

## VI.     **Defendants Inadequately Prepared Mr. Suarez's Release Plan**

Mr. Suarez was scheduled to be discharged from Downstate on September 5, 2017. PS56.1 ¶246. Leading up to his release date, the OMH treatment team—principally, Defendants Baker and Lahey—began preparing a discharge summary and release plan. *Id.* ¶¶52–56, 247, 253; PR56.1 ¶¶28–30, 36. Defendant Baker's draft discharge plan for Mr. Suarez was completed on or around August 4, 2017—prior to his violent altercation, detention in SHU, keeplock sanction, and resulting additional decompensation. PS56.1 ¶242. On August 10, 2017, Defendant Baker further indicated that Mr. Suarez proposed to live with his mother upon his release—a proposal approved by the Parole Board. *Id.* ¶¶257–59.

The treatment team pursued court-ordered Assisted Outpatient Treatment ("AOT") for Mr. Suarez—issued for SMI inmates who pose a risk to themselves or others in the community. *Id.* ¶¶253–56, 260–61. As Superintendent of Downstate, Defendant Morton was personally responsible for applying for Mr. Suarez's AOT order. *Id.* ¶¶278–79. Dr. Brandon Reynolds, an OMH psychiatrist, met with Mr. Suarez to assess his need for an AOT order. *Id.* ¶¶267–71, 275; PR56.1 ¶47. Dr. Reynolds indicated that Mr. Suarez's medication noncompliance—dating back to June 30, 2017—increased his risk of suicide. PS56.1 ¶¶267–69. Another psychiatrist, Dr. Abadul Qayyum, noted that he observed Mr. Suarez inappropriately laughing to himself and acting disconnected during an August 24, 2017 appointment. *Id.* ¶¶273–74. Defendant Morton

himself affirmed in the AOT application that "there is nothing to indicate that [Mr. Suarez] will change his pattern of treatment noncompliance with ***resultant psychosis*** and ***high risk behaviors*** without the benefit of court-ordered treatment." *Id.* ¶279 (emphasis added). On August 31, 2017, a court ultimately granted Defendant Morton's AOT petition. *Id.* ¶¶280–81.

As part of Mr. Suarez's release plan, Defendant Yee-Foon was assigned as Mr. Suarez's OMH Intensive Case Manager, or "ICM." *Id.* ¶282. Defendant Yee-Foon spoke with Defendant Baker on August 31, 2017—just a few days before Mr. Suarez was released. *Id.* ¶283. However, when completing Mr. Suarez's discharge summary, Defendant Baker incorrectly represented that Mr. Suarez had no disciplinary history at Downstate and did not include any reference to Mr. Suarez's placement in keeplock or SHU. *Id.* ¶¶289–92, 297.

## VII.    <u>Mr. Suarez Exhibited Clear Signs of Decompensation</u>

On or about September 2, 2017, the weekend before Mr. Suarez was discharged, Ms. Idiakheua visited Mr. Suarez. PS56.1 ¶313. Mr. Suarez was visibly unwell, so Ms. Idiakheua informed the on-duty corrections officers that he was in need of medical treatment. *Id.* ¶¶314–17. She was told that no doctors were available as it was Labor Day weekend. *Id.* ¶¶316, 318.

On the morning of Mr. Suarez's release, September 5, 2017, Ms. Idiakheua drove to Downstate early, not knowing how her son would make it home. *Id.* ¶¶320–22. She intended to bring him to Richmond University Hospital for treatment, but corrections officers told her this was not possible and that a parole officer would bring Mr. Suarez home later that day. *Id.* Mr. Suarez was still unmedicated and experiencing symptoms of severe psychosis. *Id.* ¶¶323, 327–33, 342–48, 358. Indeed, while meeting with Mr. Suarez to review his discharge plan, DOCCS employee Samantha L. Balestriere observed Mr. Suarez displaying "[a] slightly inappropriate affect" and noted that "[patient] has not been medicated since 6/2017." *Id.* ¶324.

That evening, Defendant Yee-Foon drove Mr. Suarez to Ms. Idiakheua's home. *Id.* ¶326. He observed that Mr. Suarez was still exhibiting obvious signs of mental decompensation, including laughing and talking to himself. *Id.* ¶¶ 327–33; PR56.1 ¶51. But instead of seeking treatment for Mr. Suarez, Defendant Yee-Foon informed Ms. Idiakheua that her son was required to meet Parole Officer Urban at 9:00 AM the next day, September 6, 2017. PS56.1 ¶338. He further warned that failure to appear would violate the terms of Mr. Suarez's release and could result in his reincarceration. *Id.* ¶¶339–40. Ms. Idiakheua expressed concern to Defendant Yee-Foon because her son "was not well," and asked if Mr. Suarez had been treated prior to his release. *Id.* ¶¶341. He had not been, and the only post-release treatment in Mr. Suarez's discharge summary was an "intake appointment" at a community mental health clinic scheduled for September 7, 2017—two days later. *Id.* ¶¶ 352, 359, 362. But due to Defendant Yee-Foon's parole warnings, Ms. Idiakheua did not immediately seek treatment for her son. *Id.* ¶350.

