UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
MARITZA IDIAKHEUA,

                                        Plaintiff,

           -against-

ROBERT MORTON, RYAN LAHEY, PETER
HORAN, CHESNEY BAKER, and RENE YEE-
FOON,

                                        Defendants.

**MEMORANDUM & ORDER**

**20-CV-4169 (NGG) (SJB)**

NICHOLAS G. GARAUFIS, United States District Judge.

Elvin Suarez was incarcerated in Downstate Correctional Facil-
ity ("Downstate") in the summer of 2017, after pleading guilty
to second-degree assault with intent to injure a police officer.
While at Downstate, Mr. Suarez was not taking medication for
his bipolar and schizoaffective disorders, and, after a few
months, he committed a disciplinary violation and was placed
in SHU and keeplock. He remained in segregated confinement
(commonly referred to as solitary confinement)[1] and keeplock

---

[1] This court generally uses the term "segregated confinement" which is the
term used under New York law for what is generally referred to as solitary
confinement. *See New York State Corr. Officers & Police Benevolent Ass'n,
Inc. v. Hochul,* 607 F. Supp. 3d 231, 236 (N.D.N.Y. 2022) (using both "sol-
itary confinement" and "segregated confinement" when discussing New
York's Humane Alternatives to Long-Term Solitary Confinement ("HALT")
Act). Then-existing New York law defined segregated confinement as "the
disciplinary confinement of an inmate in a special housing unit or in a sep-
arate keeplock housing unit" and stated that "[s]pecial housing units and
separate keeplock units are housing units that consist of cells grouped so
as to provide separation from the general population[.]" N.Y. Correct. Law
§ 2(23) (2017). This definition has was amended in 2022. *See* N.Y. Correct.
Law § 2(23). This court thus generally refers to segregated or solitary con-
finement to mean confinement in a special housing unit ("SHU") and not

for the four weeks leading up to his release, at which time he was taken to live with his mother, the Plaintiff Maritza Idiakheua.

A day after his release, Mr. Suarez experienced a psychotic episode and violently attacked Plaintiff, causing her significant injuries. Mr. Suarez was arrested for the attack, was permitted by the State to plead "not responsible by reason of mental disease or defect," and was then civilly committed to Kirby Psychiatric Facility.

Plaintiff alleges that Defendants, officers employed by the State of New York's Office of Mental Health ("OMH") and the State's Department of Corrections and Community Supervision ("DOCCS"), recklessly increased the risk of Mr. Suarez's mental decompensation and psychotic episode, and, by extension, recklessly increased the risk that Mr. Saurez would injure Plaintiff. Plaintiff focuses, in particular, on Mr. Suarez's prolonged confinement in segregated confinement and keeplock immediately prior to his release, given the well documented harms that prolonged periods of solitary confinement have on individuals with serious mental illnesses.

Accordingly, Ms. Idiakheua brought this action to hold Defendants liable for her injuries under 42 U.S.C. § 1983 and New York State tort law.[2] Now pending before the court is Defendants' motion for summary judgment. (*See* Notice of Mot. (Dkt.

---

the form of keeplock in which Mr. Suarez was confined, which was served in a general population cell. The court also notes, however, that the conditions of confinement in a separate long-term keeplock "are no different than the condition of confinement when sentenced to keeplock in a general population." (Pl. Suppl. Statement of Facts ("Pl. 56.1 St.") (Dkt. 113) ¶¶ 212-13; Defs. Resp. to Pl. Suppl. Statement of Facts ("Defs. 56.1 Resp.") (Dkt. 117) ¶¶ 212-13.)

[2] This court previously held, when ruling on Defendants' motion to dismiss, that Plaintiff adequately stated claims (1) against four defendants under

93); Defs. Mem. of Law in Supp. of their Mot. for Summ. J. ("Mot.") (Dkt. 95); Pl. Mem. Of Law in Opp. to Defs. Mot. for Summ. J. ("Opp.") (Dkt. 112); Defs. Reply Mem. Of Law in Supp. of their Mot. for Summ. J. ("Reply") (Dkt. 116).)

For the reasons discussed in this memorandum and order, the court GRANTS in part and DENIES in part Defendants' motion. The court GRANTS summary judgment with respect to Plaintiff's Section 1983 claim against Defendant Yee-Foon and Plaintiff's state law negligence claim against Defendants Yee-Foon and Horan. The court DENIES summary judgment with respect to Plaintiff's Section 1983 claims against Defendants Horan, Morton, and Lahey and Plaintiff's state law negligence claim against Defendants Baker and Lahey.

## I.  BACKGROUND

### A.  Factual Background[3]

Plaintiff Maritz Idiakheua brings this action based on injuries she suffered after being assaulted by her son, Elvin Suarez, following his release from Downstate Correctional Facility.

---

Section 1983, for a violation of Plaintiff's substantive due process rights based on a theory of state-created danger; and (2) against four defendants under New York state tort law. *See generally Idiakheua v. N.Y. State Dep't of Corr. & Cmty. Supervision,* No. 20-CV-4169 (NGG) (SJB), 2022 WL 10604355, at *1 (E.D.N.Y. Oct. 18, 2022).

[3] The court constructs the following statement of facts from the parties' Local Rule 56.1 Statements and the admissible evidence they submitted. Except where otherwise noted, the following facts are undisputed. Where the parties allege different facts, the court notes the dispute and credits the Plaintiff's version if it is supported by evidence in the record. *June v. Town of Westfield,* 370 F.3d 255, 257 (2d Cir. 2004) (construing "the evidence in the light most favorable to the non-moving party and . . . draw[ing] all reasonable inferences in its favor") (quoting *World Trade Ctr. Props., L.L.C. v. Hartford Fire Ins. Co.,* 345 F.3d 154, 165–66 (2d Cir.2003)). A fact is considered undisputed if a party asserts a fact and

In reviewing the facts relevant to Plaintiff's claims, the court first discusses Mr. Suarez's mental health background, arrest, detention at Downstate, release into Plaintiff's home, and the attack on Ms. Idiakheua. The court then reviews the Defendants' individual roles at Downstate and their actions relevant to Plaintiff's claims.

> 1. Elvin Suarez's Detention and Release Into Plaintiff's Custody
>
> a. *Mr. Suarez's Background, Arrest and Intake at Downstate*

Plaintiff's son, Elvin Suarez, was diagnosed with bipolar and schizoaffective disorders in 2014. (Pl. Suppl. Statement of Facts ("Pl. 56.1 St.") (Dkt. 113)[4] ¶ 76; Defs. Resp. to Pl. Suppl. Statement of Facts ("Defs. 56.1 Resp.") (Dkt. 117) ¶ 76.) Mr. Suarez and Plaintiff testify that Mr. Suarez's illness is treatable with proper care and medication and he was not known to be violent towards family members. (Pl. 56.1 St. ¶¶ 84-86; Defs. 56.1 Resp. ¶¶ 84-86;[5] Defs. 56.1 St. (Dkt. 94) ¶ 63; Pl. 56.1 Resp.

---

the other party does not rebut the fact with evidence in the record. *Am. Empire Surplus Lines Ins. Co. v. Certain Underwriters at Lloyd's London*, No. 16-CV-5664 (AMD) (JO), 2018 WL 10456838, at *4 (E.D.N.Y. July 23, 2018) ("[T]he party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial.").

[4] Plaintiff's Supplemental Statement of Facts begins at page 25 of this filing. It follows Plaintiff's Responses to Defendants' Statement of Facts, which is included on pages 1 through 24 of this filing.

[5] Defendants dispute certain testimony because Plaintiff or others are not qualified to provide mental health opinions. (*See, e.g.*, Defs. 56.1 Resp. ¶¶ 84, 86, 88, 91, 93.) A district court can only consider facts that would be admissible in evidence at trial, but the nonmoving party does not need to produce evidence "in a form that would be admissible at trial in order to avoid summary judgment." *Rivera v. Lopez*, 67 F. App'x 651, 653 (2d Cir.

(Dkt. 113) ¶ 63.) However, Mr. Suarez has at times experienced severe psychosis, engaged in self-harm and displayed aggressive behavior. (Pl. 56.1 St. ¶¶ 81, 88-89; Defs. 56.1 Resp. ¶¶ 81, 88-89.) On "several occasions" he has been detained by police and treated at Kirby Forensic Psychiatric Center ("Kirby"), a psychiatric hospital operated by the OMH. (Pl. 56.1 St. ¶ 89; Defs. 56.1 Resp. ¶ 89.)

Around November 2016, police detained Mr. Suarez after he broke sideview mirrors of cars parked near the home he shared with his mother. (Pl. 56.1 St. ¶¶ 91-92; Defs. 56.1 Resp. ¶¶ 91-92.) Police arrived and he subsequently pleaded guilty to second-degree assault with intent to injure a police officer. (Pl. 56.1 St. ¶ 92; Defs. 56.1 Resp. ¶ 92.) After an initial period of detention at Kirby, Mr. Suarez was sentenced to a two-year term of incarceration on June 7, 2017, and was transferred to Downstate on June 22, 2017. (Pl. 56.1 St. ¶¶ 93-94; Defs. 56.1 Resp. ¶¶ 93-94.)

Downstate was operated[6] by the State of New York's Department of Corrections and Community Supervision.[7] (Pl. 56.1 St. ¶¶ 3-5, 99; Defs. 56.1 Resp. ¶¶ 3-5, 99.) As a "Level 1 Facility," as designated by the Office of Mental Health, Downstate was

---

2003) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986); *see also Ehrens v. Lutheran Church,* 385 F.3d 232, 235 (2d Cir. 2004). These statements are considered for the present motion as it relates to Plaintiff and Mr. Suarez's understanding of Mr. Suarez's condition, which is relevant as it concerns their behavior both before and after his release from Downstate. The court also notes that a consideration of evidence at this stage is not a definitive ruling as to whether such evidence is admissible at trial. *See O.E.M. Glass Network, Inc. v. Mygrant Glass Co., Inc.,* No. 19-CV-00742 (NGG) (LB), 2023 WL 2563689, at *6 (E.D.N.Y. Mar. 17, 2023).

[6] Downstate closed in March 2022, following the events relevant to this action. (Pl. 56.1 St. ¶ 99; Defs. 56.1 Resp. ¶ 99.)

[7] DOCCS is a department or agency of the State of New York. (Pl. 56.1 St. ¶ 3; Defs. 56.1 Resp. ¶ 3.)

meant to support individuals with serious mental illnesses and provide a large array of mental health services. (Pl. 56.1 St. ¶ 96; Defs. 56.1 Resp. ¶ 96; *see also* Defs. 56.1 St. ¶¶ 3-6; Pl. 56.1 Resp. ¶¶ 3-6.)[8]

Upon his arrival at Downstate, Mr. Suarez received an intake evaluation. (Pl. 56.1 St. ¶ 101; Defs. 56.1 Resp. ¶ 101.) Mr. Suarez's screening admission note included his history of mental health treatment and suicidality, bipolar diagnosis, and history of inpatient treatment at a range of institutions and hospitals. (Pl. 56.1 St. ¶ 102; Defs. 56.1 Resp. ¶ 102.) It also noted his history of mood swings and auditory hallucinations, and that he had been prescribed medication which Mr. Saurez believed was effective in treating his symptoms.[9] (Pl. 56.1 St. ¶¶

---

[8] Defendants dispute this statement to the extent that it is an "incomplete definition" of a Level 1 facility. (See Defs. 56.1 Resp. ¶ 96.) The parties also dispute the extent of services provided at Downstate, including the existence and operation of a satellite unit where individuals may be admitted when an individual begins to psychologically decompensate, and special programs for individuals.

[9] Defendants dispute the implication of Plaintiff's statement but do not dispute the underlying facts. (*See* Defs. 56.1 Resp. ¶ 104 ("Disputed only to the extent that the paragraph is meant to imply that Mr. Suarez arrived at Downstate with Zyprexa and not just a notation that he had a prescription for said medication.").) The court notes this dispute and draws the factual content of the statement where relevant. Similarly, Defendants dispute many statements as "inappropriate argument." (*See, e.g.,* Defs. 56.1 Resp. ¶ 140 ("Paragraph 140 is inappropriate argument as it contends that there was an obligation to divert Mr. Suarez to the Forensic Diagnostic Unit.").) The court considers the factual content in Plaintiff's statements where Defendants make this challenge and considers the facts undisputed where Plaintiff provides support for the factual content of the statement and Defendants do not dispute the relevant factual content with citation to the record. In addition, where Defendants argue that a statement is "[d]isputed as misleading," (*see, e.g.,* Defs. 56.1 Resp. ¶ 205), the court will also consider the factual content of these statements when Defendants do not dispute the factual assertions.

103-04; Defs. 56.1 Resp. ¶¶ 103-04.) Intake forms also indicated that he was considered SMI "Level 1," OMH's highest mental health designation, and that he was diagnosed with schizophrenia or schizoaffective disorder. (Pl. 56.1 St. ¶¶ 105-06; Defs. 56.1 Resp. ¶¶ 105-06.) An application was also prepared for Mr. Suarez that requested a "Level 1-S" designation, which is designated by OMH when an individual has been further diagnosed with a serious mental health illness. *Id.* Defendant Lahey signed off on an initial Level 1-S designation on June 29, 2017, and this became official the next day. (Pl. 56.1 St. ¶¶ 110-11; Defs. 56.1 Resp. ¶¶ 110-11.)

Mr. Suarez's comprehensive suicide risk assessment ("CSRA") form listed treatment compliance and family support as potential "protective factors" and listed "disciplinary sanctions, housed single cell, history of suicidal behavior, and substance abuse as potential 'risk factors.'" (Pl. 56.1 St. ¶ 108; Defs. 56.1 Resp. ¶ 108.) The CSRA form also noted that if the treatment team observed signs of psychiatric decompensation, then Mr. Suarez might benefit from admission to a Residential Crisis Treatment Program. (Pl. 56.1 St. ¶ 109; Defs. 56.1 Resp. ¶ 109.)