## VIII.  <u>Mr. Suarez Attacked Ms. Idiakheua Within 24 Hours of His Release</u>

The next day, September 6, 2017, Ms. Idiakheua and her son met with Parole Officer Urban and Defendant Yee-Foon. PS56.1 ¶¶354–55. Urban was "shocked" that Mr. Suarez had been released in such poor condition and without any medication, stating he had "never seen" an SMI inmate released with so little support. *Id.* ¶357. Urban believed Mr. Suarez "appear[ed] to be in need of medication." *Id.* Ms. Idiakheua explained that Mr. Suarez was "pacing back and forth," that "he was not himself and that he did need to see a doctor." *Id.* ¶354. But Urban told Ms. Idiakheua that, pursuant to his release plan, Mr. Suarez was required to apply for Medicaid and other benefits to be eligible for care. *Id.* ¶360. Per this instruction, Ms. Idiakheua then accompanied Mr. Suarez to submit his benefits applications. *Id.* ¶363.

After returning to Ms. Idiakheua's home that afternoon, Mr. Suarez suddenly became agitated. *Id.* ¶¶364–67. He grabbed a large kitchen knife, began punching his mother, and then

stabbed his mother several times across her upper body. *Id*. Ms. Idiakheua cried out for help and pleaded with Mr. Suarez to stop. *Id.* ¶368. After stabbing Ms. Idiakheua repeatedly, Mr. Suarez fled. *Id.* ¶369. Ms. Idiakheua suffered seven stab wounds, fractured ribs, a punctured lung, and feared that she would die. *Id.* ¶372. She was transported by ambulance to Richmond University Hospital and received blood transfusions. *Id.* ¶370.

When located by police, Mr. Suarez was still exhibiting symptoms of psychosis. *Id.* ¶373. He claimed that he encountered a small child at Ms. Idiakheua's apartment, though he and Ms. Idiakheua were the only ones there. *Id.* ¶¶373–74. He was arrested and charged with attempted murder and assault, but permitted to plead not responsible by reason of mental disease. *Id.* ¶375. Mr. Suarez was then civilly committed under CPL § 730. *Id.* ¶¶376–77.

## ARGUMENT

### I. Standard of Review

Summary judgment must be denied unless the movant can "show[ ] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Nick's Garage, Inc.* v. *Progressive Cas. Ins. Co*., 875 F.3d 107, 114 (2d Cir. 2017) (movant bears burden to "demonstrat[e] the absence of a genuine issue of material fact"). "Put another way, summary judgment is appropriate only where the record taken as a whole could not lead a rational trier of fact to find for the non-movant." *Borley* v. *United States*, 22 F.4th 75, 78 (2d Cir. 2021) (internal quotations omitted). "When ruling on a summary judgment motion, the district court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Dallas Aerospace, Inc*. v. *CIS Air Corp*., 352 F.3d 775, 780 (2d Cir. 2003).

## II.     **Defendants Are Not Entitled to Summary Judgment on Ms. Idiakheua's Substantive Due Process Claims Against Defendants Horan, Morton, Lahey, and Yee-Foon**

State actors are liable under 42 U.S.C. § 1983 for Fourteenth Amendment substantive due process violations when, through affirmative conduct that shocks the contemporary conscience, they create or enhance the danger of private violence.  *See Okin* v. *Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009); *Pena* v. *DePrisco*, 432 F.3d 98, 112–14 (2d Cir. 2005); *Idiakheua* v. *New York State Dep't of Corr. & Cnty. Supervision*, 2022 WL 10604355, at *4 (E.D.N.Y. Oct. 18, 2022).  The record demonstrates a genuine dispute of material fact as to whether Defendants Horan, Morton, Lahey, and Yee-Foon engaged in affirmative acts "ratcheting up the threat of danger" to Ms. Idiakheua, foreseeably causing her injuries.  *Okin*, 577 F.3d at 430.  There is also a genuine dispute as to whether Defendants' conduct was sufficiently egregious to shock the conscience.  Summary judgment should therefore be denied.

After Mr. Suarez was involved in a violent altercation with DOCCS correctional officers—identified as a symptom of his mental illness—Defendants actively engaged in conduct that exacerbated Mr. Suarez's mental decompensation.  Specifically, Defendants Horan, Morton, and Lahey maintained Mr. Suarez's confinement in the SHU with no out-of-cell time, declined to divert Mr. Suarez for appropriate treatment, and acted in contravention to OMH staff's clinical recommendation when imposing and affirming an above-guidelines keeplock sanction.  PR56.1 ¶¶13, 18–19, 47–48; PS56.1 ¶¶47, 140–59, 162–63, 184–221, 229–45.  Defendants further failed to comply with the requirements of New York's SHU Exclusion Law—a law specifically designed to minimize the foreseeable risks Defendants here created.  PR56.1 ¶¶12–16; PS56.1 ¶¶62–75.  These risks were realized when Defendant Yee-Foon left a decompensated Mr. Suarez in Ms. Idiakheua's home while foreclosing Ms. Idiakheua from seeking proper care for her son, foreseeably resulting in Mr. Suarez's attack on Ms. Idiakheua.  PR56.1 ¶51; PS56.1 ¶¶326–62.