As early as June 30, 2017, Mr. Suarez refused to take medication while at Downstate. (Pl. 56.1 St. ¶¶ 112-13; Defs. 56.1 Resp. ¶¶ 112-13.)[10]

    *b.   Disciplinary Action and Confinement in SHU and Keeplock*

Approximately one and a half months after arriving at Downstate, on August 8, 2017, Mr. Suarez was involved in a violent altercation with DOCCS officers. (Pl. 56.1 St. ¶ 128; Defs. 56.1

---

[10] It is unclear from the parties' 56.1 statements when Mr. Suarez first stopped taking his medication with Defendants noting that he did not arrive at Downstate with medication. (*Id.*)

Resp. ¶ 128.) An "Unusual Incident Report" states that Mr. Suarez was "arguing with staff and acting unpredictable," struck an officer, and threatened staff. (Pl. 56.1 St. ¶¶ 129-32; Defs. 56.1 Resp. ¶¶ 129-32.) An OMH SHU clinician also conducted an intake interview of Mr. Suarez for a "SHU admission mental health screening." (Pl. 56.1 St. ¶¶ 142-43; Defs. 56.1 Resp. ¶¶ 142-43.)

Later on August 8, 2017, DOCCS personnel placed Mr. Suarez into a "Special Housing Unit" (SHU), where he remained for two weeks until his sentencing hearing on August 22, 2017. (Pl. 56.1 St. ¶ 140; Defs. 56.1 Resp. ¶ 140.) In SHU, Mr. Suarez was alone with a radio and headphones, bed, sink, and toilet, in a cell with one reinforced, exterior window and a small window on the door. (Pl. 56.1 St. ¶ 146; Defs. 56.1 Resp. ¶ 146.) This placement prior to his hearing would have triggered requirements on Downstate officers under New York law, including an initial screening, a need to be seen daily, and an evaluation within fourteen days of his placement in SHU. (*See* Defs. 56.1 St. ¶ 39-40, 43-45; Pl. 56.1 Resp. ¶ 39-40, 43-45.) *See also* N.Y. Correction Law § 137(6) (2017).[11] Mr. Suarez did not receive treatment or therapy during this time. (Pl. 56.1 St. ¶ 145, 153-54; Defs. 56.1 Resp. ¶ 145, 153-54.)[12]

---

[11] New York's HALT Act amended this provision in 2022, adding additional restrictions to placement of individuals in segregated confinement that were not in effect at the times relevant to this action. *See* N.Y. Correct. Law § 137; *see also New York State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul*, 607 F. Supp. 3d 231, 236 (N.D.N.Y. 2022) (discussing the HALT Act). This opinion considers the law that was in effect in 2017. N.Y. Correction Law § 137 (2017). (*See also* Opp., Ex. 42 (Dkt. 114-42).)

[12] Defendants state that Defendant Lahey testified that there was an attempt to treat, but that Mr. Suarez continued to decline treatment during this time. (Pl. 56.1 St. ¶ 153; Defs. 56.1 Resp. ¶ 153.) Individuals have a right to decide whether to medicate or participate in treatment and an incarcerated individual cannot be forced to take medication without a court

Mr. Suarez was also subject to a deprivation order between August 8, 2017 and August 15, 2017, which meant he was not allowed out of his cell even for the typically required minimum of one hour of recreation per day. (Pl. 56.1 St. ¶¶ 147-49; Defs. 56.1 Resp. ¶¶ 147-49.) He was only permitted to leave his cell once a week to shower. (Pl. 56.1 St. ¶ 149; Defs. 56.1 Resp. ¶ 149.) The deprivation order was renewed every day from August 8, 2017 through August 15, 2017. (Pl. 56.1 St. ¶ 147; Defs. 56.1 Resp. ¶ 147.)

Mr. Suarez was entitled to a disciplinary hearing within seven days of his placement in SHU, but he remained in SHU until August 22, 2017 due to delays initiated by Defendant Horan. (Pl. 56.1 St. ¶ 174; Defs. 56.1 Resp. ¶ 174.) After finding Mr. Suarez guilty of the disciplinary charges,[13] Defendant Horan sentenced Mr. Suarez to 14 days of time served in SHU, plus an additional 60 days of "keeplock time" with 30 days suspended for 180 days, (Pl. 56.1 St. ¶¶ 208-09; Defs. 56.1 Resp. ¶¶ 208-09.) Keeplock is a form of disciplinary sanction in which a prisoner is typically subject to "23-hour lockdown." (Pl. 56.1 St. ¶ 211; Defs. 56.1 Resp. ¶ 211.) At the time, keeplock served in a general population cell was not considered under New York law to be "segregated confinement." N.Y. Correct. Law § 2(23) (2017). However, the conditions of confinement for keeplock served in the general population are not materially different than the conditions of confinement for separate long-term keeplock, which was considered to be "segregated confinement." (Pl. 56.1 St. ¶¶ 212-13; Defs. 56.1 Resp. ¶¶ 212-13.)

---

order. (Defs. 56.1 St. ¶ 26-27; Pl. 56.1 Resp. ¶ 26-27.) Only OMH (not DOCCS) staff may seek such a court order if deemed necessary. (*Id.*) Plaintiff alleges (though Defendants dispute), that Mr. Suarez did not receive proper follow-up counseling regarding medication compliance, however. (Pl. 56.1 St. ¶¶ 123, 125; Defs. 56.1 Resp. ¶¶ 123, 125.)

[13] These charges included creating a disturbance, assault on staff, and refusing a direct order. (Pl. 56.1 St. ¶ 208; Defs. 56.1 Resp. ¶ 208.)

N.Y. Correct. Law § 2(23) (2017). Mr. Suarez was only permitted to leave keeplock confinement once a day to go to the yard, or, depending on the yard schedule, not at all. (Pl. 56.1 St. ¶ 215; Defs. 56.1 Resp. ¶ 215.) Mr. Suarez would spend the weeks leading up to his release in SHU and keeplock. (Pl. 56.1 St. ¶ 291; Defs. 56.1 Resp. ¶ 291.)

  *c. Discharge Planning*

On August 4, 2017, prior to his confinement in SHU and keeplock, Mr. Suarez's OMH treatment team began preparing his discharge summary and release plan. (Pl. 56.1 St. ¶ 247; Defs. 56.1 Resp. ¶ 247.)[14]

Mr. Suarez's treatment team pursued his discharge plan through Assisted Outpatient Treatment ("AOT"), which is an order a court can issue for people with serious mental illnesses ("SMI") who pose a potential risk to themselves or others in the community, are at risk of relapse or deterioration, and who show an unwillingness to voluntary comply with their prescribed treatment plan. (Pl. 56.1 St. ¶¶ 253, 260; Defs. 56.1 Resp. ¶¶ 253, 260.) In connection with Mr. Suarez's outpatient AOT petition, Mr. Suarez was interviewed by OMH doctors several times between June 30, 2017 and August 25, 2017. (Defs. 56.1 St. ¶ 57; Pl. 56.1 Resp. ¶ 57.) The doctors who interviewed Mr. Suarez noted his medication noncompliance, the risks from medication noncompliance, that his affect was elevated and insight poor, and that he displayed inappropriate smiling and laughter. (Pl. 56.1 St. ¶¶ 261, 267-68, 270-73, 275-76; Defs.

---

[14] OMH develops "individualized and comprehensive" discharge plans for all inmates it provides with mental health services. (Pl. 56.1 St. ¶¶ 249-50; Defs. 56.1 Resp. ¶¶ 249-50.) Discharge planning is particularly important to offer discharge planning for inmates designated as SMI for "continuity of care." (Pl. 56.1 St. ¶¶ 249-50; Defs. 56.1 Resp. ¶¶ 249-50.) General practice is for discharge planning to include facilitating access to mental health housing and mental health care coordination and arranging for outpatient clinic services. (Defs. 56.1 St. ¶ 36; Pl. 56.1 Resp. ¶ 36.)

56.1 Resp. ¶¶ 261, 267-68, 270-73, 275-76.) They also pre-
pared notes that reviewed Mr. Suarez's history of violence and
the conduct that led to his disciplinary hearing. (Pl. 56.1 St. ¶
270; Defs. 56.1 Resp. ¶ 270.) Defendant Morton ultimately
signed Mr. Suarez's AOT petition and a court granted it on Au-
gust 31, 2017, putting in place a court order requiring Mr.
Suarez to attend outpatient treatment upon release. (Pl. 56.1
St. ¶¶ 278-80; Defs. 56.1 Resp. ¶¶ 278-80.)

The final discharge summary noted that Mr. Suarez's AOT was
granted. (Pl. 56.1 St. ¶ 288; Defs. 56.1 Resp. ¶ 288.)[15] How-
ever, there were multiple errors or omissions in the discharge
summary. The summary stated that Mr. Suarez had no discipli-
nary infractions since his arrival at Downstate. (Pl. 56.1 St. ¶
289; Defs. 56.1 Resp. ¶ 289.) The discharge summary also did
not state that Mr. Suarez had been placed in SHU and keeplock
until his release. (Pl. 56.1 St. ¶ 291; Defs. 56.1 Resp. ¶ 291.) Fi-
nally, the discharge summary did not reference Mr. Suarez's
doctor evaluations which reviewed his medication noncompli-
ance and mental state. (Pl. 56.1 St. ¶¶ 292-96; Defs. 56.1 Resp.
¶¶ 292-96.)

Finally, as part of his release planning, Mr. Suarez proposed to
live with his mother, the Plaintiff Ms. Idiakheua, and this living
arrangement was approved by the Parole Board. (Pl. 56.1 St. ¶
266; Defs. 56.1 Resp. ¶ 266.) The Plaintiff agreed to Mr. Sua-
rez's proposal to live with her. (Defs. 56.1 St. ¶¶ 49-50; Pl. 56.1
Resp. ¶¶ 49-50.)

---

[15] Plaintiff's Supplemental 56.1 Statement notes that the final discharge
summary was emailed on September 6, 2017, but it is unclear from the
record when it was finalized. *Id.*

### d. *Release into Plaintiff's Custody*

A few days before Mr. Suarez's discharge, Ms. Idiakheua visited Mr. Suarez with her daughter, Ms. Shearer. (Pl. 56.1 St. ¶ 313; Defs. 56.1 Resp. ¶ 313.)

Ms. Idiakheua and Ms. Shearer state that they observed that Mr. Suarez was visibly unwell during this visit. He was placing his head face-down on the visiting room table, talking to himself, unable to engage in coherent conversation, and forcing himself to vomit in the bathroom without explanation. (Pl. 56.1 St. ¶ 314; Defs. 56.1 Resp. ¶ 314.) Corrections officers who were on duty at the time of Ms. Idiakheua's visit observed Mr. Suarez's erratic behavior, heard him vomiting in the bathroom, and banged on the door to encourage him to come out. (Pl. 56.1 St. ¶ 315; Defs. 56.1 Resp. ¶ 315.) Ms. Idiakheua testifies that these officers offered no assistance and refused to seek treatment for Mr. Suarez. (Pl. 56.1 St. ¶ 318; Defs. 56.1 Resp. ¶ 318.)

On the morning of his release a few days later, on September 5, 2017, Ms. Idiakheua drove to Downstate. (Pl. 56.1 St. ¶ 320; Defs. 56.1 Resp. ¶ 320.) She testifies that she did so to ask that her son be released that morning so she could drive him to a hospital to be treated, a request she testifies was rejected. (Pl. 56.1 St. ¶ 320; Defs. 56.1 Resp. ¶ 320; *see also* Defs. 56.1 St. ¶ 64; Pl. 56.1 Resp. ¶ 64.) Defendants dispute that she made such a request, however. (Pl. 56.1 St. ¶ 320; Defs. 56.1 Resp. ¶ 320; *see also* Defs. 56.1 St. ¶ 64; Pl. 56.1 Resp. ¶ 64.)

Mr. Suarez was released later that evening, at which time Defendant Yee-Foon transported Mr. Suarez to Ms. Idiakheua's apartment. Ms. Idiakheua testified that, once her son arrived at her home, she saw that Mr. Suarez was unwell and she was concerned for his safety. (Pl. 56.1 St. ¶ 341; Defs. 56.1 Resp. ¶ 341.) Joel Suarez ("Joel"), also Ms. Idiakheua's son, testified that he spoke with Elvin Suarez on the phone and observed that

he was laughing to himself and appeared to have difficulty following conversation. (Pl. 56.1 St. ¶ 344; Defs. 56.1 Resp. ¶ 344.) Ms. Idiakheua expressed concern to Defendant Yee-Foon that Mr. Suarez was released without medication. (Pl. 56.1 St. ¶ 346; Defs. 56.1 Resp. ¶ 346.) Ms. Idiakheua was told that Mr. Suarez would be placed in a program to address his mental health concerns. (Defs. 56.1 St. ¶¶ 66-67; Pl. 56.1 Resp. ¶¶ 66-67.)

Defendant Yee-Foon informed the Plaintiff that Mr. Suarez was required to appear at a meeting with Parole Officer Urban at 9:00 am the next morning. (Pl. 56.1 St. ¶ 338; Defs. 56.1 Resp. ¶ 338.) Ms. Idiakheua had previously been warned that a failure to appear would violate Mr. Suarez's terms of release and could lead to reincarceration. (Pl. 56.1 St. ¶¶ 339-40; Defs. 56.1 Resp. ¶¶ 339-40.) Plaintiff testified that based on Defendant Yee-Foon's warnings about Mr. Suarez's curfew and given the late hour, she did not bring Mr. Suarez to an emergency room for treatment. (Pl. 56.1 St. ¶ 350; Defs. 56.1 Resp. ¶ 350.)

The next day, on September 6, 2017, Ms. Idiakheua accompanied Mr. Suarez to meet with Parole Officer Urban, who reviewed files documenting Mr. Suarez's incarceration and release. (Pl. 56.1 St. ¶ 354; Defs. 56.1 Resp. ¶ 354.) Defendant Yee-Foon also attended this meeting. (Pl. 56.1 St. ¶ 355; Defs. 56.1 Resp. ¶ 355.) Parole Officer Urban noticed that Mr. Suarez's "affect was off." (Pl. 56.1 St. ¶ 356; Defs. 56.1 Resp. ¶ 356.) A report from Urban notes that Mr. Suarez appeared to be in need of medication. (Pl. 56.1 St. ¶ 357; Defs. 56.1 Resp. ¶ 357.)[16]

---

[16] Defendants dispute Pl. 56.1 St. ¶ 357, stating it is hearsay, but this dispute appears to relate to the first sentence of Pl. 56.1 St. ¶ 357 (which cites to testimony from Plaintiff concerning Urban's reaction) rather than the second sentence which is based on testimony by Urban. (Defs. 56.1 Resp.

### e.  Attack on Plaintiff

Following the meeting with Parole Officer Urban, Ms. Idiakheua accompanied Mr. Suarez to submit his benefits applications. (Pl. 56.1 St. ¶ 363; Defs. 56.1 Resp. ¶ 363.) After submitting the applications, Ms. Idiakheua and Mr. Suarez stopped at a store and for food. (Pl. 56.1 St. ¶ 363; Defs. 56.1 Resp. ¶ 363; *see also* Defs. 56.1 St. ¶¶ 71-72; Pl. 56.1 Resp. ¶¶ 71-72.)