While engaging in these acts, Defendants knew that disciplinary confinement and a lack of treatment would worsen Mr. Suarez's condition, and that his condition did in fact deteriorate while he was incarcerated. PS56.1 ¶¶128–39, 162–73, 260–77, 333. "Putting Mr. Suarez, a man known to become violent when psychotic, in restrictive disciplinary housing as his condition worsened, in [] violation of state laws on the use of segregated confinement for seriously mentally ill inmates, was an affirmative act directly causing him to be in a state of psychosis when released at his mother's home, thereby increasing the danger to her in particular." *Idiakheua*, 2022 WL 10604355, at *9. Because Defendants knew that their actions presented serious and unique risks—and as prison officials had ample time to deliberate, *see Pena*, 432 F.3d at 113—Defendants' actions were also conscience-shocking. *See Okin*, 577 F.3d at 431–32 (finding material dispute where officers deliberately ignored "well known" risks of domestic violence despite "ample time for reflection"). We take each Defendant in turn.

### A. Defendant Horan

Regarding Defendant Horan, Defendants incorrectly argue that (i) Defendant Horan "did not place Mr. Suarez in SHU;" (ii) he "had no responsibility for Mr. Suarez's mental health treatment;" (iii) Mr. Suarez's disciplinary sanction was "a relatively minor penalty;" and (iv) Defendant Horan had no power to divert Mr. Suarez. MSJ at 9.[8] Defendants' arguments are contradicted by the factual record.

*First*, the record establishes that Defendant Horan delayed—with no legitimate reason— Mr. Suarez's Tier III hearing, subjecting Mr. Suarez to unnecessary confinement in SHU from August 8 to August 22, 2017. PS56.1 ¶¶176–81. Mr. Suarez was entitled to a Tier III

---

[8] "MSJ" refers to Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, dated February 21, 2023, which is referred to herein as a motion for partial summary judgment because Defendants do not move for summary judgment on the negligence claims against Defendants Horan and Yee-Foon. *See infra* Argument Part III.

disciplinary hearing that was "supposed to be complete within 14 days and started within 7 [days]" of his initial confinement in SHU—no later than August 14, 2017. *Id.* ¶174. Despite recognizing that it is best to complete the disciplinary hearing "without extensions if at all possible," Defendant Horan did the opposite.[9] *Id.* ¶177. A reasonable juror could find that Defendant Horan's affirmative act of delaying Mr. Suarez's Tier III hearing and continuing his confinement in SHU in deliberate indifference to Mr. Suarez's potential for decompensation exacerbated this exact risk.

*Second*, the record establishes that when confronted with OMH's clinical opinion regarding Mr. Suarez's fitness for disciplinary confinement, Defendant Horan disregarded it. *Id.* ¶¶192–95, 207–08. Mr. Suarez displayed little ability to grasp the nature of the Tier III proceeding. *Id.* ¶¶182–83. And contrary to Defendants' assertion that "at no time during the hearing did it appear to defendant Horan that Mr. Suarez was decompensating or at risk of becoming violent," MSJ at 10, Defendant Horan himself recognized at the time that Mr. Suarez was not "completely free of signs of mental illness" and suffered "a lack of connection" during the hearing. *Id.* ¶¶202–04. Indeed, Defendant Horan later admitted that "[t]his was a very unique case with a guy with a serious mental illness" who appeared to be "off the rails." *Id.* ¶¶205–06. Recognizing signs of Mr. Suarez's decompensation, Defendant Horan adjourned the hearing to solicit confidential testimony from OMH regarding Mr. Suarez's fitness. *Id.* ¶¶184–86. Although Defendants falsely assert that the OMH recommendation was obtained only to determine if Mr. Suarez's "mental health should be a mitigating factor," MSJ at 9, OMH's clinical opinion was more comprehensive and unequivocal—concluding that Mr. Suarez was "not suitable for confinement in disciplinary housing due to mental illness." *Id.* ¶¶194–95.

---

[9] Notably, Defendant Lahey and others testified that DOCCS should conduct Tier III hearings *as soon as possible*, partly because it could be "detrimental" to an inmate's mental health to remain in SHU. PS56.1 ¶177.

But instead of deferring to OMH's clinical recommendation and diverting Mr. Suarez for treatment,[10] Defendant Horan sentenced Mr. Suarez to 14 days of time served in SHU in addition to 60 days of keeplock with 30 days suspended—meaning that Mr. Suarez would spend the remainder of his sentence at Downstate in disciplinary confinement immediately prior to his release.[11] *Id.* ¶¶207, 209. Defendant Horan's rationale: to send "a reminder that similar behaviors will not be tolerated." *Id.* ¶220. Defendant Horan further noted on the record that Mr. Suarez's conduct "warrant[ed] isolation and confinement," the precise conditions sought to be prevented by New York's SHU Exclusion Law. *Id.* ¶221. And Defendant Horan imposed this sanction despite understanding that it was "not a good idea" for "inmates [to go] from a confinement setting right to the street." *Id.* ¶223.