Mr. Suarez testifies that while Ms. Idiakheua went inside the store, he remained alone in the car for approximately 25 to 30 minutes and that he began hearing voices that told him to protect himself because someone dear to him was going to hurt him. (Pl. 56.1 St. ¶ 364; Defs. 56.1 Resp. ¶ 364.) He did not tell Ms. Idiakheua that he was hearing voices or was symptomatic. (Pl. 56.1 St. ¶ 366; Defs. 56.1 Resp. ¶ 366.)

After they returned home, Mr. Suarez violently attacked his mother, stabbing her repeatedly and causing significant injuries, before he realized what he was doing and fled the premises. (Pl. 56.1 St. ¶¶ 367-69; Defs. 56.1 Resp. ¶¶ 367-69; Defs. 56.1 St. ¶ 73; Pl. 56.1 Resp. ¶ 73.) Plaintiff was transported to a hospital where she was treated for her injuries. (Pl. 56.1 St. ¶ 370; Defs. 56.1 Resp. ¶ 370.) These injuries included seven stab wounds, fractured ribs, and a punctured lung. (Pl. 56.1 St. ¶ 372; Defs. 56.1 Resp. ¶ 372.) Ms. Idiakheua has lasting physical and emotional wounds from the attack. (Pl. 56.1 St. ¶¶ 387-92; Defs. 56.1 Resp. ¶¶ 387-92.)

Shortly after the attack, Mr. Suarez was located by police officers. (Pl. 56.1 St. ¶ 373; Defs. 56.1 Resp. ¶ 373.) Mr. Suarez stated that he encountered a small child at Ms. Idiakheua's apartment prior to the attack, even though he and Ms. Idiakheua were the only people there. (Pl. 56.1 St. ¶ 374; Defs. 56.1

---

¶ 357.) The court is considering the second sentence here and therefore does not need to consider whether the first is hearsay.

Resp. ¶ 374.) Mr. Suarez was charged with attempted murder and assault. (Pl. 56.1 St. ¶ 375; Defs. 56.1 Resp. ¶ 375.) He was permitted by the State to plead "not responsible by reason of mental disease or defect." (Opp., Ex. 54 (Dkt. 114-54) at ECF 10-11; *see also* Pl. 56.1 St. ¶ 376; Defs. 56.1 Resp. ¶ 376.) As a result he, was civilly committed after examination and reports by two doctors. (Pl. 56.1 St. ¶ 376; Defs. 56.1 Resp. ¶ 376.) At the time of Plaintiff's briefing for the present motion, Mr. Suarez resided at Kirby. (Pl. 56.1 St. ¶ 379; Defs. 56.1 Resp. ¶ 379.)

Following his arrest, an order of protection was put into effect prohibiting contact with his mother for two years. (Pl. 56.1 St. ¶¶ 385-86; Defs. 56.1 Resp. ¶¶ 385-86.) Once the order of protection ended, Plaintiff made regular visits to Kirby to see her son. (Opp., Ex. 59 (Dkt. 114-59) ("Maritza Idiakheua Tr.") 115:20-116:3; Opp., Ex. 15 (Dkt. 114-15) ("Elvin Suarez Tr.") 96:2-14.) Both Ms. Idiakheua and Mr. Suarez testify that his condition has considerably improved while at Kirby. (Pl. 56.1 St. ¶ 381; Defs. 56.1 Resp. ¶ 381; *see also* Maritza Idiakheua Tr. 116:4-8.)

### 2.   Defendants' Roles at Downstate

The court now turns to Defendants' roles and their actions relevant to Plaintiff's claims. At all relevant times, Defendants were employees of the New York State Department of Corrections and Community Supervision ("DOCCS") or the New York State Office of Mental Health ("OMH") who worked at Downstate or with Mr. Suarez upon his release.

### a.   *Defendant Horan*

Defendant Peter Horan was the Supervising Offender Rehabilitation Coordinator at Downstate. (Pl. 56.1 St. Supp. ¶ 24; Defs. 56.1 Resp. ¶ 24.) In this role, Defendant Horan held disciplinary hearings to determine sanctions for inmates in connection with

disciplinary violations. (Pl. 56.1 St. Supp. ¶¶ 25, 175; Defs. 56.1 Resp. ¶¶ 25, 175.)

After being assigned to preside over Mr. Suarez's hearing, Defendant Horan delayed the disciplinary hearing multiple times. He first requested and received an extension beyond the prescribed seven-day deadline to hold the hearing. (Pl. 56.1 St. ¶ 178; Defs. 56.1 Resp. ¶ 178.) Defendant Horan does not recall why he was unavailable to initiate Mr. Suarez's hearing on time; the record reflects that the reason offered was "hearing officer unavailable." (Pl. 56.1 St. ¶ 178; Defs. 56.1 Resp. ¶ 178.) Then, once the hearing began on August 15, 2017, Defendant Horan adjourned the hearing to solicit information from OMH regarding Mr. Suarez's fitness to proceed and his suitability for disciplinary housing. (Pl. 56.1 St. ¶¶ 182-84; Defs. 56.1 Resp. ¶¶ 182-84.) The confidential testimony was meant to be taken on August 18, 2017, but was delayed until August 21, 2017. (Pl. 56.1 St. ¶¶ 185-86; Defs. 56.1 Resp. ¶¶ 185-86.) These delays resulted in Mr. Suarez remaining in SHU from August 8, 2017, the date of his violation, until August 22, 2017, when his disciplinary hearing concluded. (Pl. 56.1 St. ¶ 180; Defs. 56.1 Resp. ¶ 180.)

During the disciplinary hearing, Defendant Horan's remarks indicate that he understood Mr. Suarez to be exhibiting signs of mental illness. He stated that he was not surprised Mr. Suarez was designated as having a serious mental illness and that Mr. Suarez's mental illness clearly affected his disciplinary violation which was the subject of the hearing. (Pl. 56.1 St. ¶¶ 202-06; Defs. 56.1 Resp. ¶¶ 202-06.) In addition, Maura DiNardo, a SHU clinician who also served on the JCMC at this time, testified at the hearing that Mr. Suarez was "not suitable for confinement in disciplinary housing due to the mental illness." (Pl. 56.1 St. ¶¶ 39, 194; Defs. 56.1 Resp. ¶¶ 39, 194; *see also* Opp., Ex. 56 ("DiNardo Hearing Tr.") (Dkt. 114-56) 5:11-15.)

16

Ms. DiNardo also stated that it appeared that the disciplinary violation that was the subject of the hearing was "related to the inmate patient's mental health symptoms" and that mitigating factors were present and should be given consideration. (DiNardo Hearing Tr. 5:3-10.) Defendant Horan has acknowledged that OMH testimony should be given significant weight when considering a proper sentence in a Tier 3 hearing. (Pl. 56.1 St. ¶ 193; Defs. 56.1 Resp. ¶ 193.)

At the time of the hearing, Defendant Horan knew that Mr. Suarez was due to be released "very soon." (DiNardo Hearing Tr. 6:8-10; *see also* Pl. 56.1 St. ¶ 219; Defs. 56.1 Resp. ¶ 219.) He also understood that individuals with SMI could decompensate if not taking their medication, and he was aware of the risks for inmates going right from a confined setting to the street. (Pl. 56.1 St. ¶¶ 218, 223-24; Defs. 56.1 Resp. ¶¶ 218, 223-24.)

Defendant Horan stated that when imposing Mr. Suarez's sentence, Mr. Suarez's "mental health issues were taken into consideration" and that he "wanted [Mr. Suarez] out of SHU as quickly as possible." (Pl. 56.1 St. ¶¶ 210, 217; Defs. 56.1 Resp. ¶¶ 210, 217.) However, he saw Mr. Suarez's continued confinement and isolation as warranted and necessary to "deter future similar behavior(s)." (Pl. 56.1 St. ¶¶ 220-21; Defs. 56.1 Resp. ¶¶ 220-21.) Horan also thought that the sentence was below applicable DOCCS guidelines, when in fact it was above the guidelines. (Pl. 56.1 St. ¶¶ 229-30; Defs. 56.1 Resp. ¶¶ 229-30.) Defendant Horan has also stated that he was unfamiliar with the N.Y. Correction Law § 137 or that DOCCS must divert someone with a serious mental illness to a residential treatment program rather than disciplinary housing under certain circumstances. (Pl. 56.1 St. ¶¶ 73, 227; Defs. 56.1 Resp. ¶¶ 73, 227.)

### b. *Defendant Morton*

Defendant Robert Morton was the Superintendent of Downstate, and responsible for the supervision and management of the facility. (Pl. 56.1 St. (Dkt. 113) ¶¶ 2, 7; Defs. 56.1 Resp. ¶¶ 2, 7.) In this role, Defendant Morton reviewed Tier 3 disciplinary hearing packets to ensure sanctions did not exceed guidelines or contain procedural violation, signed off on disciplinary sanctions and had the authority to recommend to Albany that sanctions be reduced. (Pl. 56.1 St. ¶¶ 22-23; Defs. 56.1 Resp. ¶¶ 22-23.)[17]

Defendant Morton was immediately notified of Mr. Suarez's assault and signed the related report detailing the incident. (Pl. 56.1 St. ¶¶ 129, 134; Defs. 56.1 Resp. ¶¶ 129, 134.) Defendant Morton also reviewed Mr. Suarez's sanction and approved it, reviewing a document noting forty-four days of disciplinary confinement consisting of 14 days' SHU (served prior to the hearing) and 30 days' keeplock. (Pl. 56.1 St. ¶¶ 237-38; Defs. 56.1 Resp. ¶¶ 237-38; *see also* Opp., Ex. 47 (Dkt. 114-47) at ECF 5.) Defendant Morton has acknowledged approving the above-guidelines sentence. (Pl. 56.1 St. ¶¶ 242-43; Defs. 56.1 Resp. ¶¶ 242-43; *see also* Opp., Ex. 47 at ECF 1.) There is a dispute as to whether Defendant Morton signed off on Mr. Suarez's deprivation order which was in effect for the first seven days he was in SHU. (Pl. 56.1 St. ¶ 150; Defs. 56.1 Resp. ¶ 150.)

As it relates to Mr. Suarez's discharge, Defendant Morton was personally responsible for applying for Mr. Suarez's AOT, and he ultimately signed his AOT petition, which a court granted a week prior to Mr. Suarez's release. (Pl. 56.1 St. ¶¶ 278-80; Defs. 56.1 Resp. ¶¶ 278-80.)

---

[17] There is a dispute as to the authority of Defendant Morton to reduce the sanction. *Id.* However, undisputed is that Morton was in the position to at least make a recommendation for such reduction. *Id.*

### c.  *Defendant Lahey*

Defendant Ryan Lahey was the Mental Health Unit Chief at
Downstate, employed by OMH, and responsible for the facility's
clinical and treatment areas. (Pl. 56.1 St. ¶¶ 28, 32; Defs. 56.1
Resp. ¶¶ 28, 32.) In this role, Lahey reviewed the treatment
plans of all patients and he supervised and could provide input
on these treatment plans. (Pl. 56.1 St. ¶ 35; Defs. 56.1 Resp. ¶
35.) He also held OMH treatment team meetings at least once a
week to discuss any concerns the treatment team had about
specific patients. (Pl. 56.1 St. ¶ 37; Defs. 56.1 Resp. ¶ 37.) And
he was required to complete rounds in SHU once a week, where
he would attempt to engage with every person in SHU. (Pl.
56.1 St. ¶¶ 50-51; Defs. 56.1 Resp. ¶¶ 50-51.)

Defendant Lahey was also chair of the Joint Care Management
Committee ("JCMC"). This committee was responsible for re-
viewing, monitoring, and coordinating the treatment plans of
any inmate placed in segregated confinement and assigned to
OMH's caseload. (Pl. 56.1 St. ¶¶ 10, 40; Defs. 56.1 Resp. ¶¶ 10,
40.) This review included a review of an inmate's confinement
sanctions, including a review of inmates sentenced to keeplock,
even if served in a general population cell. (*See* Pl. 56.1 St. ¶ 47;
Defs. 56.1 Resp. ¶ 47.) Any recommendation would then go to
the facility's Superintendent, which was Defendant Morton at
Downstate. (Pl. 56.1 St. ¶ 44; Defs. 56.1 Resp. ¶ 44.)

Defendant Lahey was made aware of the disciplinary incident
leading to Mr. Suarez's confinement. After the incident, Lahey
received an immediate emergency phone referral for a more
complete mental health evaluation, which led to a fifteen-mi-
nute meeting with an OMH psychologist. (Pl. 56.1 St. ¶¶ 136-
38; Defs. 56.1 Resp. ¶¶ 136-38.)

There is a dispute over whether, after Mr. Suarez's disciplinary
sanction, the JCMC reviewed and made a recommendation to
Defendant Morton concerning the sanction. (*See* Pl. 56.1 St. ¶

245; Defs. 56.1 Resp. ¶ 245.) If so, Defendant Morton would also review and sign off on such recommendations. (Pl. 56.1 St. ¶ 11; Defs. 56.1 Resp. ¶ 11.) As discussed *infra*, the parties also dispute Lahey's awareness of Mr. Suarez's mental condition prior to his release. If an OMH employee, including Defendant Lahey, determined that Mr. Suarez required immediate mental health treatment, the OMH employee would be able to place Mr. Suarez into such treatment regardless of the hearing date or sanction imposed. (Defs. 56.1 St. ¶ 39-40, 44-45; Pl. 56.1 Resp. ¶ 39-40, 43-45.) Defendant Lahey notes that once OMH reached a conclusion that someone was not fit for disciplinary housing, one would want them removed as soon as possible. (Pl. 56.1 St. ¶ 199; Defs. 56.1 Resp. ¶ 199.) The parties also dispute whether Defendant Lahey was also involved in and aware of Mr. Suarez's discharge plan. (Pl. 56.1 St. ¶ 247; Defs. 56.1 Resp. ¶ 247.)

### d. *Defendant Baker*

Defendant Chesney J. Baker is a Licensed Master Social Worker II at OMH and worked as a prerelease coordinator at Downstate. (Pl. 56.1 St. ¶ 52; Defs. 56.1 Resp. ¶ 52.) She worked with patients with SMI and was a member of Mr. Suarez's treatment team that prepared Mr. Suarez's discharge summary. (Pl. 56.1 St. ¶¶ 53-56 ; Defs. 56.1 Resp. ¶¶ 53-56.)