Nor was this sanction a "minor penalty" as Defendants suggest. Rather, Defendant Horan's sanction was above the prescribed DOCCS guidelines, despite the fact that DOCCS' written guidelines were then available to Defendant Horan. *Id.* ¶230. He has since testified that it would have been "inappropriate" to impose an above-guidelines sanction in Mr. Suarez's case.[12] *Id.* ¶229. A reasonable juror could find that, after multiple opportunities to reflect on his course of action, Defendant Horan's failure to defer to OMH's clinical recommendation and his imposition of an above-guidelines sanction is affirmative conscience-shocking conduct. *See Okin*, 577 F.3d at 431–32; *Pena*, 432 F.3d at 114 (concluding that behavior "over an extended period of time and in the face of action that presented obvious risk of severe consequences and

---

[10] Defendants curiously assert elsewhere in their motion that "DOCCS must defer to OMH on matters of incarcerated individuals' mental health." MSJ at 13. But Defendant Horan clearly failed to do so.

[11] For the avoidance of doubt, Defendant Horan acknowledged that this sanction qualified as disciplinary confinement. PS56.1 ¶213.

[12] The Court should reject out of hand Defendants' suggestion that Defendant Horan "believed that Mr. Suarez's actions warranted a 60 day sentence, but as a result of his mental health, suspended 30 days" in a supposed act of leniency. MSJ at 10. As Defendant Horan noted during the hearing, Mr. Suarez was "up to be released very soon," specifically, September 5, 2017. *Id.* ¶219. Suspending half the sanction was thus inconsequential.

extreme danger, falls within the realm of behavior that can properly be characterized as . . . conscience shocking") (quotations omitted).

*Finally*, Defendants unpersuasively argue that Defendant Horan did not have the authority to transfer Mr. Suarez to a Special Program to better treat his mental condition, suggesting that entrance into Special Programs is dictated only by New York State Correction Law § 137. Wrong again. PR56.1 ¶12. Accordingly, Defendant Horan himself understood that he could make OMH referrals and in fact had made such referrals in the past. PS56.1 ¶231.

### B.    Defendant Morton

Defendants argue that Defendant Morton did not take affirmative action because he: (i) "did not, nor was he required to, approve Mr. Suarez's admission to SHU;" (ii) did not approve Mr. Suarez's "deprivation order when it [was] first issued;" and (iii) only approved Mr. Suarez's Tier III disciplinary sanction because he believed that it was "appropriate" and "did not violate state law." MSJ at 12–14. But as the Superintendent of Downstate, Defendant Morton was uniquely positioned—indeed, mandated by law—to ensure that Mr. Suarez's detention and treatment were in accordance with New York State and DOCCS law and policy. *Id.* ¶¶7–8. Instead, Defendant Morton directly contributed to Mr. Suarez's mistreatment, exacerbating his deterioration and endangering Ms. Idiakheua.

*First*, Defendant Morton allowed Mr. Suarez to be placed in SHU pursuant to a deprivation order denying him all out-of-cell privileges. *Id.* ¶¶147, 150. Although Defendant Morton did not personally place Mr. Suarez in SHU at the outset, he decided not to divert Mr. Suarez for adequate treatment. Defendant Morton was immediately notified whenever an inmate assaulted a staff member, was made aware when out-of-cell privileges were revoked, and would have visited SHU the week of Mr. Suarez's confinement. *Id.* ¶16; PR56.1 ¶47. Additionally, under New York's SHU Exclusion Law, Defendant Morton was required to take action regarding

Mr. Suarez's placement in SHU within "twenty-four hours." PS56.1 ¶65. The SHU Exclusion

law further provides that where an SMI inmate is not diverted, they "shall be offered a

heightened level of care," including "a minimum of two hours each day, five days a week, of

out-of-cell therapeutic treatment and programming," unless a contrary determination is

documented and reviewed by the "superintendent, in consultation with a mental health clinician,

not less than every seven days for as long as the inmate remains in segregated confinement." *Id.*

¶70. Defendant Morton violated these provisions, as it was only after Mr. Suarez's seventh day

in SHU that Defendant Morton recalls modifying Mr. Suarez's deprivation order, and doing so

without seeking consultation from OMH. PR56.1 ¶¶46–47.

Most egregiously, Defendant Morton decided not to divert Mr. Suarez from SHU, in

violation of SHU Exclusion Law. *Id.* That law provides, *inter alia*, that "the department, in

consultation with mental health clinicians, shall divert or remove inmates with serious mental

illness . . . from segregated confinement, where such confinement could *potentially be for a*

*period in excess of thirty days . . . .*" PS56.1 ¶66 (emphasis added). This law was triggered the

very moment Mr. Suarez was placed in SHU, as he had yet to receive a disciplinary hearing

imposing an actual sanction, and faced a potential penalty in excess of 30 days. PR56.1 ¶19.