Defendant Baker was "primarily responsible" for sending the discharge summary to individuals supervising Mr. Suarez. (Pl. 56.1 St. ¶ 308; Defs. 56.1 Resp. ¶ 308.)

Defendant Baker began preparing the initial draft discharge plan for Mr. Suarez beginning on August 4, 2017, before his disciplinary action and placement in SHU, and there were minimal changes to the discharge summary between this date and the date of Mr. Suarez's release. (Pl. 56.1 St. ¶¶ 252, 296-97; Defs.

56.1 Resp. ¶¶ 252, 296-97.). As discussed, this discharge sum-
mary included multiple errors or omissions, including omitting
Mr. Suarez's disciplinary history at Downstate, his confinement
in SHU and keeplock, and Mr. Suarez's doctor evaluations which
reviewed his medication noncompliance and mental state. *See
supra.* The omissions occurred despite Defendant Baker's receipt
of Mr. Suarez's misbehavior report from the August 8 disciplinary
violation which led to his confinement in SHU and keeplock. (Pl.
56.1 St. ¶¶ 262-65; Defs. 56.1 Resp. ¶¶ 262-65.)

> e. *Defendant Yee-Foon*

Defendant Rene Yee-Foon was a Forensic Intensive Case Man-
ager at Downstate. (Pl. 56.1 St. ¶ 57; Defs. 56.1 Resp. ¶ 57.) In
that role, he was responsible for assisting seriously mentally ill
inmates to transition back into the community. (Pl. 56.1 St. ¶ 58;
Defs. 56.1 Resp. ¶ 58.) Defendant Yee-Foon was assigned to han-
dle Mr. Suarez's case upon his release from Downstate. (Pl. 56.1
St. ¶ 61; Defs. 56.1 Resp. ¶ 61.)

Yee-Foon was aware of Mr. Suarez's diagnosis of schizoaffective
bipolar disorder and Mr. Suarez's refusal of medication. (Pl.
56.1 St. ¶ 330; Defs. 56.1 Resp. ¶ 330; *see also* Opp., Ex. 5 (Dkt.
114-5) ("Yee-Foon Tr.") 67:5-68:5.) However, Mr. Yee-Foon
was given Plaintiff's discharge summary which improperly
stated that Mr. Suarez did not have any disciplinary infractions.
(Yee-Foon Tr. 75:16-76:8.)

While driving Mr. Suarez to Plaintiff's home upon his release
from Downstate, Defendant Yee-Foon observed that Mr. Suarez
was laughing and talking to himself. (Pl. 56.1 St. ¶ 327; Defs.
56.1 Resp. ¶ 327.) Defendant Yee-Foon recognized that this
laughter could be a sign of hallucination and asked Mr. Suarez
about it. (Pl. 56.1 St. ¶¶ 328-29; Defs. 56.1 Resp. ¶¶ 328-29.)
Mr. Suarez told Defendant Yee-Foon that he was "thinking
about funny things kids do that make you laugh." (Pl. 56.1 St. ¶
331; Defs. 56.1 Resp. ¶ 331.) After dropping Mr. Suarez off and

before leaving Plaintiff's home, Defendant Yee-Foon gave Plaintiff her card, listing his number and said to call if Plaintiff needed anything. (Defs. 56.1 St. ¶ 68; Pl. 56.1 Resp. ¶ 68.) Defendant Yee-Foon also told Plaintiff that Mr. Suarez had to be at his parole meeting the morning after his release and then attended that meeting alongside Parole Officer Urban. (Pl. 56.1 St. ¶¶ 338, 355; Defs. 56.1 Resp. ¶¶ 338, 355.)

### B.   Procedural Background

Plaintiff Maritza Idiakheua filed her initial Complaint on September 5, 2020, against the New York State Department of Corrections and Community Supervision, the New York State Office of Mental Health, Robert Morton, Ryan Lahey, Andrew C. Urban, and several John and Jane Doe defendants. (Dkt. 1.) Plaintiff then filed a First Amended Complaint on February 8, 2021, withdrawing her claims as to the New York State Department of Corrections and Community Supervision and the New York State Office of Mental Health. (Dkt. 22.) On April 9, 2021, Defendants filed a motion to dismiss Plaintiff's claims pursuant to Federal Rules of Procedure 12(b)(1) and 12(b)(6). (Dkt. 29.)

While Defendants' motion to dismiss was pending, Plaintiff, with permission of the court, filed the operative Second Amended Complaint (the "SAC") on March 3, 2022, against Defendants Lahey, Morton, Urban, Horan, Baker, and Yee-Foon (Dkt. 50.) In the SAC, Plaintiff brought claims under 42 U.S.C § 1983 and New York State tort law. (*See* SAC ¶¶ 132-155.) She seeks compensatory damages, punitive damages, an award of damages for lost wages, and attorneys' fees. (*Id.* ¶¶ 156-60.)

On October 18, 2022, the court granted Defendants' motion to dismiss the SAC in part, dismissing all claims against Parole Officer Urban, dismissing the Section 1983 substantive due process claim against Defendant Baker, dismissing the state-law negligence claim against Defendant Morton, dismissing the negligent infliction of emotional distress claim against all

Defendants, and dismissing the negligent supervision claim against Defendants Morton and Lahey. (Memorandum and Order dated October 18, 2022 (Dkt. 72) at 39-40.) *See also Idiakheua v. New York State Dep't of Corr. & Cmty. Supervision*, No. 20-CV-4169 (NGG) (SJB), 2022 WL 10604355 at *17 (E.D.N.Y. Oct. 18, 2022). The court denied the motion to dismiss Plaintiff's Section 1983 claims against Defendants Horan, Morton, Lahey, and Yee-Foon, and Plaintiff's state-law negligence claims against Defendants Horan, Baker, Yee-Foon, and Lahey.[18] *Idiakheua*, 2022 WL 10604355 at *17.

Upon the court's order granting in part and denying in part Defendants' motion to dismiss, and following the completion of discovery, Defendants moved for summary judgment as to Plaintiff's remaining claims arguing that there are no triable issues of fact or that Defendants are entitled to qualified immunity. (Not. of Mot. at 1.)

## II. LEGAL STANDARD

Summary judgment is warranted where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "An issue of fact is material for these purposes if it might affect the outcome of the suit under the governing law." *Konikoff v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000). A "genuine" issue of fact is one where "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party,

---

[18] Defendants' motion to dismiss the negligence claim against Defendant Lahey was "DENIED as it relates to Mr. Suarez's disciplinary confinement but GRANTED as it relates to Defendant Lahey's failure to properly treat Mr. Suarez while in custody." *Idiakheua*, 2022 WL 10604355 at *16.

there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

All evidence is construed in the light most favorable to the non-moving party, with all reasonable inferences drawn in its favor. *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998). "[T]he party opposing summary judgment must identify specific facts and affirmative evidence that contradict those offered by the moving party to demonstrate that there is a genuine issue for trial." *Am. Empire Surplus Lines Ins. Co. v. Certain Underwriters at Lloyd's London*, No. 16-CV-5664 (AMD) (JO), 2018 WL 10456838, at *4 (E.D.N.Y. July 23, 2018).

## III. DISCUSSION

Following the court's order granting in part and denying in part the defendants' motion to dismiss, Plaintiff's remaining claims against Defendants are for violation of her rights under 42 U.S.C. § 1983, (SAC ¶¶ 132-35), and for negligence under New York law. (SAC ¶¶ 136-41). These claims are reviewed in turn.

### A. 42 U.S.C. § 1983 Claims

#### 1. Legal Framework

Plaintiff seeks damages under 42 U.S.C. § 1983, arguing that Defendants violated her substantive due process rights by taking affirmative actions that created or enhanced the risk that Mr. Suarez would attack her upon his release from Downstate. (SAC ¶¶ 132-35; Opp. at 11.)

Section 1983 imposes liability for depriving an individual of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States when acting under color of state law. 42 U.S.C. § 1983.

Generally, individuals may not bring suits under Section 1983 for "a State's failure to protect an individual against private violence[.]" *Pena v. DePrisco*, 432 F.3d 98, 108 (2d Cir. 2005) (quoting *DeShaney v. Winnebago Cty. Dep't of Social Services*, 489 U.S. 189, 197 (1989)). However, when state actors "affirmatively created or enhanced the danger of private violence," the state actor may be liable under Section 1983 for violating the plaintiff's rights under the Fourteenth Amendment's Due Process Clause. *Okin v. Vill. of Cornwall-On-Hudson Police Dep't*, 577 F.3d 415, 428 (2d Cir. 2009). This *Deshaney* exception is referred to as the "state-created danger" doctrine or theory of liability. *Okin*, 577 F.3d at 427-28. Liability premised on this doctrine requires showing that (1) the defendant took an affirmative action that that created or enhanced the risk of private violence, and (2) that the state actor's behavior was "so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Okin*, 577 F.3d at 427-28, 431.

### a.   Affirmative Act Requirement

The affirmative act requirement is met when "a reasonable factfinder [] could conclude that defendants, by their affirmative conduct, enhanced the danger." *Okin*, 577 F.3d at 430. The increased risk of danger "arises from the relationship between the state and the private assailant." *Pena*, 432 F.3d at 111. And the actions must have increased the risk of private violence to the plaintiff "as opposed to the overall public at large." *Sanchez v. City of New York*, 736 F. App'x 288, 291 (2d Cir. 2018) (Summary Order) (citing *Martinez v. California*, 444 U.S. 277, 284-85 (1980)).

In some cases, whether there was an affirmative act is clear. For example, in *Hemphill v. Schott*, the plaintiff alleged that police officers, after arriving at the scene of a drugstore robbery, returned a gun to the robbery victim, the store's manager, and

allowed him to join them in pursuit of the suspect (the plain-tiff). 141 F.3d 412, 418-20 (2d Cir.1998); *see also Okin,* 577 F.3d at 430 (discussing *Hemphill).* The manager then shot the plaintiff. *Id.* The Second Circuit held that, on these facts, the plaintiff sufficiently pleaded a violation of his "Fourteenth Amendment right not to be subjected to the excessive force of a third party who is aided and abetted by a state actor." *Id.* at 419. By contrast, in *Pitchell v. Callan,* the Second Circuit af-firmed dismissal of a due process claim against an off-duty police officer who did no more than fail to stop another off-duty police officer from shooting a houseguest. 13 F.3d 545, 549 (2d Cir.1994).

Determining whether there is an affirmative act is met is more difficult, however, when a plaintiff's claim is based on the de-fendant's "repeated, sustained inaction . . . in the face of potential acts of violence, [which] might constitute prior assur-ances." *Okin,* 577 F.3d at 430 (citing *Pena,* 432 F.3d at 111). In such cases, the court must "tread a fine line" when determining when conduct in such cases is properly considered passive as opposed to affirmative conduct. *Pena,* 432 F.3d at 109; *see also Idiakheua v. New York State Dep't of Corr. & Cmty. Supervision,* No. 20-CV-4169 (NGG) (SJB), 2022 WL 10604355, at *9 (E.D.N.Y. Oct. 18, 2022) (collecting cases).

In *Okin,* the Second Circuit held that this requirement was met where the defendant state actors "implicitly but affirmatively encourage[ed] or condon[ed] [a third party's] domestic vio-lence." 577 F.3d at 429-31. The officers' actions, including expressing camaraderie with the abuser by discussing football when responding to a domestic violence complaint, communi-cated that the third party's violence would go unpunished and thus "ratchet[ed] up the threat of danger" to the victim. *Id.* at 430. They "conveyed to [the third-party abuser] that he could continue to engage in domestic violence with impunity." *Id.* at

429-30. In such a situation, a reasonable factfinder could find that the affirmative action requirement was met. *Id.; see also Pena*, 432 F.3d at 111 (finding that implicit encouragement of drunk driving could meet the affirmative action requirement for a due process claim).

Thus, the affirmative act requirement may be met where the defendant engaged in direct action, sustained inaction that conveys prior assurances, or encouragement of private violence when such actions increase the risk of private violence to the plaintiff.

### b.   *Shock the Conscience Requirement*

The second requirement under the state-created danger doctrine is that the defendant officer's actions shock the conscience. This is a high standard. The "official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007). Intentionally inflicted injuries are the "most likely to rise to the conscience-shocking level," while "negligently inflicted harm is categorically beneath the threshold of constitutional due process." *Cnty. of Sacramento v. Lewis*, 523 U.S. 833, 849 (1998).

Whether recklessly inflicted harms are sufficiently "outrageous and egregious" to shock the conscience is context dependent. *See Pena*, 432 F.3d at 113. For instance, officers acting in the heat of the moment, such as police officers acting in the midst of a high-speed chase are unlikely to meet this standard. These officers must act decisively "in haste, under pressure and frequently without the luxury of a second chance." *Lewis*, 523 U.S. at 853; *see also Lombardi*, 485 F.3d at 82. In the absence of an opportunity for reflection, officers' actions may be reckless but they are unlikely to shock the conscience. *See Lewis* 523 U.S. at 851; *see also Matican*, 524 F.3d at 158-59; *Pena*, 432 F.3d at

113. Prison officials, by contrast, often "have time to make un-hurried judgments, upon the chance for repeated reflection, largely uncomplicated by the pulls of competing obligations." *Lewis*, 523 U.S. at 853. And for such officials, "forethought about an inmate's welfare is not only feasible but obligatory un-der a regime that incapacitates a prisoner to exercise ordinary responsibility for his own welfare." *Id.* at 851. Thus, in the prison context, officers' "deliberate indifference" to the risk of injury may reasonably be considered conscience-shocking. *Id.*

Even when there is opportunity for reflection, however, there still may be a "pull of competing obligations" which would mean that an officer's actions, even if increasing the risk of harm to the plaintiff, are not reasonably egregious. *Lombardi*, 485 F.3d at 83. Such competing obligations may include an of-ficer needing to decide whether to risk his own safety or the safety of a third party. *See Matican v. City of New York*, 524 F.3d 151, 159 (2d Cir. 2008) (police officers' conduct did not shock the conscience when they executed a sting operation in a way that endangered their informant because of the competing obli-gation of protecting officer safety). Or it may include a decision where, no matter what an officer decides, there will still be harm to some third party. *Lombardi*, 485 F.3d at 83-85 (finding that Environmental Protection Agency officials' misrepresenta-tion of air quality at Ground Zero clean-up site did not shock the conscience because, even though the pollution may have harmed individuals in the vicinity, there were competing obliga-tions to "avoid panic, keep order, restore services, repair infrastructure, and preserve the economy" following the 9/11 World Trade Center attacks). When third party injuries are col-lateral harms from a separate duty or obligation, the state officers' actions are unlikely to shock the conscience.