Moreover, where the inmate "suffers from a serious mental illness"—as was the case

here—SHU Exclusion Law further dictates that the JCMC "shall direct the inmate's removal

from segregated confinement except" where the JCMC issues a contrary determination, which

"shall be documented in writing and include the reasons for the determination," a process which

must be completed within 14 days. *Id.* ¶69. As Downstate's Superintendent, Defendant Morton

was responsible for personally reviewing and signing off on the JCMC's recommendations.

PR56.1 ¶46. And given that Mr. Suarez was confined to SHU for no less than 14 days, the

JCMC and Defendant Morton—if they had been complying with the law—would necessarily have approved Mr. Suarez's confinement in SHU.[13] PR56.1 ¶¶47–48. The other possibility is that Defendant Morton violated the law, in which case he was deliberately indifferent to Mr. Suarez's mental health. Either way, a jury could find these actions conscience-shocking.

*Second*, Defendant Morton does not dispute that he affirmed Defendant Horan's imposition of an above-guidelines penalty of 44 total days of disciplinary confinement after reviewing Mr. Suarez's hearing transcript and packet. PS56.1 ¶230; *see also* MSJ at 13. This prompted the Acting Assistant Commissioner to email Defendant Morton, notifying him that because his "review still leaves the confinement sanction OVER the guidelines," he needed "to scan the hearing record sheet, misbehavior report, both disposition pages and [his] justification to" Finnegan. PS56.1 ¶242. In the "reason for decision" field, Defendant Morton simply stated, "this penalty should not be reduced," with no further justification. *Id.* ¶240. This is affirmative conduct that exacerbated Mr. Suarez's decompensation.

*Third*, Defendant Morton understood the risks of his actions. He prepared Mr. Suarez's AOT petition on August 21, 2017—a day before the conclusion of Mr. Suarez's Tier III hearing. *Id.* ¶278. The AOT petition, which Defendant Morton signed, noted that Mr. Suarez was (i) symptomatic and not medication compliant, and (ii) observed inappropriately laughing to himself and presenting as disconnected. *Id.* ¶¶267–78. Defendant Morton himself affirmed in the petition that "there is nothing to indicate that [Mr. Suarez] will change his pattern of treatment noncompliance with ***resultant psychosis*** and ***high risk behaviors*** without the benefit of court-ordered treatment." *Id.* ¶279. Despite Defendant Morton's awareness of Mr. Suarez's unstable condition, he failed to divert Mr. Suarez and instead affirmed a keeplock sentence. *Id.* ¶243.

---

[13] Despite discovery requests that would have revealed whether the JCMC ever made the written determination necessary to confine Mr. Suarez to SHU, Defendants have not produced any such evidence.

### C. Defendant Lahey

Defendants seek summary judgment with respect to Defendant Lahey, arguing that he did not take "any affirmative action at all." MSJ at 15. On this point, Defendants incorrectly suggest that "Defendant Lahey had no role whatsoever in the decision to place Mr. Suarez in disciplinary confinement," "[n]or . . . any role in the decision to allow Mr. Suarez to be sentenced to disciplinary confinement." *Id.* But there remains a material dispute of fact as to whether Defendant Lahey played such an affirmative role, foreclosing summary judgment.

As OMH's Forensic Unit Chief, Defendant Lahey was the "ultimate authority at Downstate regarding all aspects of OMH operations," and was "ultimately responsible for ensuring that the OMH staff at Downstate was following [CNYPC] policies and procedures." PS56.1 ¶¶32–34. Defendant Lahey thus met with the JCMC every two weeks on Thursdays and was responsible for reviewing, monitoring, and coordinating the treatment plans of inmates placed in segregated confinement, in part to determine whether "time cuts" or modifications to disciplinary sanctions were warranted. *Id.* ¶¶35–48. Defendant Lahey personally conducted observational rounds in SHU weekly—typically on Fridays, which would have been three days after Mr. Suarez was initially detained in SHU—and would meet with the SHU clinician almost daily to discuss SHU inmates. *Id.* ¶¶50–51; PR56.1 ¶48. Notably, Defendant Lahey was personally contacted when Mr. Suarez was initially detained in SHU as part of the OMH referral process, and was ultimately responsible for responding to this referral. PS56.1 ¶¶136–142.

Put on notice that Mr. Suarez was detained in SHU, Defendant Lahey was therefore obligated under SHU Exclusion Law—as Chair of the JCMC—to make a written determination within 14 days as to whether Mr. Suarez should remain in SHU or be diverted. *See supra* Argument Part II.B; PR56.1 ¶48; PS56.1 ¶68. Defendant Lahey admitted this at his deposition. *Id.* ¶190. And by Defendant Lahey's best estimate, there would have been a JCMC meeting on

Thursday, August 17, 2017, where Defendant Lahey would have expected Mr. Suarez's incident and SHU confinement to be discussed. *Id.* ¶¶187–89. But Defendant Lahey and the rest of the JCMC ignored their obligation under the law to divert Mr. Suarez, leaving him to decompensate in SHU. PR56.1 ¶48; PS56.1 ¶¶200–01. Defendant Lahey's repeated decisions to leave Mr. Suarez in SHU—even if construed as sustained indifference, as Defendants have argued— constitutes affirmative conduct actionable under the Substantive Due Process Clause. *See Pena*, 432 F.3d at 111; *Okin*, 577 F.3d at 428 ("repeated, sustained inaction" qualifies).