The nature of the threat is also relevant. In *Okin*, the Second Circuit considered it relevant in considering whether the officer

28

defendants' actions were conscience-shocking that the "serious and unique risks and concerns of a domestic violence situation are well known and well documented." 577 F.3d at 432. ("Given that domestic violence is a known danger that the officers were prepared to address upon the expected occurrence of incidents, the officers who responded to [plaintiff's] complaints had ample time for reflection and for deciding what course of action to take in response to domestic violence.") In such a situation where officers were deliberately indifferent in the face of a "known danger" of violence from a third party, the defendants' actions may shock the conscience. *Id.*

Ultimately, whether a state officer's reckless actions could reasonably shock the conscience is context dependent. There are a number of factors, however, that make officers' reckless actions more likely to be conscience-shocking: (a) when the officer significantly increases the risk of third-party harm; (b) when the officer is acting with the opportunity for reflection; (c) when the officer's actions do not implicate a pull of competing obligations; and (d) when the officer was acting in manner that increased the risk from a "known danger" whose risks are well known and well documented.

The court now turns to Plaintiff's Section 1983 claims before considering Defendants' qualified immunity defenses.

### 2. Application

Plaintiff argues that Defendants acted with deliberate indifference to the increased risk of private violence that the Defendants created, focusing in particular on the risk created by Mr. Suarez's confinement in SHU and keeplock, which Plaintiff argues led to his psychotic break and attack. (*See, e.g.,* Pl. 56.1 St. ¶¶ 163-65, 168; Defs. 56.1 Resp. ¶¶ 163-65, 168.) Defendants dispute this connection and move for summary judgment, arguing that there are no genuine disputes of material fact and that Plaintiff's claims fail as a matter of law.

Whether Defendants can demonstrate that there are no triable
issues of fact as to Plaintiff's Section 1983 claim requires a con-
sideration of the context in which Defendants acted. *See Okin*,
577 F.3d at 431. Thus, the court first reviews the context as
well as material issues relevant to Plaintiff's claim against each
Defendant before reviewing the claims against each Defendant.
Specifically, the court considers whether a reasonable jury
could find that: (1) Defendants would be reckless in disregard-
ing the increased risk that segregated confinement would lead
to an individual's psychotic episode; (2) whether Mr. Suarez's
confinement in SHU and keeplock led to his psychotic episode
and attack; and (3) whether Mr. Suarez's confinement in-
creased the specific risk to the Plaintiff as opposed to the public
at large.

     *a.   Defendants' Reckless Disregard of the Risks of*
            *Segregated Confinement*

A jury could reasonably find that the Defendants would be reck-
less in disregarding the risks of a psychotic episode from
prolonged confinement in SHU and keeplock immediately prior
to an inmate's release. That the risks of segregated confinement
were reasonably known to the Defendants can be inferred from:
their experience at Downstate; then-existing New York Correc-
tion Law; a recent settlement concerning segregated
confinement in the New York prison system; and the long line
of research considering the harms from segregated confine-
ment.

The Defendants were each DOCCS or OMH employees at
Downstate, a facility that was meant to support individuals with
serious mental illnesses and provide a large array of mental
health services to inmates. They each had experience working
with individuals with serious mental illness in a correctional set-
ting, and would have witnessed the impact that prolonged
solitary confinement has on individuals with SMI. A reasonable

jury could infer from Defendants' experience that they would be aware of the potential impact of solitary confinement on individuals with SMI.

New York's Segregated Housing Unit Exclusion Law ("SHU Exclusion Law"), in place at all times relevant to this action, established limitations and requirements when placing individuals with SMI in segregated confinement. (*See* Opp., Ex. 42 (Dkt. 114-42) ("N.Y. Correction Law § 137 (2017)").)[19] These limits were reasonably in recognition of the risks that segregated confinement posed to inmates with serious mental illnesses and the inmates' vulnerability to their conditions. When in segregated confinement, an inmate with SMI was required to be seen daily and diverted if showing signs of decompensation. (Defs. 56.1 St. ¶ 39-40, 44-45; Pl. 56.1 Resp. ¶ 39-40, 43-45.) If segregated confinement could be in excess of thirty days, the law required diversion out of segregated confinement, absent special circumstances. N.Y. Correction Law § 137(6)(d)(i) (2017). (*See also* Defs. 56.1 St. ¶ 12; Pl. 56.1 Resp. ¶ 12.)[20] Individuals with SMI

---

[19] New York's HALT Act amended this provision in 2022, adding additional restrictions to placement of individuals in segregated confinement that were not in effect at the times relevant to this action. *See* N.Y. Correct. Law § 137; *see also New York State Corr. Officers & Police Benevolent Ass'n, Inc. v. Hochul*, 607 F. Supp. 3d 231, 236 (N.D.N.Y. 2022) (discussing the HALT Act). This opinion considers the law that was in effect in 2017. N.Y. Correction Law § 137 (2017).

[20] These circumstances are: (1) when the reviewer finds that removal would pose a substantial risk to the safety of the inmate or other persons or a substantial threat to the security of the facility, even if additional restrictions were placed on the inmate's access to treatment, property, services or privileges in a residential mental health treatment unit; or (2) when the assessing mental health clinician determines that such placement is in the inmate's best interests based on his or her mental condition and that removing such inmate to a residential mental health treatment unit would be detrimental to his or her mental condition. N.Y. Correction Law

were also required to be assessed by a mental health clinician within fourteen days in segregated confinement to determine whether they should be diverted. N.Y. Correction Law § 137(6)(d)(ii)(C)-(D). For facilities with a Joint Case Management Committee (the "JCMC"), the JCMC makes recommendations for diversion or removal. *Id.* at § 137(6)(d)(ii)(C)-(D). Defendant Lahey chaired Downstate's JCMC. (Pl. 56.1 St. ¶ 37; Defs. 56.1 Resp. ¶ 37.) Lastly, even when not diverted or removed, inmates with SMI must still receive, absent exceptional circumstances, "a heightened level of care, involving a minimum of two hours each day, five days a week, of out-of-cell therapeutic treatment and programming." N.Y. Correction Law § 137(6)(d)(iii). New York law thus demonstrated the need to consider, at multiple stages, the impact that segregated confinement had on an inmate with a serious mental illness.

In addition, a little over one year prior to the relevant actions, a federal district court approved a "historic" settlement in a case in which DOCCS was a party and where plaintiffs challenged the use of segregated confinement in New York State prisons. *See Peoples v. Annucci*, 180 F. Supp. 3d 294, 297 (S.D.N.Y. 2016). The court observed "that the deleterious effects of isolated housing on inmates—especially to those assigned to long-term solitary confinement—are well-known and amply documented," and courts have noted this for over 135 years. *Id.* at 299-300 (citing *In re Medley*, 134 U.S. 160, 168 (1890)). The court also discussed the state of the research into the impact of segregated confinement, based on policy statements from the American Psychiatric Association, the American Public Health Association, the National Alliance on Mental Illness, the Society

---

§ 137(6)(d)(i), (ii)(E) (2017). Any determination that exceptional circumstances are present requires documentation in writing, noting the reasons the determination was made. *Id.* § 137(6)(d)(ii)(E).

of Correctional Physicians, and Mental Health America. *Id.*[21] These statements noted that the harms from segregated confinement on inmates with mental illnesses are especially pronounced. *Id.*

Plaintiff also submits a sworn expert report from Dr. Christopher Wildeman detailing the harms from segregated confinement and the specific impacts segregated confinement had on Mr. Suarez. (Wildeman Report (Dkt. 124-1).)[22] In this report, Wildeman concludes:

> (1) even extremely short stints in solitary confinement can have negative consequences for mental health; and (2) these effects do not dissipate immediately after release from solitary confinement and may linger for years; and (3) increase their risk of committing new crimes after release from prison, including violent crimes, because of a combination of negative effects on mental health and rapidly-learned coping mechanisms that contribute to struggles post-release. (Wildeman Report at ECF 16.)

In sum, Defendants were individuals who worked with inmates with serious mental illness at a time when: (1) New York law

---

[21] *See also, e.g.,* American Psychiatric Association, *Position Statement on Segregation of Prisoners with Mental Illness* (2012); American Public Health Association, *Solitary Confinement as a Public Health Issue, Policy No. 201310* (2013); National Alliance on Mental Illness, *Public Policy Platform Section 9.8*; Society of Correctional Physicians, *Position Statement, Restricted Housing of Mentally Ill Inmates* (2013); Mental Health America, *Seclusion and Restraints, Policy Position Statement 24* (2011).

[22] In their Reply, Defendants challenged the admission of Dr. Wildeman's report on the basis that it would be inadmissible at trial as an unsworn expert report. (*See* Defs. 56.1 Resp. ¶¶ 164-65.) This potential defect was cured for the Wildeman Report, however, when Plaintiff submitted a sworn declaration from Dr. Chris Wildeman verifying his report under penalty of perjury. (*See* Wildeman Report; *see also Sur* Reply at 2-3 (citing *New Old Music Grp., Inc. v. Gottwald,* 122 F. Supp. 3d 78, 86 n.5 (S.D.N.Y. 2015)).)

limited the use of segregated confinement on individuals with SMI; (2) a federal court recently finalized a settlement limiting the use of segregated confinement in New York prisons; and (3) there was a long line of research documenting segregated confinement's risks and harms to individuals with SMI. Taken together, Defendants, who have experience working with individuals with SMI in a correctional setting, would reasonably be aware of the risks of segregated confinement and would reasonably be reckless in disregarding these risks. This includes the risk that segregated confinement would cause an individual to decompensate and have a psychotic episode after his placement in SHU and keeplock.

### b. *Defendants' Causing Mr. Suarez's Decompensation and Attack*

A jury could also reasonably find a causal connection between Mr. Suarez's confinement and his attacking the Plaintiff upon his release. As discussed, the harms from segregated confinement on individuals with SMI, such as Mr. Suarez, are well-known and well documented. It is also undisputed that Mr. Suarez acted aggressively towards staff, was treatment noncompliant, and was due to be released to Plaintiff's home shortly after his detention in SHU and keeplock. And records show that when not receiving proper treatment, Mr. Suarez experienced psychosis, hallucinations and aggressive behavior. That his mental condition led to the attack is also supported by the State's allowing Mr. Suarez to plead "not responsible by reason of mental disease or defect." (Pl. 56.1 St. ¶ 375; Defs. 56.1 Resp. ¶ 375); *see also* Opp., Ex. 54 (Dkt. 114-54) at ECF 10-11.)

Plaintiff's expert, Dr. Wildeman, also concludes that:

> (1) solitary confinement placement almost certainly exacerbated the symptoms of mental illness that Mr. Suarez was exhibiting and (2) that it was obvious based both on anecdotal      evidence,      existing      professional      society

recommendations, and the scientific literature on the effects of solitary confinement that someone like Mr. Suarez would respond very poorly to solitary confinement placement and struggle greatly after release from it and (3) that it would not have been surprising if this poor adjustment, which was at least partially caused by his placement in solitary confinement, led to violent outbursts against those around him. (*Id.* at ECF 17.)

It is reasonable that Defendants would have been aware of the risk that Mr. Suarez's confinement in SHU and keeplock would cause his attack. Mr. Suarez's mental health history was well documented during his intake at Downstate. And there is, at least, a genuine dispute as to whether Defendants witnessed Mr. Suarez's decompensation, both before and after the disciplinary hearing. (*See, e.g.,* Pl. 56.1 St. ¶¶ 169-72, 200; Defs. 56.1 Resp. ¶¶ 169-72, 200). Defendant Horan received testimony from Ms. DiNardo in which she noted that Mr. Suarez was not suitable for confinement in disciplinary housing due to his mental illness. And Defendants Lahey and Morton were in roles that led them to make regular rounds among inmates in SHU or led to their receipt of reports concerning the welfare of inmates at Downstate or the conditions of their confinement. In addition, Plaintiff testifies that Mr. Suarez's deteriorating condition was evident when visiting him a few days prior to his release.

Thus, while the causal connection between Mr. Suarez's confinement in SHU and keeplock immediately prior to his release and his psychotic break and attack may not be generally apparent, a reasonably jury could find that the connection was apparent to these Defendants. The risk at issue here can therefore be considered a risk from a "known danger that the officers were prepared to address upon the expected occurrence of incidents." *See Okin*, 577 F.3d at 431-32.

       c.   *Defendants Increasing the Risk to Plaintiff as*
             *Opposed to the Public at Large*

Much of the discussion is on Defendants' actions in connection
to Mr. Suarez, but the focus for this motion must be on the in-
creased risk of harm to Ms. Idiakheua.[23] Plaintiff's claim
requires demonstrating that Defendants' actions increased the
particular risk of harm to her, as opposed to an increased risk to
the public at large. *See Sanchez v. City of New York*, 736 F. App'x
288, 291 (2d Cir. 2018) (Summary Order).

Defendants reasonably increased the particular risk of harm to
the Plaintiff by increasing the risk he would attack her by plac-
ing him in segregated confinement and keeplock immediately
prior to his release into Ms. Idiakheua's home without alerting
her to the risk that his condition posed. Ms. Idiakheua testifies
that she was not made aware of Mr. Suarez's segregated con-
finement or his disciplinary action at Downstate. (Pl. 56.1 St. ¶
319; Defs. 56.1 Resp. ¶ 319.) Plaintiff also testifies that she ex-
pected that if her son was not mentally fit, he would not be
discharged to her home. (Pl. 56.1 St. ¶ 322; Defs. 56.1 Resp. ¶
322.)

Plaintiff's expectations reasonably increased the risk to Plaintiff
and should have been considered by Defendants prior to releas-
ing Mr. Suarez to live with the Plaintiff. It would be reasonable
to expect that Downstate would at least evaluate Mr. Suarez for
signs of decompensation and provide accurate information of
his present condition to those known to be living with him. And
it was reasonable for Plaintiff to expect that Defendants would
not, immediately prior to Mr. Suarez's release, take affirmative
actions that worsened his mental state to such a degree that it

---

[23] Mr. Suarez brought a case in the Southern District of New York which
arises out of the same underlying conduct at issue here. *See Elvin Suarez v.
Anthony J. Annucci, et al.*, 20-cv-7133 (VB) (S.D.N.Y.).

caused him to have a psychotic episode that led to a violent attack.