Defendant Lahey also approved of Defendant Horan's imposition of an above-guidelines sanction. PR56.1 ¶48. Defendant Lahey testified that he would have been personally contacted to field Defendant Horan's request for OMH testimony and would have discussed with Ms. DiNardo whether Mr. Suarez's conduct was related to his mental health symptoms. *Id.* Additionally, Mr. Suarez's file would have been reviewed by Defendant Lahey and others on the JCMC, where Defendant Lahey would have developed his own independent view as to whether Mr. Suarez should be confined. *Id.* Defendant Lahey and the JCMC were further required to review and issue a recommendation on, and did review and recommend, Mr. Suarez's conditions of confinement. PS56.1 ¶¶48, 245. Lahey now admits that he agrees—and at the time of the Tier III hearing likely agreed—that Mr. Suarez was not fit for confinement in disciplinary housing. *Id.* ¶¶198. He further admits that, once OMH had reached the conclusion that an inmate was not fit for disciplinary housing, you would want to move them as promptly as possible. *Id.* ¶199. Despite these admissions, and when presented with the same facts put before the JCMC at the time of Mr. Suarez's Tier III hearing and disciplinary sentence, Defendant Lahey decided not to divert Mr. Suarez from disciplinary confinement or move him to a long- term Level 1 facility that could provide him proper treatment. *Id.* ¶¶200–01.

Of course, after 15 years of working with inmates suffering from mental health conditions, Defendant Lahey was aware of Mr. Suarez's risk of decompensation and potential for violence, and knew that segregated confinement and keeplock would be "detrimental" to Mr. Suarez, further exacerbating both results. *Id.* ¶163. Through his role on the JCMC, or as Unit Chief, Defendant Lahey could have recommended to the Superintendent that Mr. Suarez receive a time cut, or just transferred Mr. Suarez himself to a mental health unit for appropriate treatment instead of permitting segregated confinement, PR56.1 ¶12; but he did just the opposite, all while exhibiting deliberate indifference to Mr. Suarez's mental health and resulting risk of violence.

### D. Defendant Yee-Foon

Defendants argue that Defendant Yee-Foon's conduct was not sufficiently conscience-shocking to sustain Ms. Idiakheua's substantive due process claim, primarily arguing that (i) Defendant Yee-Foon had "no role" in deciding when Mr. Suarez would be released from prison and "no discretion" with respect to where Mr. Suarez would be housed upon his release; (ii) Ms. Idiakheua did not specifically request that her son be taken to a hospital; and (iii) Mr. Suarez showed no signs of decompensation during meetings with Yee-Foon. *See* MSJ at 16–20. Defendants' arguments misconstrue the factual record.

*First*, Defendant Yee-Foon certainly had more discretion than Defendants suggest. Defendant Yee-Foon understood that if a client released from prison with an AOT "become[s] symptomatic, then there's a possibility that they can be removed from the community and placed in a hospital." PS56.1 ¶332. Defendant Yee-Foon could thus request a "removal," through which a pickup team would bring Mr. Suarez to a hospital. *Id.* ¶334. In fact, Defendant Yee-Foon has, himself, taken clients to hospitals during emergencies, and admitted he had discretion and authority to deal with emergencies. *Id.* ¶¶334, 337. He could also make an application for a "higher level

of care" for Mr. Suarez and recommend "assertive community treatment" ("ACT") or "forensic ACT." *Id.* ¶336. Defendants' suggestions to the contrary are unsupported.

*Second*, it is inapposite that Ms. Idiakheua did not explicitly request that Defendant Yee-Foon deliver Mr. Suarez at an earlier hour on the day of his release so that he could be taken to a treatment program. Ms. Idiakheua drove to Downstate on the morning of Mr. Suarez's release to pick him up, intending to take him to an outpatient psychiatric center immediately, specifically, Richmond University Hospital. PS56.1 ¶320. She was turned away. *Id.* ¶321. In any case, Ms. Idiakheua is neither a doctor nor a mental health provider. Having control over Mr. Suarez, and with the requisite training and experience, it was Defendant Yee-Foon who was best positioned to determine the appropriate place and time for Mr. Suarez to be delivered to Ms. Idiakheua.

*Third*, Defendants make the unbelievable claim that Mr. Suarez exhibited no signs of decompensation during his interactions with Defendant Yee-Foon. This is false. PS56.1 ¶¶327–29. Defendant Yee-Foon and others observed Mr. Suarez in a symptomatic state on and around the day of his release. *Id.* ¶¶324, 327–29, 341. Still, Defendant Yee-Foon took no steps to seek treatment for Mr. Suarez. *Id.* ¶¶337–38. Rather, he actively disincentivized Ms. Idiakheua from taking her son to a treatment center, threatening a parole violation. *Id.* ¶¶339–40.