In sum, a reasonable jury could find: (1) that Defendants would be reckless in disregarding the increased risk that segregated confinement would lead to an individual's psychotic episode; (2) that Mr. Suarez's confinement in SHU and keeplock led to his psychotic episode and attack; and (3) that Mr. Suarez's confinement increased the specific risk to the Plaintiff as opposed to the public at large.

The court now turns to Plaintiff's Section 1983 claims against Defendants Horan, Morton, Lahey and Yee-Foon.

### d.   Defendant Horan

Defendant Horan was the Supervising Offender Rehabilitation Coordinator at Downstate and he was assigned to preside over Mr. Suarez's disciplinary hearing.

There are triable issues of fact that Defendant Horan's actions increased the risk of private violence to Plaintiff and thus meet state-created danger doctrine's affirmative act requirement. Defendant Horan played a key role in Mr. Suarez's detention in solitary confinement and keeplock. He first prolonged Mr. Suarez's time in segregated confinement by delaying the disciplinary hearing multiple times. Then, after this delay, Horan sentenced Mr. Suarez to an additional 30 days of disciplinary confinement in keeplock despite warnings from the SHU clinician that Mr. Suarez was not suited for disciplinary confinement. He did so despite his awareness that Mr. Suarez would soon be released. A jury could thus reasonably find that Defendant Horan recklessly increased the risk of Mr. Suarez's decompensation and attack on Plaintiff.

Defendant Horan's conduct could also reasonably shock the contemporary conscience. As discussed, Mr. Suarez had a serious mental illness and a history of symptoms that included

psychosis and aggressive behavior. He was treatment non-compliant, appeared to be displaying symptoms at the time of sentencing, and was scheduled to be released very soon after the hearing when he would be living with his mother. Ms. DiNardo also testified at the disciplinary hearing that Mr. Suarez was not suitable for disciplinary housing due to his mental illness and that his behavior at the hearing appeared to be related to mental health symptoms.

Despite an awareness of Mr. Suarez's condition and his awareness of the risks of segregated confinement, Defendant Horan sentenced Mr. Suarez to keeplock for 30-days to be served after Mr. Suarez's fourteen days in SHU. He imposed this sentence when segregated confinement reasonably posed a "known danger" to individuals such as Mr. Suarez and Plaintiff. *See Okin*, 577 F.3d at 432. And he did so despite time to deliberate and consider the potential impact of his decision, and when "forethought about an inmate's welfare is not only feasible but obligatory" for officers in Defendant Horan's position. *Lewis*, 523 U.S. at 851. This was not a case in which an officer was making decisions in the midst of a high-speed chase. *See id.*

Defendant Horan's actions were also not taken while balancing "competing prison interests." *Snider*, 188 F.3d at 55. Prison officials are required to take action to protect the safety of staff or other inmates and the court does not call into question officials' initially removing Mr. Suarez after his disciplinary violation. But Defendant Horan did not simply remove an inmate that posed a present risk of danger. Defendant Horan extended Mr. Suarez's time in SHU and then sentenced him to keeplock when there were alternative for inmates suffering symptoms of mental illness. The purported reason for Defendant Horan's sentence, to deter future behavior, is not persuasive. As Defendant Lahey has acknowledged, inmates with serious mental illnesses are

38

unlikely to appreciate the deterrence aspect of a punishment.
(Pl. 56.1 St. ¶ 222; Defs. 56.1 Resp. ¶ 222.)

Considered together, when considering the undisputed facts,
the disputed facts in Plaintiff's favor and drawing inferences in
Plaintiff's favor, Defendants cannot demonstrate that no reason-
able jury could find that Defendant Horan's actions are
conscience-shocking. Defendants are thus unable to meet their
burden at summary judgment as to Plaintiff's Section 1983
claim against Defendant Horan.

### e. Defendant Morton

Defendant Morton was the Superintendent of Downstate. (Pl.
56.1 St. ¶¶ 2, 7; Defs. 56.1 Resp. ¶¶ 2, 7.) In this role, he was
responsible for the supervision and management of the facility
and for ensuring that inmates were treated in compliance with
applicable guidelines, state laws, rules and regulations. (Pl. 56.1
St. ¶¶ 14-15; Defs. 56.1 Resp. ¶¶ 14-15.)

A supervising officer cannot be held liable pursuant to 42 U.S.C.
§ 1983 under a theory of *respondeat superior*. *Richardson v.
Goord*, 347 F.3d 431, 435 (2d Cir. 2003). Instead, a "plaintiff
must plead that each Government-official defendant, through
the official's own individual actions, has violated the Constitu-
tion." *Tangreti v. Bachmann*, 983 F.3d 609, 616 (2d Cir. 2020)
(citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)). "The focus is on
what the *supervisor* did or caused to be done" and "[t]he factors
necessary to establish a [Section 1983] violation will vary with
the constitutional provision at issue." *Id.*

Here, a reasonably jury could find that Defendant Morton met
the affirmative action requirement based on his approval of Mr.
Suarez's sanction or Defendant Morton's sustained inaction in
the face of Mr. Suarez's potential psychotic episode and attack.
*Okin*, 577 F.3d at 430. As Superintendent, Morton was immedi-
ately notified of Mr. Suarez's assault on DOCCS staff (Pl. 56.1 St.

¶¶ 129, 134; Defs. 56.1 Resp. ¶¶ 129, 134.) He also made weekly visits to SHU. (Pl. 56.1 St. ¶¶ 16-18; Defs. 56.1 Resp. ¶¶ 16-18.) And Defendant Morton approved Mr. Suarez's above-guidelines sanction, despite Mr. Suarez's mental illness designation and his noncompliance with treatment. (Pl. 56.1 St. ¶¶ 243-44; Defs. 56.1 Resp. ¶¶ 243-44.) Defendant Morton's role as Superintendent also put him in the position to recommend a sentence reduction to Albany after being informed of the sentence, but he did not do so and instead accepted the sanction. (Pl. 56.1 St. ¶ 23; Defs. 56.1 Resp. ¶ 23.) Defendant Morton was also responsible for applying for Mr. Suarez's AOT petition and signed off on the petition prior to his release, which indicated an awareness of Mr. Suarez's treatment noncompliance and "resultant psychosis and high-risk behaviors" immediately prior to Mr. Suarez's release. (Pl. 56.1 St. ¶¶ 278-80; Defs. 56.1 Resp. ¶¶ 278-80.)

A reasonably jury could find that Defendant Morton's approval of Defendant Horan's sanction enhanced the risk of private danger to Plaintiff and that Plaintiff therefore meets the affirmative act requirement for her state-created danger claim. A reasonable jury could also find that Defendant Morton displayed sustained inaction in the face of potential acts of violence when considering: Defendant Morton being told of Mr. Suarez's confinement in SHU; Defendant Morton approving the sanction imposed by Defendant Horan, leading to Mr. Suarez's disciplinary confinement until his release; Defendant Morton's weekly visits to SHU where he may have been aware of Mr. Suarez's deteriorating mental state; and Defendant Morton's signing the AOT petition, which noted Mr. Suarez's mental state immediately, prior to his release to live with Plaintiff. Thus, a reasonably jury could find that Plaintiff meets the affirmative act requirement for her claim against Defendant Morton.

Taking actions that affirmatively increase the risk of private danger to Plaintiff may reasonably be considered conscience-shocking for many of the same reasons discussed when considering the claim against Defendant Horan. Specifically, the jury may consider that the risk of harm from Mr. Suarez's confinement was a known danger, that there was time for reflection, and that there are no competing priorities that would indicate that Mr. Suarez's continued confinement was warranted. Defendant Morton's leadership position is also relevant as it indicates that Morton may have had greater awareness of the degree of risk to which Plaintiff was exposed by Mr. Suarez's confinement. Morton was responsible for ensuring inmates were treated in compliance with then-existing laws, which included laws limiting the harmful impacts of solitary confinement on individuals with SMI. His actions that prolonged Mr. Suarez's stay in confinement despite the known harms from confinement could reasonably be found to constitute deliberate indifference to these harms and attendant risks to the Plaintiff. Thus, Defendant Morton's actions could reasonably shock the conscience.

Defendants have therefore not met their burden to show that there are no triable issues as to Plaintiff's Section 1983 claim against Defendant Morton.

### f. Defendant Lahey

Defendant Ryan Lahey was the Mental Health Unit Chief at Downstate and responsible for clinical treatment areas. (Pl. 56.1 St. ¶ 28; Defs. 56.1 Resp. ¶ 28.)

As with Defendants Horan and Morton, there are triable issues as to whether Defendant Lahey took affirmative actions that created or enhanced the danger to Plaintiff. As OMH Unit Chief, Defendant Lahey received a phone referral immediately after Mr. Suarez's disciplinary action and he was responsible for responding to this referral. Defendant Lahey was also required to

complete rounds in SHU once a week, where he would attempt to engage with every person in SHU. And Defendant Lahey also supervised and reviewed the treatment plans of all patients, and held OMH treatment team meetings at least once a week to discuss any concerns the treatment team had about specific patients. As chair of the JCMC, he also held meetings every two weeks where the JCMC would meet to review and coordinate treatment plans for individuals with SMI in SHU and keeplock. (Pl. 56.1 St. ¶¶ 40-43; Defs. 56.1 Resp. ¶¶ 40-43.) There are also genuine disputes as to: whether the JCMC reviewed Mr. Suarez's condition or confinement, (Pl. 56.1 St. ¶ 40; Defs. 56.1 Resp. ¶ 40); whether Defendant Lahey reviewed and issued a recommendation on Mr. Suarez's sanction, (Pl. 56.1 St. ¶ 245; Defs. 56.1 Resp. ¶ 245); and Defendant Lahey's role in preparing Mr. Suarez's discharge summary and release plan. (Pl. 56.1 St. ¶ 247; Defs. 56.1 Resp. ¶ 247.)

Taken together, as with Defendant Morton, there are triable issues as to whether Lahey either: (1) took actions that increased the risk to Plaintiff, including that he reviewed and issued a recommendation concerning Mr. Suarez's sanction; or (2) engaged in sustained inaction in the face of potential violence, starting from when Defendant Lahey was first notified of Mr. Suarez's confinement in SHU through Mr. Suarez's release. There are therefore triable issues as to whether Defendant Lahey meets the affirmative act requirement.

A reasonably jury could also find that Defendant Lahey's are conscience-shocking. As with Defendants Horan and Morton, Defendant Lahey would have known of the risks of Mr. Suarez's confinement as an individual who had a serious mental illness was non-compliant with treatment and who had displayed aggressive behavior. Defendant Lahey's actions reasonably demonstrated deliberate indifference to these risks despite an opportunity for reflection and despite the absence of a pull of

competing obligations that would justify Mr. Suarez's continued segregated confinement. For instance, the stated reason for the above-guidelines sanction was deterrence, but Lahey has acknowledged that individuals who suffer from serious mental illness may not appreciate the deterrence aspect of punishment. Taken together, Defendant Lahey could reasonably be found to have been deliberately indifferent to the risks Mr. Suarez's segregated confinement created for Plaintiff in a manner that shocks the conscience.

Thus, there are triable issues of fact as to whether Lahey engaged in affirmative acts that increased the risk of private violence and that his actions were conscience-shocking.

### g. *Defendant Yee-Foon*

Defendant Rene Yee-Foon was a Forensic Intensive Case Manager at Downstate. In this role, Yee-Foon assisted seriously mentally ill inmates to safely transition out of prison and into the community. He was assigned to handle Mr. Suarez's case upon Mr. Suarez's release from Downstate. (Pl. 56.1 St. ¶¶ 58, 61; Defs. 56.1 Resp. ¶¶ 58, 61.)

A crucial difference between Defendant Yee-Foon and the other Defendants is that Defendant Yee-Foon was not involved in the actions that led to Mr. Suarez's continued detention in SHU and keeplock. Plaintiff's claim against Yee-Foon is thus not based on Mr. Suarez's segregated confinement. Instead, it is based on Mr. Yee-Foon's driving Mr. Suarez to Plaintiff's home rather than seeking alternatives such as removal or involuntary civil commitment.

Plaintiff argues that when taking Mr. Suarez to her home, Defendant Yee-Foon should have been aware of the risk that Mr. Suarez posed. Mr. Suarez was laughing to himself without provocation and Yee-Foon would have been aware that this could be a sign of hallucination. Plaintiff also expressed concern about

Mr. Suarez's condition when Mr. Suarez reached her home, in-
cluding that he was released without medication, which Yee-
Foon has acknowledged is rare for someone with Mr. Suarez's
treatment history. Plaintiff argues that, rather than leaving Mr.
Suarez at Plaintiff's home, Yee-Foon could have pursued a num-
ber of alternatives including: moving to have Mr. Suarez civilly
committed; requesting a "removal" if he observed severe symp-
toms, which would lead a team to pick up Mr. Suarez and bring
him to a hospital; or making an application for a "higher level
of care" and recommend "assertive community treatment."
(Opp. at 20-21.)

However, even if acting affirmatively in ways that increased the
risk to Plaintiff, no reasonably jury could find that Defendant
Yee-Foon's actions were so reckless that they shocked the con-
science.

Initiating civil commitment proceedings requires an officer to
balance of competing priorities. "Involuntary civil commitment
to a mental institution has been recognized as a massive curtail-
ment of liberty, which, because it may entail indefinite
confinement, could be a more intrusive exercise of state power
than incarceration following a criminal conviction." *Project Re-
lease v. Prevost*, 722 F.2d 960, 971 (2d Cir. 1983). This liberty
interest is not lessened for individuals in the process of being re-
leased after a criminal sentence. *Bailey v. Pataki*, 722 F. Supp.
2d 443, 447 (S.D.N.Y. 2010) (citing *Vitek v. Jones*, 445 U.S.
480, 491–92 (1980)). Involuntary civil commitment therefore
generally requires a showing by clear and convincing evidence
that an individual has (1) a mental illness and (2) poses a
threat to themselves or others. *See Rodriguez v. City of New
York*, 72 F.3d 1051, 1062 (2d Cir. 1995). Emergency situations
allow for a lower standard, considering whether an individual's
mental illness is "likely to result in serious harm to the individ-
ual or others." *Id.* (citing MHL § 9.39(a)). But it will always

44

implicate a balance between the liberty interest of the individual being involuntarily committed and societal interests in mitigating the potential risk of danger. *Youngberg v. Romeo*, 457 U.S. 307, 320 (1982). A decision to initiate civil commitment often also implicates professional judgment in reviewing individual symptoms to determine whether commitment is warranted. *Fisk v. Letterman*, 501 F. Supp. 2d 505, 522 (S.D.N.Y. 2007).