Finally, this case is not meaningfully distinguishable from *Armijo By & Through Chavez* v. *Wagon Mound Pub. Sch.*, 159 F.3d 1253 (10th Cir. 1998). Indeed, the *Armijo* factors are satisfied here and a jury could deem the instant facts worse. Ms. Idiakheua is a member of limited group—she is the mother of Mr. Suarez and was known to Defendant Yee-Foon, who personally provided her instructions. PS56.1 ¶¶339–40. Defendant Yee-Foon put Ms. Idiakheua at risk of serious, immediate harm by delivering Mr. Suarez directly to Ms. Idiakheua's home while he was unstable, all while "cutting off potential sources of private aid." *Armijo*, 159 F.3d at 1263 (internal

citation omitted). Defendant Yee-Foon knew that Mr. Suarez was aggressive and SMI, but consciously disregarded symptoms of his decompensation. PS56.1 ¶¶327–40. Thus, Defendant Yee-Foon's actions can fairly be viewed as conscience-shocking. *Armijo*, 159 F.3d at 1262–63.

Accordingly, the Court should deny Defendants' motion for summary judgment on Ms. Idiakheua's substantive due process claim.

## III. Ms. Idiakheua's Negligence Claims Against Defendants Lahey and Baker Should Proceed to Trial[14]

### A. Defendants Lahey and Baker Owed Ms. Idiakheua a Duty

Defendants incorrectly argue that "because Plaintiff cannot establish that either defendant Lahey or defendant Baker owed her a special duty, Plaintiff's negligence claim fails as a matter of law." MSJ at 21. Defendants' argument miscites the applicable legal standard. The Court dismissed Ms. Idiakheua's Negligent Infliction of Emotional Distress claim in part based on the lack of a special duty. *See Idiakheua*, 2022 WL 10604355, at *17. But this special duty rule does not apply to a normal negligence claim. *See Druschke* v. *Banana Republic, Inc.*, 359 F. Supp. 2d 308, 315 (S.D.N.Y. 2005) (stating that the special duty rule is "far more specific than the more generalized duty to avoid negligently injuring another"). Here, Defendants Lahey and Baker owed Ms. Idiakheua a duty as a matter of law by virtue of their control of Mr. Suarez. *See* Restatement (Second) of Torts § 319 (1965) ("One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm."); *Ben* v. *United States*, 160 F. Supp. 3d 460, 478–83 (N.D.N.Y. 2016) (applying § 319 to

---

[14] Defendants' motion does not seek summary judgment with respect to the outstanding negligence claims against Defendants Horan and Yee-Foon. Accordingly, arguments with respect to these Defendants are waived and need not be addressed by Ms. Idiakheua. *See Levine* v. *Lawrence*, No. 03-CV-1694 (DRH) (ETB), 2005 WL 1412143, at *5 (E.D.N.Y. June 15, 2005) ("[F]ailure to adequately brief an argument constitutes waiver . . . ."). In any case, for the reasons discussed in Argument Parts II.A. and D., these claims should proceed to trial.

negligence claim against Pre-Trial Services); *Saint-Guillen* v. *United States*, 657 F. Supp. 2d 376, 385 (E.D.N.Y. 2009) (discussing application to mental health professionals).

### B. There Is a Genuine Issue of Material Fact as to Whether Defendant Lahey Was Negligent

As previously demonstrated, Defendants' factual argument that Defendant Lahey "had no involvement in either the initial decision to confine Mr. Suarez nor continue his confinement," MSJ at 21, fails. *See supra* Argument Part. II.C. Because a jury could find that Defendant Lahey violated Ms. Idiakheua's substantive due process rights, there is necessarily a dispute of material fact as to whether Defendant Lahey's conduct meets the lower threshold of negligence. *Cf. Idiakheua*, 2022 WL 10604355, at *4 (contrasting negligence and due process standards).

### C. There Is a Genuine Issue of Material Fact as to Whether Defendant Baker's Negligence Proximately Caused Harm to Ms. Idiakheua

Defendants' causation argument regarding Defendant Baker's "failure to include [Mr. Suarez's] disciplinary information in the Discharge Summary and provide this information to the DOCCS parole supervision staff," MSJ at 22, similarly fails on both the facts and the law.

A reasonable juror could find that Ms. Idiakheua's injuries were proximately caused by Defendant Baker's failure to properly communicate the severity of Mr. Suarez's disciplinary history. Witness after witness—including Defendant Baker herself—testified that it was important to provide an accurate and complete discharge summary to supervision staff. PS56.1 ¶¶301, 304–07. And the reasons why one should not omit from an inmate's discharge summary the fact that the inmate had a recent violent altercation with officers—threatening to kill them upon his release—are obvious. Defendants' argument ignores Defendant Baker's myriad other omissions when preparing Mr. Suarez's discharge summary and release plan—namely, the details of Mr. Suarez's placement in SHU and keeplock, and his further mental decompensation. PS56.1 ¶¶291–96. This information was essential for the individuals, including Defendant Yee-