Here, it was not conscience-shocking that Defendant Yee-Foon chose not to initiate involuntarily civil commitment proceedings. While Yee-Foon reasonably witnessed symptoms of Mr. Suarez's mental illness, there were not clear signs that Mr. Suarez posed a danger to himself or others. Notably, the discharge summary omitted information that may have been material in finding that Mr. Suarez posed a danger, including information about Mr. Suarez's disciplinary history at Downstate and his segregated confinement. Without this information, a jury could not reasonably find that Mr. Suarez posed such a high risk of danger to himself or others and Yee-Foon was deliberately indifferent to this risk by not initiating civil commitment proceedings when transporting Mr. Suarez. [24]

Defendant Yee-Foon is also unlike the other Defendants given the shorter time in which he had to act. Unlike the other Defendants, Defendant Yee-Foon was required to make a decision

---

[24] Although this court noted that the case at that stage could be analogized to driving a suicidal and distraught person to his home and leaving him alone which could meet the state-created doctrine's requirements, *Idiakheua*, 2022 WL 10604355, at *13 (citing *Armijo by & Through Chavez v. Wagon Mound Pub. Schs.*, 159 F.3d 1253, 1264 (10th Cir. 1998)), the court was considering Plaintiff's allegations that Mr. Suarez was exhibiting "clear signs of mental decompensation." *Id.* (citing (SAC ¶¶ 14, 119-20.)) Based on the record here, however, the signs of decompensation are not as clear as Plaintiff initially alleged.

that required a balance of competing interests based on his impressions of Mr. Suarez over the course of a drive home and his short visits with the Plaintiff the night of Mr. Suarez's release and at his parole hearing the following day. And, again, he was acting with incomplete information due to the omissions in Mr. Suarez's discharge summary. By contrast, Defendants Horan, Morton and Lahey acted over a period of weeks while Mr. Suarez was in SHU and keeplock with greater awareness of the extent of Mr. Suarez's condition, disciplinary action, and treatment history.

Defendant Yee-Foon's decision not to initiate civil commitment proceedings therefore does not shock the conscience as a matter of law. This is especially the case if operating, as courts are instructed to do in the Section 1983 context, from a "presumption that the administration of government programs is based on a rational decision-making process that takes account of competing social, political, and economic forces." *Lombardi v. Whitman*, 485 F.3d 73, 83-84 (2d Cir. 2007).[25]

The court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's Section 1983 claim against Defendant Yee-Foon and dismisses this claim.

## B.  Qualified Immunity

### 1.  Legal Framework

Defendants raise defenses of qualified immunity. Qualified immunity protects officers from liability when their actions do not

---

[25] Not initiating a "removal" request or an application for "assertive community treatment" also do not shock the conscience given the same considerations relating to an awareness of the danger that Mr. Suarez posed as well as the curtailment of Mr. Suarez's liberty (though the curtailment of liberty is relatively less than the curtailment of liberty resulting from involuntary civil commitment).

46

violate rights that were "clearly established" at the time of the violation. *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). "In resolving questions of qualified immunity at summary judgment, courts engage in a two-pronged inquiry." *Tolan v. Cotton*, 572 U.S. 650, 655 (2014). The first considers whether the facts, "taken in the light most favorable to the party asserting the injury," show that the officers' conduct violated a federal right. *Id.* at 655-56. The second considers whether the right was "clearly established" at the time of the violation. *Id.* at 656.

"A clearly established right is one that is sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). "The salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged conduct was unconstitutional." *Tolan*, 572 U.S. at 655 (citing *Hope*, 536 U.S. at 739). In making this inquiry, this court looks to "Supreme Court and Second Circuit precedent existing at the time of the alleged violation to determine whether the conduct violated a clearly established right." *Okin*, 577 F.3d at 433.

The Supreme Court has directed lower courts not to "define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741-42 (2011). At the same time, however, "qualified immunity law does not require a case on point concerning the exact permutation of facts that state actors confront in order to establish a clear standard for their behavior." *Hancock v. Cnty. of Rensselaer*, 882 F.3d 58, 69 (2d Cir. 2018); *see also White v. Pauly*, 580 U.S. 73, 79 (2017) ("[G]eneral statements of the law are not inherently incapable of giving fair and clear warning to officers, but in the light of pre-existing law the unlawfulness must be apparent."). State actors can "still be on notice that their conduct violates established law even in novel factual circumstances." *Hope v. Pelzer*, 536 U.S. 730, 741

(2002). This may occur when the alleged violation is "so obvi-ous" that officers committing this violation can be said to have "fair notice" despite an absence of materially similar binding precedent. *Id.* at 741.

Lastly, "[e]ven if this or other circuit courts have not explicitly held a law or course of conduct to be unconstitutional, the un-constitutionality of that law or course of conduct will nonetheless be treated as clearly established if decisions by this or other courts clearly foreshadow a particular ruling on the is-sue." *Jones v. Treubig*, 963 F.3d 214, 236 n.13 (2d Cir. 2020). "But precedent must have spoken with sufficient clarity to have placed the constitutional question at issue beyond debate." *Mara v. Rilling*, 921 F.3d 48, 68 (2d Cir. 2019).

The focus of this inquiry, again, is on ensuring that officers have "fair notice." *Hope*, 536 U.S. at 741. This serves the doctrine's purpose to "balance[] two important interests—the need to hold public officials accountable when they exercise power irre-sponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reason-ably." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009).

As an affirmative defense, defendants bear the burden to prove that the doctrine of qualified immunity bars liability for their ac-tions. *Jackler v. Byrne*, 658 F.3d 225, 242 (2d Cir. 2011). And when considering both prongs at summary judgment, facts must be taken in the light most favorable to the party asserting the injury. *Tolan,* 572 U.S. at 655-57.

## 2. Application

Defendants' qualified immunity defenses fail because, by the time of the relevant actions, Defendants were on notice that they violated "a person's due process rights by affirmatively cre-ating or increasing the risk of private violence against that person." *Okin*, 577 F.3d at 434.

48

The Second Circuit's discussion as to why qualified immunity did not apply in *Okin*—which focused on state officers' encouraging third-party violence from domestic abuse—is instructive as to why it also does not apply here. *See id.* at 433-34. In *Okin*, the Circuit held that, at the time of the relevant conduct, it was clearly established that police officers may violate a victim's substantive due process rights by explicitly or implicitly condoning or encouraging private violence against the victim. *Id.* at 433-34 (citing *Dwares v. City of New York*, 985 F.2d 94 (2d Cir.1993), *Pena v. DePrisco*, 432 F.3d 98, 111 (2d Cir.2005), and *Hemphill v. Scott*, 141 F.3d 412 (2d Cir.1998)). The cases relied on to reject Defendants' qualified immunity defense did not involve domestic violence. *Id. Pena* involved drunk driving, *Dwares* involved condoning violence against demonstrators, and *Hemphill* involved a situation in which officers gave a gun to a shopkeeper who then used the gun to shoot a robbery suspect.[26] Yet the Circuit still held that these cases "clearly established that police officers are prohibited from affirmatively contributing to the vulnerability of a known victim by engaging in conduct, whether explicit or implicit, that encourages *intentional* violence against the victim." *Okin*, 577 F.3d at 434. Further, the Circuit noted that while *Dwares* focused on explicit encouragement of private violence, affirmative conduct "runs along [a] spectrum

---

[26] In the present case, it is also not relevant that Horan did not explicitly or implicitly encourage violence. Instead, the emphasis in the Second Circuit has been on the foreseeability of harm to a third party from the officers' affirmative actions. *Hemphill* is illustrative on this point. Giving a gun to a robbery victim and allowing the victim to ride along to pursue the robber created a foreseeable risk of private violence to the robber, and the state violated his clearly established rights. The subjective intention of the officers was not relevant—they still violated their duty to the public by creating the risk of violence. So too here—Horan created known risks to Plaintiff by placing her son in conditions that predictably caused his mental deterioration.

of explicit and implicit actions" and officers' implicitly encouraging private violence did not undermine the "critical fact" that the police officers engaged in affirmative conduct that encouraged, condoned or facilitated private actors intending to commit private violence. *Id.* In further support of rejecting that qualified immunity applied, *Okin* cited *Hope* which held that "officials can still be on notice that their conduct violates established law even in novel factual circumstances," *id.* at 434 (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)), and noted that, at summary judgment, the facts are considered with reasonable inferences viewed in favor of the non-moving party. *See id.* at 434. Thus, although the Second Circuit had not previously held that officers violated due process rights by implicitly encouraging private violence in the domestic violence context, any reasonable officer in defendants' positions would know that their actions violated clearly established rights and qualified immunity therefore did not apply.

Turning to the present case, any reasonable officer in Defendants' positions would be on notice that recklessly increasing the risk of private violence by causing Mr. Suarez's psychotic break and attack violates Plaintiff's due process rights. As discussed, the Defendants were acting in a context in which the risks of danger from Mr. Suarez's segregated confinement were well known to individuals in their positions. The claim in *Okin* centered on defendants' implicitly communicating to a third party that the third party could "persist in intentional violence against [the plaintiff] without threat of punishment." 577 F.3d at 434. The Circuit thus found these actions violated the *Okin* plaintiff's clearly established due process rights. Here, the claim against Defendants focuses on their *causing* the third party to commit violence rather than *encouraging* a third party's intentional violence. In the present case, the claim does not rely on the third party's intentional, knowing, or even reckless conduct (as it did in *Okin*). Instead, state actors created conditions that they knew

or should have known caused decompensation and violent be-
havior that was outside of the third-party's, Mr. Suarez's,
control. Plaintiff's claim is therefore more direct than the claim
in *Okin*, which still required the third party to form the requisite
intent to commit the violence after the defendants' implicit con-
doning of the violence. If officers have fair notice that they
violate a victim's rights when *encouraging* third-party violence,
they are also on notice they violate a victim's due process rights
when *causing* third-party violence by taking actions that lead to
an individual's psychotic episode and attack on the victim.

The court therefore finds that qualified immunity does not bar
Plaintiff's claim against Defendant Horan based on his actions
increasing the risk to Plaintiff by extending Mr. Suarez's time in
SHU, sentencing him to additional confinement in keeplock, ig-
noring signs that Mr. Suarez's was not suitable for disciplinary
confinement, and acting with awareness that Plaintiff was to be
released soon to Plaintiff's home. Qualified immunity also does
not bar Plaintiff's claim against Defendants Morton and Lahey
who each reasonably enhanced the risk of private violence to
Plaintiff through affirmative actions in approving Defendant
Horan's sanction or demonstrating sustained inaction with de-
liberate indifference to the risk created by Mr. Suarez's
confinement in a manner that could reasonably be found to be
conscience-shocking.

In sum, the "critical fact" against Defendants Horan, Morton
and Lahey is that the state actors knew or should have known
that placing or approving of Mr. Suarez's confinement in SHU
and keeplock immediately prior to his release to his mother's
home recklessly enhanced the risk of third-party violence to
Plaintiff. The Second Circuit's prior holdings gave Defendants
fair notice that their actions violated Plaintiff's rights. Therefore,
when considering the facts in the light most favorable to Plain-
tiff and drawing reasonable inferences in Plaintiff's favor,

51

Defendants Horan, Morton and Lahey have not met their burdens to demonstrate that qualified immunity bars Plaintiff's claims. Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims against Defendants Horan, Morton and Lahey is DENIED.

### C.  State Law Negligence Claims

#### 1.  Legal Framework

Defendants move for summary judgment to dismiss Plaintiff's New York law negligence claims against Defendants Horan, Baker, Yee-Foon, and Lahey.

Under New York law, to establish a claim of negligence, "'a plaintiff must demonstrate (1) a duty owed by the defendant to the plaintiff, (2) a breach thereof, and (3) injury proximately resulting therefrom.'" *David v. The Weinstein Company*, 431 F.Supp.3d 290, 305 (S.D.N.Y. 2019) (citing *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 286 (2d Cir. 2006)).

"The threshold question in any negligence action is: does defendant owe a legally recognized duty of care to plaintiff?" *Hamilton v. Beretta U.S.A. Corp.*, 96 N.Y.2d 222, 232, *opinion after certified question answered*, 264 F.3d 21 (2d Cir. 2001). Generally, one does not have a duty to "control the conduct of third persons so as to prevent them from harming others." *Id.* at 233. A duty to an individual harmed by a third person may arise, however, in two scenarios relevant here: (1) where there is a relationship "between defendant and a third-person tortfeasor that encompasses defendant's actual control of the third person's actions" or (2) where there is a relationship "between defendant and plaintiff that requires defendant to protect plaintiff from the conduct of others." *Id.* "The key in each is that the defendant's relationship with either the tortfeasor or the plaintiff places the defendant in the best position to protect against the risk of harm." *Id.*

In considering the first of the two scenarios, control over the third party, the focus is on the degree of control the defendant has over the actions of the third party and the risk of harm to the plaintiff from the third party. *Davis v. S. Nassau Communities Hosp.*, 26 N.Y.3d 563, 574 (2015); *see also Purdy v Public Adm'r of County of Westchester*, 72 NY2d 1, 8 (1988). A treatment facility is therefore less likely to owe a duty to plaintiffs harmed by a resident who is free to leave the facility than a third party who is involuntarily committed or whose actions are otherwise more restricted. *See Avins v. Fed'n Emp. & Guidance Serv., Inc.*, 52 A.D.3d 30, 36 (2008) (citing *Purdy*, 72 NY2d at 9 and *Schrempf v State of New York*, 66 NY2d 289, 296 (1985)).