Foon and Mr. Urban, tasked with supervising Mr. Suarez upon his release—who otherwise might have appreciated Mr. Suarez's potential for violence and taken preventative action. *Id.* ¶¶301, 304–07. A reasonable juror could thus find that Defendant Baker's omissions increased the risk of harm to Ms. Idiakheua and was a substantial factor in causing her injuries.[15]

## IV.   <u>Defendants Are Not Entitled to Qualified Immunity</u>

As established, the discovery record demonstrates a genuine issue of material fact as to whether Defendants violated Ms. Idiakheua's substantive due process rights. Accordingly, to be entitled to qualified immunity, Defendants must demonstrate that the right asserted here—Ms. Idiakheua's right to be free from state created danger—was not clearly established at the time of the violation.[16] Defendants cannot, and indeed do not even attempt to, make this showing. Nor could they, given that "police officers have long been on notice that they can violate a person's due process rights by affirmatively creating or increasing the risk of private violence against that person." *Idiakheua*, 2022 WL 10604355, at *10 (quotations omitted).

Rather, Defendants argue that their actions were "objectively reasonable." MSJ at 24. But even if this argument were meritorious—which it is not—it could not yield summary judgment in Defendants' favor. As the Circuit has made clear, "[t]he matter of whether a defendant official's conduct was objectively reasonable . . . is a mixed question of law and fact." *Outlaw* v. *City of Hartford*, 884 F.3d 351, 367 (2d Cir. 2018) (quotations omitted).

---

[15] Proximate causation is a factual issue most appropriately left for the trier of fact. *See In re Fosamax Prod. Liab. Litig.*, 688 F. Supp. 2d 259, 266 (S.D.N.Y. 2010) ("A party seeking summary judgment on the issue of proximate cause faces a difficult burden as this generally is an issue of fact."); *Hassanein* v. *Avianca Airlines*, 872 F. Supp. 1183, 1188–89 (E.D.N.Y. 1995); *Uryevick* v. *Rozzi*, 751 F. Supp. 1064, 1072 (E.D.N.Y. 1990).

[16] Defendants bear the burden on this affirmative defense to "demonstrat[e] that no rational jury could conclude (1) that the official violated a statutory or constitutional right, and (2) that the right was clearly established at the time of the challenged conduct." *Vasquez* v. *Maloney*, 990 F.3d 232, 238 (2d Cir. 2021). Whether a right is clearly established is a question of law. *See Outlaw*, 884 F.3d at 366. Where threshold factual issues are disputed, however, it becomes a mixed question of fact and law. *Id.* at 367. Either way, when deciding whether qualified immunity applies, the Court "must view the evidence in the light most favorable to the opposing party." *Tolan* v. *Cotton*, 572 U.S. 650, 657 (2014); *Sloley* v. *VanBramer*, 945 F.3d 30, 36 (2d Cir. 2019).

Accordingly, if there is a "dispute as to the material historical facts"—as there is here—"the factual question[s] must be resolved by a factfinder." *Id.* It is only then that "the court [] may make the ultimate legal determination of whether qualified immunity attaches on those facts." *Id.*; *see also Kerman* v. *City of New York*, 374 F.3d 93, 109 (2d Cir. 2004).

Multiple factual disputes remain as to whether Defendants' actions were objectively reasonable—disputes that must be resolved by a jury. For example, a rational jury could reject Defendants' argument that it was objectively reasonable for Defendants Horan and Morton to sentence Mr. Suarez—an SMI 1-S inmate exhibiting clear signs of mental decompensation—to 30 days' keeplock, ignoring applicable guidelines and OMH staff's mental health recommendations. A rational jury could further reject Defendants' argument that it was objectively reasonable for Defendant Lahey to actively refrain from diverting Mr. Suarez for mental health treatment at the time he was placed in SHU—contravening his obligations under the SHU Exclusion Law—and again when Mr. Suarez was subsequently sentenced to 30 days' keeplock. As just one more example, a jury could find that it was not objectively reasonable for Defendant Yee-Foon to observe Mr. Suarez laughing to himself—an obvious sign of mental decompensation documented by Defendants after evaluating Mr. Suarez—yet claim that he "had no reason to suspect that Mr. Suarez was decompensating." MSJ at 19. Given these threshold factual issues, and the myriad other disputed facts material to whether Defendants can claim that their actions were objectively reasonable, *see supra* Argument Part II, Defendants have failed to demonstrate that they are entitled to qualified immunity. *See Outlaw*, 884 F.3d at 367.

## CONCLUSION

Accordingly, Defendants' motion for partial summary judgment should be denied.

Dated: March 21, 2023

Respectfully submitted,

PAUL, WEISS, RIFKIND, WHARTON &
  GARRISON LLP

By: /s/ *Walter G. Ricciardi*
    Walter G. Ricciardi

Aidan Synnott
Alison R. Benedon
Jason A. Driscoll
1285 Avenue of the Americas
New York, NY 10019
(212) 373-3000
Email: wricciardi@paulweiss.com

*Counsel for Plaintiff Maritza Idiakheua*