In the second of the two scenarios, the duty of care the defendant owes to the third party may, in limited circumstances, extend to a duty of care from the defendant to the injured plaintiff. In *Tenuto v. Lederle Lab.*, 90 N.Y.2d 606 (1997), the New York Court of Appeals concluded that a physician had a duty of reasonable care to the parents of a five-month-old to whom he administered an oral polio vaccine because the administration of the vaccine created a risk that the parents would contract polio through contact with their infant. The Court of Appeals found that the services performed to the child patient "necessarily implicate[d] protection of household members" and found that the duty to warn of the dangers of the oral polio vaccine extended to household members the "doctor knows or should know may suffer harm by relying on prudent performance of that medical service." *Tenuto*, 90 N.Y.2d at 613-14). A duty to the plaintiff is especially likely to be found in cases where the "services, by necessity, require advising the [plaintiffs]." *Tenuto*, 90 N.Y.2d at 614. Significantly, this duty arises from the defendant's affirmative actions that created the risk of harm to the plaintiff, as opposed to their position to prevent harms that the third-party may cause independent of the defendant's actions. *See McNulty v. City of New York*, 100 N.Y.2d 227, 233, 792 N.E.2d 162 (2003) ("[A]

critical factor [in *Tenuto*] was that the physician's acts in administering the [polio] vaccination to the infant . . . created the serious risk of physical harm to the parent"). Such a duty may be breached if not providing sufficient warning of the harm that may result from the doctor's actions. *Tenuto*, 90 N.Y.2d at 614.[27]

Lastly, the New York Court of Appeals has advised that courts "should proceed cautiously and carefully in recognizing a duty of care." *Davis*, 26 N.Y.3d at 580. "[A]ny extension of the scope of duty must be tailored to reflect accurately the extent that its social benefits outweigh its costs." *Hamilton*, 96 N.Y.2d at 232. And whether a duty exists may depend in part on whether the defendants were in "the best position to protect against the risk of harm" based on their relationship with the third party. *See Hamilton*, 96 N.Y.2d at 233. When the defendant was best positioned to protect against the risk of harm, "the balancing of factors such as the expectations of the parties and society in general, the proliferation of claims, and public policies affecting the duty proposed . . . [may] tilt[] in favor of establishing a duty running from defendants to plaintiffs[.]" *Davis*, 26 N.Y.3d at 574.

The court now considers Plaintiff's negligence claims against Defendants Horan, Baker, Yee-Foon and Lahey.

    2.   Application

    *a.*   *Defendant Horan*

Under New York law, "federal courts can only invoke their supplemental jurisdiction to hear state tort claims against correctional officers when the conduct falls outside the scope of their employment." *Idiakheua v. New York State Dep't of Corr. & Cmty. Supervision*, No. 20-CV-4169 (NGG) (SJB), 2022 WL

---

[27] While involving the conduct of a physician, the Court of Appeals considered the relationship that created a duty for causes of action in both negligence and malpractice. *Id.*

10604355, at *15 (E.D.N.Y. Oct. 18, 2022) (citing N.Y. Correction Law § 24).[28] In ruling on Defendants' motion to dismiss, this court thus found that Plaintiff could only bring claims against DOCCS officers if they were acting outside their employment, which led to the dismissal of negligence claims against Defendants Morton and Parole Officer Andrew Urban. *Id.* The court, however, did not dismiss the claim against Defendant Horan who is also a DOCCS employee. *Id.*

Because N.Y. Correction Law § 24 is jurisdictional, *see Curtis v. New York*, No. 22-CV-7201 (LTS), 2022 WL 14054222, at *3 (S.D.N.Y. Oct. 24, 2022), it cannot be waived.[29] And because Plaintiff does not assert that Defendant Horan was acting beyond his authority, his negligence claim must be dismissed. *See Parker v. Miller*, 199 F.3d 1323 (2d Cir. 1999).

The court therefore GRANTS Defendants' motion for summary judgment as to Plaintiff's negligence claim against Defendant Horan and dismisses this claim.

### b. *Defendant Baker*

Defendant Baker, a Licensed Master Social Worker II at the Office of Mental Health worked with patients with serious mental illnesses for discharge planning. She was part of the treatment team that prepared a discharge summary and release plan for

---

[28] "Even after the Supreme Court's decision in *Haywood v. Drown*—where the Court held that New York 'is not at liberty to shut the courthouse door to federal claims,' like Section 1983 claims, 'that it considers at odds with its local policy,' 556 U.S. 729, 740 (2009)—Section 24 continues to bar state law claims against DOCCS officers that are not brought to the Court of Claims unless the individuals acted outside their scope of employment." *Aurecchione v. Falco*, No. 22-CV-04538 (NSR), 2023 WL 6255529, at *8 (S.D.N.Y. Sept. 25, 2023).

[29] Plaintiff does not dispute this. (*See* Pl. Sur Reply (Dkt. 124) at 5.)

Mr. Suarez and was primarily responsible for sending this discharge summary to individuals that would supervise Mr. Suarez following his release. (Pl. 56.1 St. ¶ 288; Defs. 56.1 Resp. ¶ 288.)

Defendant Baker owed a duty of care to Plaintiff akin to the duty recognized by the Court of Appeals in *Tenuto v. Lederle Lab.*, 90 N.Y.2d 606 (1997), by virtue of her affirmatively increasing the risk of injury to Plaintiff, which created a duty to exercise reasonable care in advising Plaintiff of the risks posed by Mr. Suarez's treatment at Downstate.

Mr. Suarez's discharge summary had significant omissions that reasonably prevented Plaintiff from taking cautionary steps and thus increased the risk of his attack. The report did not review Mr. Suarez's disciplinary infractions since his arrival at Downstate, it did not note that Mr. Suarez was placed in SHU until his release, and it did not reference Mr. Suarez's doctor evaluations reviewing his condition prior to his release. Parole Officer Urban has pointed to the discharge summary's statement that Mr. Suarez had no disciplinary history at Downstate, including no history of keeplock, as significant and something he may have factored into his actions after Mr. Suarez's release. (Pl. 56.1 St. ¶¶ 303-04; Defs. 56.1 Resp. ¶¶ 303-04.) And Defendant Yee-Foon noted that it would have been important to know Mr. Suarez's disciplinary history at Downstate and his placement in SHU when considering whether Mr. Suarez would pose a danger. (Pl. 56.1 St. ¶ 306; Defs. 56.1 Resp. ¶ 306.) Defendant Lahey agrees that this should have been in Mr. Suarez's discharge summary. (Pl. 56.1 St. ¶ 306; Defs. 56.1 Resp. ¶ 306.) And Defendant Baker admits that Mr. Suarez's disciplinary history was important information, particularly for the next person working on the case. (Pl. 56.1 St. ¶ 301; Defs. 56.1 Resp. ¶ 301.)

Thus, Defendant Baker had and reasonably breached a duty to exercise reasonable care in preparing a discharge summary that she reasonably knew would advise Mr. Suarez's post-release

treatment team, and by extension the Plaintiff, of Mr. Suarez's condition. While Defendant Baker did not place Mr. Suarez in segregated confinement, she may have been in the best position to warn of the risk that Mr. Suarez's deteriorating mental condition resulting from his time at Downstate posed to the Plaintiff.

In recognizing this duty, the court thus finds that it is in accord with the New York Court of Appeals' cautionary approach to extending existing duties to avoid potentially limitless liability when treating third parties. *See Tenuto*, 90 N.Y.2d at 614. Here, as in *Tenuto*, the duty was owed to an immediately family member that Defendant Baker knew would provide care to Mr. Suarez upon his release. *See id.* ("Plaintiffs fall within a determinate and identified class--immediate family members--whose relationships to the person acted upon have traditionally been recognized as a means of extending and yet limiting the scope of liability for injuries caused by a party's negligent acts or omissions"). In addition, the claim focuses on the risk that arose based on Mr. Suarez's treatment at Downstate as opposed to an inability to affirmatively treat an underlying illness. *See Davis*, 26 N.Y.3d at 574-75 (discussing the New York Court of Appeals' decision in *McNulty v City of New York*, 100 NY2d 227 (2003), which "arguably constrained" *Tenuto* to cases where the injury arose from a physician's treatment of the patient as opposed to a failure to treat). Here, Plaintiff alleges that the attack resulted from Plaintiff's treatment which exacerbated his illness and led to his psychotic episode, rather than simply the failure to warn of Mr. Suarez's underlying condition.

Lastly, the court finds that Defendant Baker did not have a separate duty to exercise reasonable care based on her control over Mr. Suarez. Mr. Suarez was required to take part in outpatient treatment pursuant to a court order, but Plaintiff has not shown that the treatment team had control over Mr. Suarez's conduct

outside of emergency situations that would warrant civil commitment. In similar situations, New York courts have found that this degree of control does not establish a general duty to prevent third-party harm. *See Avins v. Fed'n Emp. & Guidance Serv., Inc.,* 52 A.D.3d 30, 36, 857 N.Y.S.2d 550 (2008) (dismissing a case where plaintiff did not allege a special duty on behalf of the defendant who operated programs providing housing and other services because there were not sufficient facts to demonstrate control over the resident who injured the plaintiff once they left the facility); *see also Purdy,* 72 NY2d at 9. Thus, Defendant Baker did not owe a duty to Plaintiff based solely on her control over Mr. Suarez.

In sum, the court finds that Defendant Baker owed a duty to exercise reasonable care to advise Plaintiff of Mr. Suarez's condition and a jury could reasonably find that Defendant Baker breached this duty based on her actions in the preparation of Mr. Suarez's discharge summary. For the reasons already discussed in considering the connection between Mr. Suarez's confinement, his psychotic episode, and his attack on Plaintiff, a jury could also reasonably find that Defendant Baker's negligence caused Defendant's injuries.

Thus, the court DENIES Defendants' summary judgment motion as to Plaintiff's negligence claim against Defendant Baker.

### c.  *Defendant Yee-Foon*

Plaintiff argues that Defendants waived their negligence arguments as to Defendant Yee-Foon because their initial motion did not address this claim. (Opp. at 22 n.14; Defs. Sur Reply at 6.) Defendants respond that Plaintiff was able to sufficiently address their argument relating to Defendant Yee-Foon's negligence by responding to the motion as it relates to the federal claims. (Reply at 10-11.) Plaintiff also addressed whether Defendant Yee-Foon was negligent in her Sur Reply. (*See* Sur Reply at 6-7.) Because of the overlap in factual issues concerning the negligence

and federal claims, and Defendants' ability to respond to Defendants' arguments in their Sur Reply, the court finds that Defendants' argument was not waived. The court thus considers whether to grant summary judgment as to Plaintiff's negligence claim against Defendant Yee-Foon.

As discussed when considering Plaintiff's Section 1983 claim, Defendant Yee-Foon was responsible for assisting Mr. Suarez to transition into the community after his release from Downstate. In this role, Defendant Yee-Foon drove Mr. Suarez to Plaintiff's home and then attended the meeting with the Parole Officer the following day. Plaintiff argues that Defendant Yee-Foon had a duty to Plaintiff based on his ability to control Mr. Suarez upon Mr. Suarez's release, and that Yee-Foon was negligent by not initiating civil commitment proceedings, requesting removal, and not warning Plaintiff of Mr. Suarez's lack of treatment and symptoms of decompensation. (Sur Reply at 7.)

For the reasons discussed when considering Plaintiff's Section 1983 claim, Plaintiff cannot show that Defendant Yee-Foon had a duty to exercise reasonable care to Plaintiff or breached this duty by acting negligently. While Defendant Yee-Foon could have requested a removal or have initiated involuntarily commitment proceedings, Yee-Foon's failure to do so was not negligent given: (1) the absence of clear evidence to Defendant Yee-Foon that Mr. Suarez posed a danger and (2) the need to weigh the risk of danger with the significant liberty interests curtailed by involuntarily commitment. Significant in this finding is the absence of an accurate discharge summary or evidence of more significant signs of the danger Mr. Suarez posed in Defendant Yee-Foon's presence.

The court therefore GRANTS summary judgment as to Plaintiff's negligence claim against Defendant Yee-Foon.

*d.   Defendant Lahey*

Defendant Lahey was OMH Unit Chief and Chair of the JCMC at Downstate. As discussed when considering Plaintiff's Section 1983 claim against Defendant Lahey, he would have known about Mr. Suarez's disciplinary action, confinement, mental health history and noncompliance with treatment. And there are triable issues concerning Defendant Lahey's awareness of the deterioration in Mr. Suarez's mental condition and whether he affirmatively approved of Mr. Suarez's segregated confinement, or whether he failed to act after being advised of Mr. Suarez's condition and confinement. There is also a dispute concerning his involvement in Mr. Suarez's discharge planning as a member of his treatment team. (Pl. 56.1 St. ¶ 247; Defs. 56.1 Resp. ¶ 247.)

As with Defendant Baker, Defendant Lahey's affirmative actions in increasing the risk of harm to Plaintiff created a duty to exercise reasonable care by advising or warning Plaintiff of the risk Mr. Suarez's confinement created. That Defendant Lahey had a duty to advise Plaintiff akin to the duty discussed by the New York Court of Appeals in *Tenuto* is especially appropriate in light of (1) Lahey's role in prolonging Mr. Suarez's stay in segregated confinement and keeplock, making Defendant Lahey's actions more analogous to the doctor who affirmatively created the risk to the parent plaintiffs in *Tenuto*, 90 N.Y.2d at 610-14; and (2) his position as OMH Unit Chief, which indicates that he would have had greater reason to know of the potential risks to Plaintiff that Mr. Suarez's condition posed, indicating that he was in a position to protect against the risk of harm to the Plaintiff, *see Davis v. S. Nassau Communities Hosp.*, 26 N.Y.3d 563, 572 (2015) ("A critical consideration in determining whether a duty exists is whether the defendant's relationship with either the tortfeasor or

the plaintiff places the defendant in the best position to protect against the risk of harm").[30]

Thus, Defendant Lahey had a duty to exercise reasonable care in advising Plaintiff of the risk that Mr. Suarez's confinement in SHU and keeplock created. For the reasons discussed when considering Plaintiff's Section 1983 claim, there are also triable issues as to whether Defendant Lahey was negligent and breached this duty, and whether his negligence caused Plaintiff's injuries.

Defendants' motion for summary judgment with regard to Defendant Lahey is therefore DENIED.

---

[30] The court notes that in *Davis*, the claim sounded in medical malpractice. Here, as discussed when considering Plaintiff's Section 1983 claim against Defendant Lahey, Mr. Suarez's segregated confinement does not implicate treatment decisions. Therefore, standard negligence is the proper claim against Defendant Lahey.

## IV. CONCLUSION

Defendants' motion for summary judgment is GRANTED in Part and DENIED in part. The court GRANTS Defendants' motion for summary judgment as to Plaintiff's Section 1983 claim against Defendant Yee-Foon and Plaintiff's negligence claim against Defendants Horan and Yee-Foon. These claims are dismissed. The court DENIES Defendants' motion for summary judgment as to Plaintiff's Section 1983 claims against Defendants Horan, Lahey and Morton, and Plaintiff's negligence claims against Defendants Baker and Lahey.

The Parties are DIRECTED to contact the chambers of Magistrate Judge Sanket J. Bulsara regarding next steps in the case.

SO ORDERED.

Dated:     Brooklyn, New York
           February 5, 2024

                                        s/NICHOLAS G. GARAUFIS
                                        NICHOLAS G. GARAUFIS
                                        United States District Judge